**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICHARD DOMINGUEZ, on behalf of himself and all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UAL CORPORATION | ) | |
| 1200 East Algonquin Road | ) | Civil Action: No. 1:07CV00418 (RJL) |
| Elk Grove Township, Illinois  60007 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED AIR LINES, INC. | ) | |
| 1200 East Algonquin Road | ) | |
| Elk Grove Township, Illinois  60007, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS THE
COMPLAINT FOR FAILURE TO STATE A CLAIM**

Defendants UAL Corporation and United Air Lines, Inc. (collectively, "United"),

respectfully move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the

complaint for failure to state a claim.  In support thereof, United states as follows:

1.      Plaintiff Richard Dominguez's complaint alleges that United possesses

"monopoly market power" in a relevant market he defines as "nonstop airline travel between the

airports serving the metropolitan Washington, D.C. area . . . and the San Francisco Bay Area

Airports . . . in either direction."  Compl. ¶ 1.  Dominguez claims that United's no-resale rule,

which provides that ticketed passengers may not resell or transfer their tickets and that a ticket

may not be presented for travel by a passenger other than the one for whom the ticket was issued,

constitutes an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1, and unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C.

§ 2. *Id.* ¶ 11. In this lawsuit, he seeks to compel United to allow customers to resell their United tickets "on a secondary marketplace such as eBay or the like." *Id.* ¶ 2.

2.    Dominguez's novel and unsupported complaint fails to state any cognizable claim and should be dismissed for at least five reasons:

a.    **NO SECTION 2 CAUSE OF ACTION (Count II).** Dominguez's Section 2 claim fails because he has not alleged any anticompetitive or unlawful conduct on the part of United. It is a sacrosanct principle of antitrust law that a seller—even a monopolist—has the unfettered right to choose with whom it will deal. Moreover, United's no-resale rule serves important business and security purposes.

b.    **NO SECTION 1 CAUSE OF ACTION (Count I).** Dominguez's Section 1 claim fails because he has not pled any "contract, combination or conspiracy" within the meaning of the statute. United's no-resale rule is imposed unilaterally. Furthermore, the rule is reasonable as a matter of law.

c.    **NO SHERMAN ACT CAUSE OF ACTION (Counts I and II).** Both of Dominguez's Sherman Act claims also fail because he has not alleged any anticompetitive or exclusionary effects in the relevant market. The hypothetical "secondary market" he asserts is infirm as a matter of law, and any anticompetitive effect within it would be speculative at best.

d.    **NO STANDING.** Dominguez lacks standing under the Clayton Act, 15 U.S.C. §§ 4, 16 to sue for treble damages and injunctive relief because the

indirect and speculative nature of the injury he alleges renders him an improper plaintiff for that purpose.

e.     **<u>NO UNJUST ENRICHMENT CAUSE OF ACTION (Count III).</u>**

Dominguez's claim for common law unjust enrichment is squarely preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) (preempting all state law causes of action "related to a price, route, or service of an air carrier").  Moreover, this quasi-contractual remedy is unavailable to Dominguez because he has pled the existence of a contract between himself and United.

3.     The specific grounds for this Motion are set forth in Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Complaint for Failure to State a Claim, which is incorporated by reference herein.

WHEREFORE, for all the reasons set forth in the accompanying memorandum of law, United respectfully requests that this Court dismiss all counts of the complaint with prejudice.  A proposed order is attached hereto.

Dated:  April 23, 2007

Respectfully submitted,

UAL CORPORATION and
UNITED AIR LINES, INC.


By: /s/ Richard J. Favretto

Richard J. Favretto (#156588)
John Roberti (#76397)
MAYER, BROWN, ROWE & MAW, LLP
1909 K Street, NW
Washington, DC  20006
T:  (202) 263-3000
F:  (202) 263-3300

*Attorneys for Defendants UAL Corporation
and United Air Lines, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RICHARD DOMINGUEZ, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UAL CORPORATION 1200 East Algonquin Road Elk Grove Township, Illinois  60007 | ) ) ) ) | Civil Action: No. 1:07CV00418 (RJL) |
| and | ) ) | |
| UNITED AIR LINES, INC. 1200 East Algonquin Road Elk Grove Township, Illinois  60007, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Of Counsel:
Ricks Frazier
Richard Fiore
UAL CORPORATION
UNITED AIR LINES, INC.
77 West Wacker Drive
Chicago, IL  60601
(312) 997-8077

Richard J. Favretto (#156588)
John Roberti (#76397)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000 (voice)
(202) 263-3300 (fax)

*Counsel for Defendants UAL Corporation and United Air Lines, Inc.*

Dated: April 23, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ALLEGATIONS OF THE COMPLAINT.................................................................... 3

ARGUMENT ................................................................................................................... 5

I.      STANDARDS GOVERNING A MOTION TO DISMISS................................. 5

II.     DOMINGUEZ'S SECTION 2 CLAIM FAILS BECAUSE THE CONDUCT
        ALLEGED IS PERMISSIBLE AS A MATTER OF LAW. ............................... 6

        A.      United's Choice Not to Allow Customers to Resell Tickets Is Fully
                Consistent with Its Right to Choose the Parties With Whom It Will Deal........... 7

        B.      Dominguez Has Not Pled Circumstances Requiring United to Assist
                Would-Be Competitors. .................................................................... 8

                1.      United's long-recognized legitimate business interest in offering
                        restricted discounted tickets justifies its no-resale rule.......................... 10

                2.      United's no-resale rule facilitates United's compliance with federal
                        security regulations. ............................................................... 12

                3.      Resale of tickets is rational for reasons other than exclusion. ................. 14

III.    DOMINGUEZ'S SECTION 1 CLAIM ALSO FAILS BECAUSE HE HAS NOT
        ALLEGED AN ILLEGAL RESTRAINT OF TRADE. ................................... 15

        A.      Dominguez Has Not Alleged Concerted Action Within the Meaning of
                Section 1........................................................................................ 16

        B.      Dominguez Has Not Alleged an Unreasonable Restraint of Trade Within
                the Meaning of Section 1. ................................................................ 18

IV.     DOMINGUEZ'S SHERMAN ACT CLAIMS FAIL TO ALLEGE ANY
        ANTICOMPETITIVE EFFECT IN THE RELEVANT MARKET................................ 18

V.      DOMINGUEZ LACKS STANDING TO BRING HIS ANTITRUST CLAIMS. .......... 21

        A.      Dominguez Does Not Have Standing to Sue for Treble Damages Under
                Section 4 of the Clayton Act. .......................................................... 21

        B.      Dominguez Does Not Have Standing to Sue for Injunctive Relief Under
                Section 16 of the Clayton Act. ......................................................... 23

VI.     DOMINGUEZ'S UNJUST ENRICHMENT CLAIM IS PREEMPTED AND
        NON-COGNIZABLE. ...................................................................... 24

CONCLUSION.............................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457 (D.C. Cir. 1991) .....................................................6

*Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24 (D.C. Cir. 1987) ................................22, 23

*Agency Dev., Inc. v. Med Am. Ins. Co.*, 310 F. Supp. 2d 538 (W.D.N.Y. 2004) ............................7

*Alpert's Newspaper Delivery Inc. v. N.Y. Times*, 876 F.2d 266 (2d Cir. 1989)............................7

*In re American Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552 (N.D. Tex. 2005) .................25

*\*Am. Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992).................................................16, 17

*\*Am. Airlines v. Wolens*, 513 U.S. 219 (1995) .......................................................................24, 25

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001)............................20, 22

*Ass'n of Retail Travel Agents, Ltd. v. Air Transport Ass'n of Am.*, 635 F. Supp. 534
    (D.D.C. 1986) ...........................................................................................................................18

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983).............................................................................................................22, 23

*\*Bitterman v. Louisville & Nashville R.R. Co.*, 207 U.S. 205 (1907) ..........................................10

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ........................................................22, 23

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999)................11

*Breitling U.S.A. Inc. v. Fed. Express Corp.*, 45 F. Supp. 2d 179 (D. Conn. 1999) ......................25

*Bridges v. MacLean-Stevens Studios, Inc.*, 201 F.3d 6 (1st Cir. 2000) ........................................16

*Buck v. Am. Airlines, Inc.*, 476 F.3d 29 (1st Cir. 2007) ................................................................25

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ........................................................24

*\*Covad Commc'ns v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ............................................9

*Covad Commc'ns v. Bell Atl. Corp.*, 407 F.3d 1220 (D.C. Cir. 2005) ...........................................9

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802 (6th Cir. 1988) ........................19

*Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.*, 972 F. Supp. 665 (N.D.
    Ga. 1997)...................................................................................................................................25

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077 (D.C. Cir. 1984) ...........................................5

*Gratz v. Bollinger*, 539 U.S. 244 (2003)..................................................................................24

*Gregg v. Barrett*, 771 F.2d 539 (D.C. Cir. 1985) ...................................................................5, 6

*Gregoris Motors v. Nissan Motor Corp. in U.S.A.*, 630 F. Supp. 902 (E.D.N.Y. 1986)..............20

*Hack v. Yale Coll.*, 237 F.3d 81 (2d Cir. 2000) ......................................................................19

*Harrington v. Delta Air Lines, Inc.,* No. Civ. A. 04-12558-NMG, 2006 WL 1581752 (D. Mass. Feb. 21, 2006)...........................................................................................................25

*Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.D.C. 2002) .............................................................4

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ...............................................5

*Lehman v. USAir Group, Inc.*, 930 F. Supp. 912 (S.D.N.Y. 1996) ...........................................25

*Levitch v. Columbia Broad. Sys., Inc.*, 495 F. Supp. 649 (S.D.N.Y. 1980)................................20

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)...........................................16, 17

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)....................................................25

*In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6 (D.D.C. 2004) ................................16, 23, 24

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986).........................9

*Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308 (D.C. Cir. 1982) ..............................16

*Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195 (7th Cir. 1981) ..............................16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ...........................20

*Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006)..................................................................9

*Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) .......................................................................................................................22

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)..................................................................................18

*Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384 (11th Cir. 1991)...............................................16

*\*Toscano v. Prof'l Golfers' Ass'n*, 258 F.3d 978 (9th Cir. 2001) ..............................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240 (D.C. Cir. 1996) ....................................................................................................................26

\**United States v. Colgate & Co.*, 250 U.S. 300 (1919) ........................................ *passim*

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .................................18

*Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999) ..............................................3

\**Verizon Commc'ns Inc. v. Trinko*, 540 U.S. 398 (2004) .................................. *passim*

*Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001) ...........17

**Statutes and Rules:**

15 U.S.C. § 1 ....................................................................................................... *passim*

15 U.S.C. § 2 ....................................................................................................... *passim*

49 U.S.C. § 114(h) .........................................................................................................13

49 U.S.C. § 41113(b) .....................................................................................................13

49 U.S.C. § 41113(d) .....................................................................................................13

49 U.S.C. § 41707 .....................................................................................................3, 15

49 U.S.C. § 41708(b)(3) ................................................................................................15

49 U.S.C. § 44709(a) .....................................................................................................15

49 U.S.C. § 41713(b)(1) ............................................................................................2, 24

49 U.S.C. § 44901(a) ...............................................................................................12, 13

49 U.S.C. § 44903(j)(2) ........................................................................................12, 13, 14

Fed. R. Civ. P. 12(b)(6)...................................................................................................5

Fed. R. Evid. 201 ...........................................................................................................15

**Regulations:**

14 C.F.R. § 221.107(b)(1)...............................................................................................15

14 C.F.R. § 243.7(a)(1)...................................................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

14 C.F.R. § 243.9 ................................................................................................13

14 C.F.R. § 253.4 ................................................................................................15

Notice of Final Order, 69 Fed. Reg. 65,619 (Nov. 15, 2004) .................................13, 14

Privacy Impact Assessment, 69 Fed. Reg. 57,352 (Sept. 24, 2002) ...............................14

**Miscellaneous:**

3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (2d ed. 2002)................................6

2 Phillip E. Areeda, et al., *Antitrust Law* ¶ 339 (2d ed. 2000) ......................................22

4 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 759e6 (2d ed. 2006) ........................7

9 *Corbin on Contracts* § 873 ...........................................................10

14 Am. Jur. 2d *Carriers* § 798..........................................................10

JetBlue Contract of Carriage, http://www.jetblue.com/p/jetblue_coc.pdf....................................15

Mardi Ruth Thompson & Kapila Juthani, *Providing Smarter Security and Customer Service: TSA's Secure Flight and Registered Traveler Programs*, 19-SPG Air & Space Law 8, 11 n.3 (2005) ....................................................................13

Southwest Airlines Contract of Carriage, http://www.southwest.com/ travel_center/coc.pdf...........................................................................15

United States Gen. Accounting Office, *Aviation Competition: Restricting Airline Ticketing Rules Unlikely to Help Consumers, Report to Congressional Committees* (July 31, 2001), http://www.gao.gov/new.items/d01831.pdf ..............3, 11, 12

## <u>INTRODUCTION</u>

This case presents a controlling question of law that can and should be resolved on the pleadings: does the Sherman Act require defendant United Air Lines, Inc.[1] to allow customers to resell their United tickets "on a secondary marketplace such as eBay or the like?" Compl. ¶ 2.

Antitrust law and policy provide a clear answer: No.

Antitrust law recognizes a firm's right to exercise its own independent discretion as to parties with whom it will deal. Courts are, and should be, extremely hesitant to interfere with a firm's choice of its own business partners, distributors, or customers. Plaintiff Richard Dominguez asks this Court to ignore these principles and to regulate United's discretion as to its business partners and customers. He seeks to use the Sherman Act to compel United to deal with customers it did not choose and competitors it does not wish to support. As such, Dominguez's novel and unsupported claims fundamentally offend the goals and purposes of antitrust law, conflict with antitrust precedent, and should be dismissed.

Specifically, Dominguez's complaint fails to state any cognizable claims for the following reasons:

***First***, Dominguez's claim for unlawful monopolization in violation of Section 2 of the Sherman Act (Count II) fails because the conduct alleged in the complaint is permissible as a matter of law. Dominguez has failed to plead any anticompetitive conduct on the part of United. It is a sacrosanct principle of antitrust law that a seller—even a monopolist—has the unfettered right to choose with whom it will deal. This includes the right to choose not to deal with unapproved resellers and also the right not to aid competitors. Dominguez has not pled the existence of circumstances triggering any of the narrow exceptions to this well-established rule.

---

[1]    United Air Lines, Inc. and defendant UAL Corp. will be referred to collectively as "United."

Indeed, it is evident that United's no-resale rule serves important business and security purposes. Dominguez, therefore, fails to state a Section 2 claim, and Count II should be dismissed.

**Second,** Dominguez's claim for an unlawful restraint of trade in violation of Section 1 of the Sherman Act (Count I) fails because Dominguez simply has not pled any "contract, combination or conspiracy" within the meaning of Section 1. United's no-resale policy is imposed unilaterally, not by concerted action, and as a matter of law cannot be the basis for a Section 1 conspiracy action. And even if United's unilateral act could be considered concerted action, Dominguez's Section 1 claim fails because the challenged conduct is reasonable as a matter of law. Count I therefore should be dismissed.

**Third**, Dominguez's Sherman Act claims fail because he has failed to allege any anticompetitive effects in the relevant market resulting from the challenged conduct. The complaint does not allege that United's no-resale rule affects any other air carrier in any way. Moreover, Dominguez's "secondary" market is infirm as a matter of law, and any actual anticompetitive effect therein would be speculative at best. Dominguez's failure to allege an anticompetitive effect is fatal to **both** of his Sherman Act claims, and Counts I and II should be dismissed.

**Fourth**, Dominguez lacks Clayton Act standing to sue for treble damages or injunctive relief because he does not allege a sufficiently direct relationship between the alleged wrongdoing and his purported injury. The injury he pleads is indirect and speculative. For this reason, both Counts I and II should be dismissed.

**Finally**, Dominguez's common law claim for unjust enrichment (Count III) fails because it is squarely preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1). The quasi-contractual remedy of unjust enrichment is unavailable for the additional reason that the parties'

express contract supersedes any quasi-contract claim under D.C. law.  Count III, therefore, should be dismissed.

## ALLEGATIONS OF THE COMPLAINT

For purposes of this motion only, United accepts the factual allegations of the complaint as true.  United is one of the world's largest airlines.  Compl. ¶ 10.  Dominguez alleges that United possesses "monopoly market power" in a relevant market he defines as "nonstop airline travel between the airports serving the metropolitan Washington, D.C. area . . . and the San Francisco Bay Area Airports . . . in either direction."  Id. ¶ 11.  Although two other airlines, JetBlue and Southwest, offer eight daily nonstop flights along United's purportedly monopolized route, Dominguez contends that the number of seats offered by these competitors "is so small compared to United's available seats in this market that they have no price-constraining effects."  Id. ¶ 17.  He further alleges that flights other than nonstop flights are not "a reasonable substitute" for nonstop flights.  Id. ¶ 12.

Dominguez, a Virginia resident, claims that he purchased a ticket from United for nonstop travel between Washington, D.C. and San Francisco.  Id. ¶ 9.[2]  Like all United tickets, and as specifically authorized by 49 U.S.C. § 41707, Dominguez's ticket incorporated by reference United's Contract of Carriage.  The Contract of Carriage, which is publicly available on United's website and is attached to this Memorandum as Exhibit A,[3] provides that "tickets are

---

[2]     Dominguez does not specify what type of ticket he purchased.  Like most airlines, United sells fully refundable tickets as well as less expensive tickets that are not fully refundable.  The less expensive tickets often are subject to terms and conditions on their availability and use, such as requirements for advance purchase, a Saturday night stay, departure before or after a particular time, and so on.  See, e.g., U.S. Gen. Accounting Office, Aviation Competition: Restricting Airline Ticketing Rules Unlikely to Help Consumers, Report to Congressional Committees (July 31, 2001) at 3, 14, http://www.gao.gov/new.items/d01831.pdf.

[3]     The nontransferability provisions contained in United's Contract of Carriage are referred to explicitly in and relied on by Dominguez throughout his complaint.  See Compl. ¶¶ 1–4, 9, 15–17, 19–23, 34, 37–38, 40, 43–44, 47, 51.  Because the Contract "is referred to in the complaint and is central to plaintiff[']s claim," it "may be

not transferable" and that "presentation of a ticket for transportation on [United] by someone other than the passenger named thereon renders the ticket void."  Exhibit A at Rule 100; *see also* Compl. ¶ 9.  The Contract of Carriage also provides that United may require "identification of persons purchasing tickets and/or presenting a ticket(s) for the purpose of boarding the aircraft" and may refuse to transport a passenger who is unable to "produce identification which reflects the same full name information displayed on the ticket(s)."  Exhibit A at Rule 35.

Dominguez contends that because these rules preclude resale of United tickets, they constitute an unlawful use of market power in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.  Compl. ¶¶ 5–7.  The purpose of the no-resale rule, he claims, is to "cement" United's purported monopoly by "unlawfully restrain[ing] trade" of, and "thwart[ing] the emergence of a secondary market for," travel on United's planes within the purported relevant market.  *Id.* ¶ 1.  Dominguez contends that if consumers were able to purchase United's tickets "on a secondary marketplace such as eBay or the like," United would be forced to lower its prices in response.  *Id.* ¶¶ 2, 17, 22.  He purports to represent a class "likely in the hundreds of thousands or millions" consisting of passengers who, since February 2, 2006 (when United emerged from bankruptcy), have purchased "from United or United's agent" a ticket for nonstop air travel within the alleged relevant market.  *Id.* ¶¶ 24, 26.

Notably, however, Dominguez does not allege that he wanted to or tried to resell his United ticket, or that if he had tried he would have succeeded.  He also does not allege that he wished to or tried to purchase a United ticket from a source other than United or its agents, or that if he had tried he would have succeeded.  In other words, Dominguez nowhere alleges that

---

considered without converting the motion to one for summary judgment."  *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999); *accord Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 110 (D.D.C. 2002).

United's no-resale rule *actually* prevented him from buying or selling a ticket in a "secondary marketplace."

## ARGUMENT

Courts consistently have recognized the fundamental right of a firm to choose the parties with whom it will deal.  *See, e.g.*, *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Accordingly, the general rule is that a firm may choose its form of distribution, its business partners, and its terms of sale.  This rule is not absolute, but the exceptions are extremely limited and simply are not present here.  Dominguez's complaint fails because United's decision not to allow customers to resell their tickets is neither exclusionary conduct within the meaning of Section 2 (*see* Section II, *infra*) nor concerted action within the meaning of Section 1 (*see* Section III, *infra*).

The other fundamental flaw in Dominguez's complaint is its failure to identify any harm cognizable under the antitrust laws.  When the curtain is pulled back, it is clear there is nothing behind the allegations of anticompetitive effects except pure speculation.  This is not enough to trigger antitrust scrutiny.  (*See* Sections III and IV, *infra*).  The complaint must be dismissed.

## I.     STANDARDS GOVERNING A MOTION TO DISMISS.

A complaint is subject to dismissal under Rule 12(b)(6) if it does not "set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted."  *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1081–82 (D.C. Cir. 1984).  The Court ordinarily accepts the plaintiff's well-pled factual assertions as true.  *See, e.g.*, *Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985).  But the Court is not required to "create, unaided by the plaintiff, new legal theories to support" the complaint, credit "legal conclusions cast in the form of factual allegations," or "accept inferences . . . unsupported by the facts set out in the complaint."  *Air Fla.*, 750 F.2d at 1081–82; *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276

(D.C. Cir. 1994); *see also ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 472 (D.C. Cir. 1991)

("District courts are not . . . required to speculate that factual propositions unmentioned, or

evidentiary links unrevealed, are among the facts plaintiff intends to prove at trial.").

Accordingly, a complaint must be dismissed where "even assuming all the factual allegations are

true, the plaintiff has failed to establish a right to relief based upon those facts." *Gregg*, 771 F.2d

at 547.  As demonstrated below, Dominguez manifestly fails to allege facts entitling him to

relief.  The Court therefore should grant United's motion to dismiss the complaint.

## II.     DOMINGUEZ'S SECTION 2 CLAIM FAILS BECAUSE THE CONDUCT ALLEGED IS PERMISSIBLE AS A MATTER OF LAW.

Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize, or attempt to

monopolize any part of the trade or commerce among the several States, or with foreign

nations."  15 U.S.C. § 2.  "The mere possession of monopoly power, and the concomitant

charging of monopoly prices, is not only not unlawful; it is an important element of the free-

market system."  *Verizon Commc'ns Inc. v. Trinko*, 540 U.S. 398, 407 (2004).  Consequently,

"the possession of monopoly power will not be found unlawful unless it is accompanied by an

element of anticompetitive *conduct*."  *Id.* (emphasis in original); *see also* 3 Phillip Areeda &

Herbert Hovenkamp, *Antitrust Law* ¶ 651c, at 78 (2d ed. 2002) ("Exclusionary behavior must be

conduct that prevents actual or potential rivals from competing or which impairs their

opportunities to do so effectively.").  Dominguez's complaint manifestly fails to meet this

standard because it fails to allege *any* unlawful exclusionary conduct on the part of United.

Indeed, the particular conduct alleged—United's rule prohibiting the resale of its tickets—is

permissible as a matter of law.

## A. United's Choice Not to Allow Customers to Resell Tickets Is Fully Consistent with Its Right to Choose the Parties With Whom It Will Deal.

Dominguez claims that United has engaged in exclusionary conduct by refusing to allow its customers to resell United tickets. This conduct, however, is not unlawful. United provides a service to the public, and has decided, for a number of legitimate reasons discussed below, to provide that service only to those customers who contract with United directly. This unilateral decision is legally justified given "the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Colgate*, 250 U.S. at 307.

Under *Colgate* and its progeny, a firm—even a monopolist—can choose with whom it will contract in providing a service. United is aware of no legal authority interpreting Section 2 of the Sherman Act to *require* a vertically integrated service provider (such as United) to perform its service for someone other than the customers with whom it contracts. Requiring United to allow ticket resale, and thus requiring it to provide a service to a reseller's assignee, would result in United losing control over who flies on its airplanes. Antitrust law does not compel such a result. Even in cases involving the distribution of an alienable good, courts repeatedly have recognized that a monopolist is generally free to control the distribution of its own product. *See, e.g.*, *Alpert's Newspaper Delivery Inc. v. N.Y. Times*, 876 F.2d 266, 269 (2d Cir. 1989) ("[V]ertical integration, even by a monopolist, does not offend Section 2 of the Sherman Act."); *Agency Dev., Inc. v. Med Am. Ins. Co.*, 310 F. Supp. 2d 538, 544 (W.D.N.Y. 2004) (same); 4 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 759e6 (2d ed. 2006) ("We would find de novo vertical integration by a monopolist per se lawful except in a few cases where all of the following conditions are met: . . . (2) the integration is not into distribution . . . ."). The facts of this case are even stronger in compelling adherence to *Colgate*, because United

7

is a service provider, not a manufacturer of alienable goods, and United is not alleged to have engaged in any course of dealing allowing any broker or customer to resell United tickets at any time.

For these reasons, *Colgate* and its progeny compel dismissal of Dominguez's Section 2 claim.

**B.      Dominguez Has Not Pled Circumstances Requiring United to Assist Would-Be Competitors.**

The *Colgate* principle that a firm is free to choose with whom it deals is implicated in this case not just because requiring United to allow ticket resale would force it to deal with parties with whom United has not contracted.  Granting Dominguez his requested relief also would compel United to assist those who would resell United's tickets in competition with United.  It is well established, however, that Section 2 does not require a firm to assist potential competitors in such a manner.

The relief Dominguez seeks would impose an obligation on United to allow others (presumably passengers who bought a ticket, or ticket brokers wishing to arbitrage United's tickets) to resell United tickets "on a secondary marketplace such as eBay or the like" in competition with United.  Compl. ¶ 2.  As the Supreme Court recently affirmed, however, a monopolist's "refusal to cooperate with a rival" generally does *not* constitute anticompetitive conduct giving rise to a Section 2 claim.  *Trinko,* 540 U.S. at 407–08.  In *Trinko*, the Court recognized that because "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers," requiring such monopolists to "share the source of their advantage . . . may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  *Id.*  Thus, a firm's decision not to sell a good or service on such terms as to enable the buyer to compete with the firm is generally not

prohibited conduct under Section 2. *Id.*; *see also Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete."), *cert. denied*, 127 S.Ct. 1257 (2007); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("[I]t is clear that a firm with lawful monopoly power has no general duty to help its competitors . . . .").

This Circuit has squarely held that under *Trinko* a Section 2 claim premised on a monopolist's refusal to deal with would-be competitors "can withstand a motion to dismiss *only*" if the plaintiff alleges either (1) that the defendant "had previously 'engaged in a course of dealing with its rivals'" or (2) that the defendant "ever would have done so." *Covad Commc'ns v. Bell Atl. Corp.*, 398 F.3d 666, 673 (D.C. Cir. 2005) (emphasis added) (quoting *Trinko*, 540 U.S. at 409); *see also Covad Commc'ns v. Bell Atl. Corp.,* 407 F.3d 1220, 1222 (D.C. Cir. 2005) (reiterating applicability of this standard in denying rehearing). Therefore, to survive dismissal, the complaint must allege that United in the past has allowed customers to resell United tickets, or that it would be in United's economic interest to do so.

Dominguez clearly does not allege that United has allowed ticket resale (let alone that United has "engaged in a course of dealing with" Dominguez or any other United customer allowing such resale). Dominguez also has not alleged that it would be in United's interest to do so. Dominguez's failure to make either allegation is fatal to his claim for relief under Section 2 of the Sherman Act.

Furthermore, Dominguez **cannot** allege that it would be in United's interest to allow ticket resale. The no-resale rule is in United's interest for at least three reasons. First, the rule makes economic sense because it enables United to increase its output by selling discounted airfares to consumers who are unwilling or unable to pay for full-fare tickets. Second, the rule is

key to United's compliance with federal laws governing airline security.  Finally, the rule is rational for reasons that have nothing to do with maintaining United's alleged monopoly.

> ### 1. United's long-recognized legitimate business interest in offering restricted discounted tickets justifies its no-resale rule.

The no-resale policy is in United's interest because it allows United to offer conditional discounts to its passengers.  For over a century, the Supreme Court has recognized and enforced the right of common carriers like United to prohibit the resale of such discounted tickets in order to protect the integrity of the discounts and restrict the use of those tickets to the agreed-upon terms.  In *Bitterman v. Louisville & Nashville Railroad Co.*, 207 U.S. 205, 221 (1907), a railroad that had a policy prohibiting resale of reduced-rate tickets intended for use only on special conditions (*e.g.*, for special occasions such as conventions) sued brokers who had resold tickets in violation of that policy.  In response, the brokers argued, *inter alia*, that the no-resale policy violated the Sherman Act.  The Supreme Court disagreed, holding that "the [railroad's] lawful right to sell nontransferable tickets of the character alleged in the bill at reduced rates . . . *is not open to controversy*."  *Id.* (emphasis added).  The brokers therefore had committed a "legal wrong" by facilitating use of the reduced-rate tickets by passengers who were not in compliance with the carrier's terms of issuance and "not entitled to the ticket."  *Id.* at 222, 224.  The rule of *Bitterman* is that "a common carrier of passengers may make its passenger tickets nontransferable, and an express restriction in a passenger ticket against transfer is valid and enforceable."  14 Am. Jur. 2d *Carriers* § 798 (collecting cases); *accord* 9 *Corbin on Contracts* § 873 (noting that "[n]o one doubts that railway passenger tickets can be made non-assignable").

Now, one hundred years after *Bitterman*, Dominguez is challenging United's "lawful right to sell nontransferable tickets."  But it is clear that United's exercise of this lawful right is in United's legitimate business interest because it allows United to charge different prices to

different customers, and to use a no-resale policy to enforce that pricing system. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783, 786 (7th Cir. 1999) (finding "no general rule against the possession of market power or the use of price discrimination to exploit it"; "since the unilateral exercise of a firm's individual market power does not violate the antitrust laws, preventing the frustration of that exercise through arbitrage is not a violation either").

"Passengers on the same commercial airline flight—sometimes even those in adjoining seats—may pay fares that vary widely."  United States Gen. Accounting Office, *Aviation Competition: Restricting Airline Ticketing Rules Unlikely to Help Consumers, Report to Congressional Committees* (July 31, 2001) at 3, http://www.gao.gov/new.items/d01831.pdf. Airlines such as United offer discounts for passengers who purchase their tickets 14 days in advance, consent to a Saturday evening stay, acknowledge that the ticket will be nonrefundable, and/or agree to pay a fee to change their tickets.  These conditional discounts enable United to attract the business of a wide variety of consumers, including customers who could not or would not pay full fare.  Of course, passengers also may purchase unrestricted, fully refundable tickets, but then must forego the offered discount.  Indeed, United's ability to charge higher prices for unrestricted tickets makes the discounts possible.  *Id.* at 8 (noting that the higher-priced, more flexible tickets sold to business passengers "provide the majority of [airlines'] revenue"), 22 (absent the ability to "charge different fares to different passengers," airlines "might not be able to cover the total cost of providing frequent and extensive service").

Requiring the free transferability of these reduced-fare, restricted tickets would mean that United would have no control over how the tickets, once sold, actually were used, and therefore no incentive or ability to offer discounts in exchange for specific terms and conditions.

Customers would be free to resell tickets to others who do not consent to the fare rules. This would frustrate entirely United's motivation and ability to offer such discounts. As the United States General Accounting Office has concluded, if airlines were unable to offer conditional discounts, particularly the Saturday night stay, prices for consumers would increase and consumers would be worse off. *See id.* at 44 (finding that legislating restrictions on airline pricing practices could lead airlines to take action—such as raising airfares and decreasing service—to reduce losses they would be likely to incur).

Moreover, both United and consumers would suffer real harm if United were compelled to allow resale of fully refundable tickets. If resale of such tickets were permitted, brokers undoubtedly would purchase all of the available tickets on a given flight, resell as many as possible at a premium price, and then return any unsold tickets to United for a full refund. Such a policy likely would result in numerous unfilled flights and a substantial reduction in consumer welfare.

For these reasons, United's no-resale rule is procompetitive and output-enhancing, and does not violate the Sherman Act.

### 2. United's no-resale rule facilitates United's compliance with federal security regulations.

United's no-resale rule also is key to United's strategy for fulfilling its obligations under federal laws governing airline security. In the wake of the terrorist attacks of September 11, 2001, federal law and regulations impose upon all air carriers a heavy burden to ensure the safety of their flights, including the obligation to pre-screen all passengers prior to boarding. *See* 49 U.S.C. §§ 44901(a) (pre-boarding screening must include "identifying passengers and baggage for screening"); 44903(j)(2)(A) (requiring the use of a system "to evaluate all passengers before they board an aircraft" and to "ensure that individuals selected by the system and their . . .

12

baggage are adequately screened").  Federal law also mandates (1) use of the Computer-Assisted

Passenger Pre-Screening Program ("CAPPS"), an automatic screening system that analyzes data

United collects from each passenger and enters in its reservations system, also known as

Passenger Name Records or "PNRs,"[4] to identify individuals to receive enhanced pre-boarding

screening; and (2) pre-boarding comparisons of passenger names to federal "Selectee" and "No-

Fly" lists, functions that currently are performed by the airlines.  *See* 49 U.S.C. §§ 114(h)(2)–(4),

44901(a), 44903(j)(2)(A); Notice of Final Order, 69 Fed. Reg. 65,619, 65,625 (Nov. 15, 2004)

(describing the operation of CAPPS and of airlines' pre-screening responsibilities).  In short,

federal law requires specific security measures that mean air carriers must know their

passengers' names in advance of every flight.[5]

    The relief Dominguez seeks—compelling United to permit the exchange or resale of

issued tickets on "eBay or the like"—would cause United to lose control over much of the

information on which these security systems and functions depend.  First, as to any particular

flight, United would not know the names of the passengers who actually were going to fly;

United would know only the names of the passengers who originally had purchased tickets.

---

[4]    The content of this information varies among airlines, but usually includes at least the following information:  "(1) passenger name, (2) reservation date, (3) travel agency or agent, (4) travel itinerary items, (5) form of payment, (6) flight number, and (7) seating location."  *See* Mardi Ruth Thompson (Deputy Chief Counsel, TSA Office of Chief Counsel) & Kapila Juthani (Attorney-Advisor, TSA Counsel's Office), *Providing Smarter Security and Customer Service:  TSA's Secure Flight and Registered Traveler Programs*, 19-SPG Air & Space Law 8, 11 n.3 (2005); *see also* 14 C.F.R. § 243.7(a)(1) (requiring "covered airline[s]" to "[c]ollect, or cause to be collected, the full name for each passenger who is a U.S. citizen" and providing that "passengers for whom this information is not obtained shall not be boarded").

[5]    In addition to collecting passenger data for CAPPS and watch-list comparison purposes, domestic air carriers must be capable of transmitting passenger manifests in case of an aviation disaster, and of making best-effort attempts to contact passengers' families prior to releasing such information to the public.  49 U.S.C. §§ 41113(b)(4), 41113(b)(14) (requiring passenger carriers to develop a plan for providing authorities with "a list . . . of the names of the passengers aboard the aircraft" and assuring that "upon request of the family of a passenger, the air carrier will inform the family of whether the passenger's name appeared" on that list); 14 C.F.R. § 243.9 (requiring that individual passenger information be collected "before each passenger boards the aircraft").  Air carriers may incur liability for gross negligence or intentional misconduct in carrying out this function.  *See* 49 U.S.C. § 41113(d).

Second, United would have no way of capturing important information such as the date, time, and means of ticket purchase. This is information that the Transportation Security Administration ("TSA") could—and currently does—legitimately seek in order to facilitate effective passenger pre-screening and enhance security. Third, when TSA assumes responsibility for passenger pre-screening, as mandated by the Intelligence Reform and Terrorism Prevention Act of 2004, 49 U.S.C. § 44903(j)(2)(C)(i), it will continue to depend on the airlines' generation of PNRs for all passengers, a function that United cannot perform if purchases are transacted outside of its own systems. *See* Privacy Impact Assessment, 69 Fed. Reg. 57,352 (Sept. 24, 2002) (noting that Secure Flight, the next-generation pre-screening system in development by the TSA, will continue to use "passenger name record (PNR) data"). *Cf.* Notice of Final Order, 69 Fed. Reg. at 65,624 ("Collecting information from passengers at the airport for purposes of the Secure Flight test would impose a tremendous burden on the flying public in the form of additional time required for security screening. It also would not allow TSA to obtain and test the information in a PNR format . . . ."). United's no-resale rule therefore clearly fulfills another of United's legitimate interests: its interest in efficient and effective compliance with federal security regulations.

  **3.**  **Resale of tickets is rational for reasons other than exclusion.**

  Finally, it is clear that United's no-resale rule serves a purpose other than exclusion. United prohibits ticket resale in every market it serves, not just those in which it allegedly has market power. *See* Exhibit A. Therefore, United's imposition of the "contractual bar" in markets in which United lacks power must be justified by reasons other than United's effort to extend or maintain monopoly power. Similarly, the only other competitors in the relevant

market—JetBlue[6] and Southwest[7]—both prohibit ticket resale,[8] and both allegedly lack market power.  Compl. ¶ 17.  Given that carriers that lack market power have instituted no-resale rules, it cannot logically be argued that these rules have no non-exclusionary purpose.

In sum, Dominguez has failed to plead the existence of any circumstances requiring an exception to the rule of *Colgate*, *Trinko*, and *Covad*, nor has he pled facts that reasonably would allow the Court to infer that such circumstances exist.  Count II of the complaint therefore should be dismissed.

## III.   DOMINGUEZ'S SECTION 1 CLAIM ALSO FAILS BECAUSE HE HAS NOT ALLEGED AN ILLEGAL RESTRAINT OF TRADE.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  In this Circuit, "to withstand a motion to dismiss a Section 1 conspiracy claim, the plaintiffs must [i] allege concerted action by two or more persons [ii] that unreasonably restraints interstate or foreign trade or commerce."

---

[6]       JetBlue's Contract of Carriage provides that tickets are not transferable:

> All reservations are *non-transferable and non-assignable*.  Reservations may *only* be used by the Passenger named on the reservation at the time the reservation is made. . . .  Carrier reserves *the right to refuse carriage* to any person who has acquired a reservation in violation of applicable law or Carrier's rules and regulations.

JetBlue Contract of Carriage, http://www.jetblue.com/p/jetblue_coc.pdf (emphasis added).

[7]       Southwest's Contract of Carriage prohibits both the purchase of tickets from anyone other than Southwest or its authorized agents as well as ticket resale:

> No person shall be entitled to transportation except upon presentation of a valid ticket or proof of identification acceptable to Carrier *that transportation has been purchased through Carrier's electronic ticketing or Ticketless Travel systems* or through the reservations or electronic ticketing systems of a [sic] another airline or agent authorized to sell transportation on Carrier under a codeshare agreement. . . . *Tickets are not transferable unless specified thereon*, but Carrier is not liable to the owner of a ticket for honoring or refunding such ticket when presented by another person.

Southwest Airlines Contract of Carriage 11, http://www.southwest.com/ travel_center/coc.pdf (emphasis added).

[8]       These publicly available documents are subject to the notice requirements of federal law and are posted on JetBlue's and Southwest's websites.  49 U.S.C. §§ 41707; 41708(b)(3); 41709(a); 14 C.F.R. §§ 221.107(b)(1), 253.4.  The Court may take judicial notice of such materials.  *See* Fed. R. Evid. 201.

*In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 16 (D.D.C. 2004).  Dominguez's complaint fails to satisfy either requirement.

> **A.    Dominguez Has Not Alleged Concerted Action Within the Meaning of Section 1.**

By its own terms, Section 1 requires a "contract, combination . . . or conspiracy."  15 U.S.C. § 1.  "Independent action is not proscribed."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).  "Despite the different terminology, there is no magic unique to each term [contained in Section 1].  Courts use the words 'contract,' 'combination,' and 'conspiracy' interchangeably."  *Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1991).  Furthermore, "[a]s a matter of law, a contract by itself does not constitute a conspiracy."  *Bridges v. MacLean-Stevens Studios, Inc.*, 201 F.3d 6, 14 (1st Cir. 2000).  In other words, a Section 1 claim will not lie absent some allegation of a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 US. at 764.

Courts have held that where one party independently sets the terms or conditions of dealing and the other party merely accepts them, the resulting "contract" cannot satisfy the concerted action requirement of Section 1.  This is a corollary to the *Colgate* doctrine discussed above: a manufacturer may announce its terms for doing business, and such an announcement will not violate the antitrust laws.  *See, e.g.*, *Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 338 (D.C. Cir. 1982) (recognizing "the longstanding antitrust principle" under *Colgate* "that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business") (quoting *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1205 (7th Cir. 1981)).

*American Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992), is particularly instructive.  In that case, the Tenth Circuit rejected the argument that a "no-sale" rule prohibiting

members of American's frequent flyer program from selling their travel awards constituted

concerted action for Section 1 purposes.  The court held that absent the "suggest[ion] that

American did not independently set the terms under which it would offer its travel awards . . . the

mere fact that [the program's] members accepted those terms does not generate the kind of

concerted action needed to violate Section 1."  *Id.* at 413–14.

Similarly, in *Toscano v. Professional Golfers' Association*, 258 F.3d 978 (9th Cir. 2001),

the Ninth Circuit rejected a Section 1 claim brought by a professional golfer who alleged that

sponsorship agreements entered into by the Professional Golfers' Association violated Section 1

of the Sherman Act.  The court found that the sponsors "had no involvement in the establishment

or enforcement of the allegedly anticompetitive provisions of the contracts," and that the

agreements therefore could not constitute "concerted action."  *Id.* at 984; *see also Virgin Atl.*

*Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (airline's incentive

agreements entered into with travel agencies and corporate customers did not constitute

concerted action under Section 1).

This is precisely the sort of agreement that Dominguez has alleged.  Dominguez claims

that United "used its monopoly market power" to impose the challenged no-resale rule.  Compl.

¶ 15.  As demonstrated above (and as acknowledged by Dominguez, *see id.* ¶ 38), these rules are

terms of the unilateral Contract of Carriage between Dominguez and United, which are mandated

exclusively by conditions set by United.  Dominguez does not allege that he or any other

customer bargained with United to set the terms of their ticket, nor does he claim that they could

have done so.  As a matter of law, therefore, the Contract of Carriage is not a "conscious

commitment to a common scheme designed to achieve an unlawful objective."  *Toscano*, 258

F.3d at 984 (quoting *Monsanto*, 465 U.S. at 764).  Count I of the complaint should be dismissed.

**B.     Dominguez Has Not Alleged an Unreasonable Restraint of Trade Within the Meaning of Section 1.**

Even if Dominguez had adequately alleged concerted action—which he has not—Section 1 *also* requires that a plaintiff plead the existence of an "unreasonable restraint of trade."  *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only unreasonable restraints.").  As recounted above at length, because Dominguez has failed to plead any conduct that is a violation of the antitrust laws, Dominguez entirely has failed to allege that United's no-resale rule is unreasonable.  *See supra* at Sections II & III.  For this reason, too, Count I of the complaint should be dismissed.

**IV.     DOMINGUEZ'S SHERMAN ACT CLAIMS FAIL TO ALLEGE ANY ANTICOMPETITIVE EFFECT IN THE RELEVANT MARKET.**

In order to defeat a motion to dismiss a Section 1 claim, a plaintiff must plead the existence of an actual anticompetitive effect resulting from the defendant's actions.  *See, e.g.*, *Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 537 (D.D.C. 1986) (dismissing Section 1 claim given "absen[ce] [of] factually supported allegations of anticompetitive effect").  The same is true for Section 2 claims, because to be condemned as "exclusionary," "a monopolist's act must have an 'anticompetitive effect.'  That is, it must harm the competitive *process* and thereby harm consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original).

Dominguez has failed to allege that United's no-resale rule has any anticompetitive effect in the purported relevant market.  This omission dooms *both* of Dominguez's Sherman Act claims.  Notwithstanding his claim that United has a monopoly on nonstop flights between the Washington, D.C. and San Francisco Bay areas, Compl. ¶ 11, Dominguez acknowledges that two other carriers, JetBlue and Southwest, offer nonstop flights along this route.  *Id.* ¶ 17.

18

Dominguez, however, entirely fails to allege that United's no-resale rule has *any* exclusionary effect on these existing rivals or on other airlines that might seek to enter the market. For example, Dominguez does not allege:

- that United's no-resale rule constitutes a barrier to entry or expansion of competing airlines;

- that United's no-resale rule in any way disadvantages Southwest or JetBlue;

- that United's no-resale rule in any way reduces any other carrier's output; or

- that United's no-resale rule has any effect on the prices charged by Southwest or JetBlue for travel within the relevant market.

Indeed, the *only* effect Dominguez attributes to United's no-resale rule is that United customers are unable to resell their United tickets in competition with United itself, and therefore are not able to establish a secondary market. *See id.* ¶ 2 (alleging that but for United's no-resale rule, "competition would be present between United Airlines and the secondary marketplace comprised of such passengers seeking to resell their tickets").

While Dominguez asserts effects or exclusion in a "secondary marketplace," he fails to provide any definition of that hypothetical market. This is not surprising in light of the fact that Dominguez's "secondary marketplace" appears to be a market solely for the sale of United tickets, and a relevant market that consists solely of one company's products is not cognizable as a matter of law. *See, e.g.*, *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 807 (6th Cir. 1988) ("[A] complaint charging restraint of trade based on a manufacturer's substitution of one distributor for another must allege anticompetitive effect at the interbrand level to survive a Rule 12(b)(6) motion for failure to state a violation of Section 1 of the Sherman Anti-Trust Act."); *Hack v. Yale College*, 237 F.3d 81, 85 (2d Cir. 2000) (rejecting claim for monopolization

of college dormitory rooms by college); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d

430, 438–39 (3d Cir. 1997) (rejecting claim for monopolization of approved ingredients for pizza

franchisees); *Gregoris Motors v. Nissan Motor Corp. in U.S.A.,* 630 F. Supp. 902 (E.D.N.Y.

1986) (Datsun automobiles are not a relevant market); *Levitch v. Columbia Broad. Sys., Inc.,* 495

F. Supp. 649 (S.D.N.Y. 1980) (television network's own programming is not a separate antitrust

market).

Even if such a market were cognizable, Dominguez has not alleged injury to competition

in that market.  Dominguez contends that United's purported monopoly in the relevant market

has allowed United to charge consumers "supra-competitive" prices for travel on its planes.  *See,*

*e.g.*, Compl. ¶ 17.  At most, this alleges the circular point that United is a monopolist and

therefore has the power to charge a monopoly price for its own products.  However, "[t]he mere

possession of monopoly power, and the concomitant charging of monopoly prices, is . . . not

unlawful." *Trinko*, 540 U.S. at 407.  Therefore, the mere allegation that United charged too high

a price is not an allegation of anticompetitive effects.

Moreover, Dominguez's theory of injury to competition is so remote and speculative that

it must be dismissed.  Dominguez alleges that if United permitted ticket resale, other customers

"would be able to sell and purchase airline tickets," but he never alleges that anyone, including

himself, actually would have done so.  Compl. ¶ 19; *cf. Andrx Pharm., Inc. v. Biovail Corp. Int'l*,

256 F.3d 799, 806 (D.C. Cir. 2001) ("A competitor that has not yet entered the market [is] . . .

require[d] . . .  to demonstrate both its intention to enter the market and its preparedness to do

so.").  More fundamentally, even if the complaint alleged that some tickets would be bought and

sold if the resale rule were changed, the effect of such sales on the relevant market—and the

resulting effect on the price charged to Dominguez—depends on unknown and unknowable

20

variables. For example, Dominguez's theory of injury relies upon the notion that enough tickets would be resold so as to constrain overall prices. According to the complaint itself, however, this number of resales would have to be very significant. Dominguez alleges that the number of seats offered by United's competitors (JetBlue and Southwest, with eight flights per day) "is so small compared to United's available seats in this market that they have no price-constraining effects." Compl. ¶ 17. Therefore, ticket resale could not have a price-constraining effect unless United customers offered to sell more tickets than Southwest and JetBlue combined.

In other words, Dominguez's formulation assumes that more than 20 percent of United tickets would be resold—that is, more than eight planeloads of seats per day on the relevant route alone. Yet Dominguez does not and could not reasonably allege such a fact. Because Dominguez's antitrust claim is based on unreasonable assumptions about the number of tickets that would be resold, and speculation about how those sales would affect him, Dominguez has not alleged any anticompetitive effects.

In sum, Dominguez simply has failed to allege a necessary element of his Sherman Act claims: the existence of an anticompetitive effect. Counts I and II of the complaint therefore should be dismissed.

## V.    DOMINGUEZ LACKS STANDING TO BRING HIS ANTITRUST CLAIMS.

Dominguez's claims should be dismissed not only because they lack merit under the established principles of antitrust law described above, but also because Dominguez lacks standing to sue for damages or injunctive relief under Sections 4 and 16 of the Clayton Act.

### A.    Dominguez Does Not Have Standing to Sue for Treble Damages Under Section 4 of the Clayton Act.

Section 4 of the Clayton Act, pursuant to which an antitrust plaintiff may seek treble damages, does not "allow suit by *every* party affected by an antitrust violator's 'ripples of

21

harm.'" *Andrx Pharm.,* 256 F.3d at 806 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465,

476–77 (1982)).  Because "radiating injuries through the economy are far beyond the ability or

willingness of antitrust courts to trace and measure," 2 Phillip E. Areeda, et al., *Antitrust Law* ¶

339, at 326 (2d ed. 2000), courts insist that an antitrust plaintiff requesting treble damages plead

that he is an "appropriate plaintiff, namely, [one] whose alleged injury possesses a sufficiently

direct causal relationship to the alleged wrongdoing," *Serv. Employees Int'l Union Health &*

*Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1072 (D.C. Cir. 2001).

   To determine whether a party is a proper plaintiff to sue for treble damages, this Court is

required to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendant[], and the

relationship between them." *Assoc. Gen. Contractors of Cal. v. Cal. State Council of*

*Carpenters*, 459 U.S. 519, 535 (1983).  The D.C. Circuit has identified five factors relevant to

this analysis: "[1] the directness of the injury, [2] whether the claim for damages is 'speculative,'

[3] the existence of more direct victims, [4] the potential for duplicative recovery and [5] the

complexity of apportioning damages." *Andrx Pharm.*, 256 F.3d at 806; *accord Adams v. Pan*

*Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987).

   The first and third factors strongly weigh against standing because Dominguez has failed

to allege ***any*** direct injury in this case.  He does not allege that the purportedly anticompetitive

conduct—United's no-resale rule—was enforced against him, or that he ever wanted to buy or

sell tickets in a secondary market.  Instead, the complaint merely alleges that the challenged

provision prevented ***other consumers*** (not Dominguez) from reselling their tickets, and that if

resale had been permitted, ***other consumers*** (again, not Dominguez) could have purchased

United tickets from these resellers.  Compl. ¶¶ 19–21.  Dominguez speculates that these

purchases would have forced United to lower its prices charged to Dominguez and those

similarly situated, *id.* ¶ 22, but the antitrust laws simply do not grant standing to sue for such purported "ripples of harm." *McCready*, 457 U.S. at 476–77. This is particularly the case where a plaintiff has pled the existence of more "immediate victims" of the challenged conduct. *Id.*[9]

The second factor also weighs against standing because Dominguez's claim is highly speculative. Dominguez alleges that if United permitted ticket resale, consumers "would be able to sell and purchase airline tickets." Compl. ¶ 19. However, as discussed above, the effect of such sales on the relevant market, and the resulting effect on the price charged to Dominguez, clearly depend on unknown and unknowable variables. When an antitrust claim for damages "rests at bottom on some abstract conception or speculative measure of harm," *McCready*, 457 U.S. at 475 n.11, the claim should be dismissed. *See, e.g.*, *Assoc. Gen. Contractors*, 459 U.S. at 543; *Adams*, 828 F.2d at 30.

The final two factors also fail to establish Dominguez's standing. The indirect and derivative nature of Dominguez's alleged injury, and the existence of multiple subclasses, means that a highly complicated trial would be required to apportion damages. Courts properly have declined to grant standing in cases presenting similar risks of duplicative and complex damage apportionment. *See, e.g.*, *Assoc. Gen. Contractors*, 459 U.S. at 545; *Adams*, 828 F.2d at 31.

### B. Dominguez Does Not Have Standing to Sue for Injunctive Relief Under Section 16 of the Clayton Act.

Dominguez also seeks injunctive relief under Section 16 of the Clayton Act. An antitrust plaintiff seeking injunctive relief must satisfy the Article III standing requirement of injury-in-fact, *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d at 16, and also show that he is a proper

---

[9] The most "immediate victims" of United's alleged anticompetitive conduct are the customers who Dominguez claims would have resold their tickets but for the provision prohibiting such resale. Compl. ¶ 19. Next removed are those who would have purchased their tickets from those resellers. *Id.* ¶¶ 19–20. Dominguez, however, does not allege that he belongs to either class.

plaintiff given the various prudential considerations outlined above. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986).

Dominguez lacks standing to seek injunctive relief under Section 16 for at least two distinct reasons. First, in addition to failing to allege any cognizable past injury, Dominguez has not alleged that he will suffer any ***future*** injury due to United's purportedly anticompetitive conduct. He therefore has failed to satisfy the injury-in-fact requirement for Article III standing. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 284 (2003) ("To seek forward-looking, injunctive relief, petitioners must show that they face an imminent threat of *future* injury.") (emphasis added); *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d at 16 (same). Second, for the numerous prudential reasons discussed immediately above, Dominguez lacks standing under Section 16 because he is not a proper plaintiff to bring this suit: his purported injury is indirect and speculative.

Because Dominguez lacks standing under Sections 4 and 16 of the Clayton Act, his claims for treble damages and injunctive relief should be dismissed.

## VI. DOMINGUEZ'S UNJUST ENRICHMENT CLAIM IS PREEMPTED AND NON-COGNIZABLE.

Count III of the complaint, which purports to state a claim for common law unjust enrichment, is grounded on the allegedly "anticompetitive and unlawful" nature of the nontransferability provision in United's contract of carriage. *See* Compl. ¶ 51. Because this Count alleges a claim related to United's pricing and services, it is preempted by the Airline Deregulation Act ("ADA"). The ADA provides that states "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1); *see Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995) (the "ADA's preemption

24

prescription bars state-imposed regulation of air carriers"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted" by the ADA).[10]

Courts confronting unjust enrichment claims against airlines consequently dismiss those claims as a matter of course. *See, e.g., Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 32, 36 n.9, 38 (1st Cir. 2007) (plaintiffs' claims, including an unjust enrichment claim, were based on "price grounds" and therefore preempted under the ADA); *Harrington v. Delta Air Lines, Inc.*, No. Civ. A. 04-12558-NMG, 2006 WL 1581752, at *1, *3–4 (D. Mass. Feb. 21, 2006) (unjust enrichment claim was preempted under the ADA because to hold otherwise would cause "airline prices and services [to be] . . . more than marginally affected and the ADA's deregulatory purpose [to be] frustrated"); *In re Am. Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 554, 563 (N.D. Tex. 2005) (dismissing claims, including unjust enrichment claim, that were "expressly preempted [by the ADA] because they relate to at least one of [the airline's] . . . services"); *Breitling U.S.A. Inc. v. Fed. Express Corp.*, 45 F. Supp. 2d 179, 181–82 (D. Conn. 1999) (plaintiff's unjust enrichment claim was preempted under the ADA); *Lehman v. USAir Group, Inc.*, 930 F. Supp. 912, 915 (S.D.N.Y. 1996) (preempting an unjust enrichment claim under the ADA because the claim related to airline "ticket prices"*); see also Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.*, 972 F. Supp. 665, 669, 673 (N.D. Ga. 1997) (unjust enrichment claim was preempted under the Federal Aviation Administration Authorization Act of 1994, which "Congress intended [to have an] . . . identical preemptive effect as the preemption provisions of the ADA").

---

[10]    Both *Wolens* and *Morales* considered an earlier version of the current statute, which was amended in 1994. As the Supreme Court noted, however, Congress "intended the revision to make no substantive change." *See Wolens*, 513 U.S. 219, 222–23 & n.1.

Furthermore, Dominguez's unjust enrichment claim fails because unjust enrichment is a quasi-contractual remedy that is available only where there is no contract and, here, Dominguez has pled the existence of a contract; namely, United's Contract of Carriage. *See United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 247 (D.C. Cir. 1996) (remedy of unjust enrichment is "available only in the absence of a contract, either actual or implied in fact").

## <u>CONCLUSION</u>

For all the reasons set forth herein, United respectfully requests that this Court dismiss Dominguez's complaint with prejudice for failure to state a claim.


Dated: April 23, 2007                    Respectfully submitted,


                                         UAL CORPORATION and
                                         UNITED AIR LINES, INC.


                                  By:  /s/ Richard J. Favretto

                                       Richard J. Favretto (#156588)
                                       John Roberti (#76397)
                                       MAYER, BROWN, ROWE & MAW LLP
                                       1909 K Street, NW
                                       Washington, D.C. 20006
                                       (202) 263-3000

                                       Counsel for Defendants UAL Corporation and
                                       United Air Lines, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RICHARD DOMINGUEZ, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| UAL CORPORATION<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois  60007 | ) ) ) ) | Civil Action: No. 1:07CV00418 (RJL) |
| and | ) ) | |
| UNITED AIR LINES, INC.<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois  60007, | ) ) ) ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER**

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss the Complaint is

GRANTED.  The complaint shall be dismissed with prejudice.


_____
The Honorable Richard J. Leon

## CERTIFICATE OF SERVICE

I, Holly H. Daee, an attorney, certify that on April 23, 2007, I caused true and correct copies of **DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM, DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES** in support thereof, and a **PROPOSED ORDER** to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following counsel who has registered for receipt of documents filed in this matter:

Roy A. Katriel
THE KATRIEL LAW FIRM
1101 30th Street, NW
Suite 500
Washington, DC  20007
(202) 625-4342

In addition, on this same date, I caused the above-mentioned motion, memorandum, and proposed order to be served upon the following counsel of record via overnight delivery:

Gary B. Friedman
Tracey Kitzman
FRIEDMAN LAW GROUP, LLP
270 Lafayette Street, 14th Floor
New York, NY  10012
(212) 680-5150

/s/ Holly H. Daee
Holly H. Daee

## **PARTIES TO BE NOTIFIED**

Roy A. Katriel
THE KATRIEL LAW FIRM, PLLC
1101 30th Street, NW
Suite 500
Washington, D.C. 20007-3772

Gary B. Friedman
Tracey Kitzman
FRIEDMAN LAW GROUP, L.L.P.
270 Lafayette Street, 14th Floor
New York, NY 10012

**EXHIBIT A**

# UNITEDAIRLINES

# Contract of Carriage Reference Guide

*Note:* *Click on any chapter below to go directly there, enable the Navigation pane, or use the "search" feature in Acrobat.*

1.  Tariff Application ................................................................ 02

2.  Definitions .......................................................................... 04

3.  Refusal to Transport Passengers ........................................ 07

4.  Electronic Surveillance of Passengers and Baggage ............ 09

5.  Children as Passengers ....................................................... 09

6.  Inflight Entertainment ....................................................... 11

7.  Ticketing ............................................................................ 12

8.  Reservations ....................................................................... 15

9.  Fares .................................................................................. 16

10. Baggage Acceptance ........................................................... 19

11. Failure to Operate on Schedule or Failure to Carry ............ 26

12. Denied Boarding Compensation ......................................... 29

13. Rerouting ........................................................................... 32

14. Refunds .............................................................................. 33

15. Fees ................................................................................... 37

16. United Express .................................................................... 42

United Airlines, Inc.

Updated: 2/12/2007

AREA: US TARIFF: DGR      CXR: UA  RULE: 0001

**APPLICATION OF TARIFF**

A)   RULES IN THIS TARIFF CONSTITUTE THE CONDITIONS UPON WHICH UA
TRANSPORTS OR AGREES TO TRANSPORT, AND ARE EXPRESSLY AGREED TO BY THE
PASSENGER TO THE SAME EXTENT AS IF SUCH RULES WERE INCLUDED AS
CONDITIONS IN THE CONTRACT OF CARRIAGE.

B)  INTERNATIONAL TRANSPORTATION SHALL BE SUBJECT TO THE RULES RELATING
TO LIABILITY ESTABLISHED BY, AND TO ALL OTHER PROVISIONS OF, THE
CONVENTION FOR THE UNIFICATION OF CERTAIN RULES RELATING TO
INTERNATIONAL TRANSPORTATION BY AIR, SIGNED AT WARSAW, OCTOBER 12,
1929, OR SUCH CONVENTION AS AMENDED, WHICHEVER MAY BE APPLICABLE TO THE
TRANSPORTATION HEREUNDER.  ANY PROVISIONS OF THESE RULES WHICH IS
INCONSISTENT WITH ANY PROVISION OF THE SAID CONVENTION SHALL, TO THAT
EXTENT, BUT ONLY TO THAT EXTENT, BE INAPPLICABLE TO INTERNATIONAL
TRANSPORTATION.

C)  CHANGES IN RULES, FARES, AND CHARGES  EXCEPT AS OTHERWISE PROVIDED
WITHIN SPECIFIC FARE RULES, TRANSPORTATION IS SUBJECT TO THE RULES,
FARES, AND CHARGES IN EFFECT ON THE DATE ON WHICH THE TICKET IS ISSUED.
"WRITE YOUR OWN" TYPE TICKETS WHICH ARE BILLED TO THE PASSENGER ONLY
AFTER USE ARE CONSIDERED TO BE ISSUED ON THE DATE OF USE.  PURCHASE OF
A PREPAID TICKET ADVICE (PTA) CONSTITUTES PURCHASE AND ISSUANCE OF A
TICKET FOR THE PURPOSE OF THIS RULE PROVIDED THE PTA IS PURCHASED IN
ACCORDANCE WITH THE RESERVATION AND PURCHASE REQUIREMENTS WHICH APPLY
TO THE FARE.  ALL PROVISIONS WITHIN THIS RULE APPLICABLE TO TICKETS
APPLY TO PTAS.  THE PROVISIONS OF THIS RULE APPLY ONLY TO THE PASSENGER
TO WHOM THE TICKET WAS ORIGINALLY ISSUED.

  1) IF, AFTER A TICKET HAS BEEN ISSUED AND BEFORE ANY PORTION THEREOF
HAS BEEN USED, EITHER A DECREASE IN THE FARES OR CHARGES APPLICABLE TO
THE TRANSPORTATION SHOWN ON THE TICKET BECOMES EFFECTIVE, OR A NEW FARE
(UNLESS THAT NEW FARE-SUCH AS A CERTAIN LIMITED SALE TIME PROMOTIONAL
FARE-IS   SPECIFICALLY EXEMPTED FROM THIS PROVISION) FOR WHICH THE
PASSENGER CAN QUALIFY IS ADDED BETWEEN THE POINTS SHOWN ON THE TICKET,
THE FULL AMOUNT OF THE DIFFERENCE IN FARES WILL BE REFUNDED AND ANY
APPLICABLE SERVICE CHARGES WAIVED (EXCEPT AS SPECIFIED IN THIS RULE),
PROVIDED:

    A) THERE IS NO CHANGE IN ORIGIN, DESTINATION, STOPOVER
POINT(S)/FLIGHT(S)/DATES(S) SHOWN ON THE ORIGINAL TICKET;

    B) WHERE THE DECREASED FARES OR CHARGES OR THE NEW FARES BEARS A
FIRST DATE ON WHICH TICKETS MAY BE ISSUED, THE ORIGINATING FLIGHT IS
NOT EARLIER THAN THE FIRST DATE WHICH WOULD BE ALLOWED AFTER MEETING
ADVANCE RESERVATION AND TICKETING REQUIREMENTS APPLICABLE TO THE
DECREASED FARES OR CHARGES OR TO THE NEW FARE;

    C) SUBSEQUENT TO THE DECREASE IN FARES OR CHARGES OR THE ADDITION
OF A NEW FARE, ALL CONDITIONS OF THE DECREASED FARES OR CHARGES OR THE
NEW FARE ARE MET, INCLUDING BOOKING CODE AND ADVANCE RESERVATIONS AND
TICKETING REQUIREMENTS.

D) CHARGE WILL BE USD 100.00 FOR ALL -N TYPE NONREFUNDABLE FARE TICKETS/UNTICKETED PTAS PRESENTED FOR REFUND.

EXCEPTION 1:  THE PASSENGER WILL BE GIVEN THE OPTION OF RECEIVING A REFUND (AFTER SUBTRACTING THE USD 100.00 SERVICE CHARGE) OR RECEIVING THE DIFFERENCE IN FARES IN THE FORM OF A NONREFUNDABLE MISCELLANEOUS CHARGE ORDER (MCO)OR UA TRAVEL VOUCHER.  THE USD 100.00 SERVICE CHARGE WILL BE WAIVED IF THE REFUND IS ISSUED IN THE FORM OF A NONREFUNDABLE MCO/UA TRAVEL VOUCHER.  THE MCO/TRAVEL VOUCHER IS TRANSFERABLE TO ANOTHER PERSON, VALID FOR ONE YEAR FROM DATE OF ISSUE AND MAY BE USED AS PAYMENT FOR AIR TRAVEL ON UA OR UA EXPRESS ONLY.  PARTIALLY USED MCOS/TRAVEL VOUCHERS WILL HAVE RESIDUAL VALUE.  THE ENDORSEMENT BOX OF ANY TICKET ISSUED IN EXCHANGE FOR THE MCO/TRAVEL VOUCHER REFERRED TO ABOVE MUST CONTAIN A NON-REF AMOUNT (INCLUDING TAXES AND SURCHARGES) EQUAL TO THE GREATER OF THE SERVICE CHARGE APPLICABLE TO THE FARE ON THE TICKET OR OF THE VALUE OF THE MCO/UA TRAVEL VOUCHER THAT WAS APPLIED TO THE TICKET.
EXCEPTION 2:  THE USD 100.00 SERVICE CHARGE DOES NOT APPLY TO REFUNDS UNDER THIS RULE IF THE TICKET HAS AN ORIGIN/STOPOVER/DESTINATION IN CANADA.

   2) WHERE THE TICKET HAS BEEN ISSUED BEFORE THE EFFECTIVE DATE OF A TARIFF CONTAINING AN INCREASE IN THE APPLICABLE FARE, THE INCREASE WILL NOT BE COLLECTED, PROVIDED:

   A) THE ORIGINATING FLIGHT COUPON OF THE TICKET WAS ISSUED FOR A SPECIFIC FLIGHT AT THE FARE CONTAINED IN A TARIFF IN EFFECT ON THE DATE OF THE TICKET ISSUANCE (DETERMINED BY THE VALIDATION STAMPED OR IMPRINTED ON THE TICKET.);

   B) THAT SUBSEQUENT TO THE EFFECTIVE DATE OF ANY INCREASE IN THE APPLICABLE FARE:

      I) THE ORIGINATING FLIGHT IS NOT VOLUNTARILY CHANGED, AND
      II) FLIGHTS OTHER THAN THE ORIGINATING FLIGHT ARE NOT VOLUNTARILY CHANGED TO REFLECT A REVISED ROUTING VIA WHICH THE ORIGINAL FARE CHARGED WOULD NOT HAVE BEEN APPLICABLE.
NOTE:  THESE PROVISIONS APPLY WHETHER OR NOT AN INCREASE RESULTS FROM A CHANGE IN FARE LEVEL, A CHANGE IN CONDITIONS GOVERNING THE FARE, OR A CANCELLATION OF THE FARE ITSELF.

   D)UA WILL BE RESPONSIBLE FOR THE FURNISHING OF TRANSPORTATION ONLY OVER ITS OWN LINES.  WHEN UA UNDERTAKES TO ISSUE A TICKET, CHECK BAGGAGE, OR MAKE ANY OTHER ARRANGEMENTS FOR TRANSPORTATION OVER THE LINES OF ANY OTHER CARRIER (WHETHER OR NOT SUCH TRANSPORTATION IS PART OF A THROUGH SERVICE), UA WILL ACT ONLY AS AGENT FOR SUCH OTHER CARRIER, AND WILL ASSUME NO RESPONSIBILITY FOR THE ACTS OR OMISSIONS OF SUCH OTHER CARRIER.

   E)FARES APPLY FOR TRAVEL ONLY BETWEEN THE POINTS FOR WHICH THEY ARE PUBLISHED.  TICKETS MAY NOT BE ISSUED AT FARE(S) PUBLISHED TO AND/OR FROM A MORE DISTANT POINT(S) THAN THE POINTS BEING TRAVELED, EVEN WHEN ISSUANCE OF SUCH TICKETS WOULD PRODUCE A LOWER FARE. WHEN THROUGH OR CONNECTING PASSENGERS ENPLANE AT AN INTERMEDIATE POINT BETWEEN THE ORIGIN AND DESTINATION SHOWN ON THEIR TICKETS, UA MAY REQUIRE EVIDENCE, SUCH AS A BOARDING PASS, OF USE OF A PRECEDING FLIGHT FOR THE PORTION OF THE TICKET FROM POINT OF ORIGIN TO INTERMEDIATE POINT.  ABSENT SUCH

EVIDENCE, UA MAY REQUIRE ADDITIONAL FARE COLLECTION FROM THE PASSENGER FOR ANY DIFFERENCE BETWEEN THE FARE PAID FOR THE TICKET FROM ORIGIN TO DESTINATION AND THE FARE WHICH WOULD APPLY FROM THE INTERMEDIATE BOARDING POINT TO THE DESTINATION.

F)NO EMPLOYEE OF UA HAS THE AUTHORITY TO ALTER, MODIFY, OR WAIVE ANY PROVISION OF THE CONTRACT OF CARRIAGE OR OF THIS TARIFF UNLESS AUTHORIZED BY A CORPORATE OFFICER OF UA.  UA APPOINTED AGENTS AND REPRESENTATIVES ARE ONLY AUTHORIZED TO SELL TICKETS FOR AIR TRANSPORTATION PURSUANT TO APPROVED FARES, RULES, AND REGULATIONS OF UA.

G)SMOKING IS PROHIBITED ON ALL FLIGHTS. FEDERAL LAW PROHIBITS TAMPERING WITH, DISABLING, OR DESTROYING ANY SMOKE DETECTOR INSTALLED IN AN AIRCRAFT LAVATORY.

H)UNITED INCORPORATES BY REFERENCE INTO THIS TARIFF THE PROVISIONS OF "OUR UNITED COMMITMENT", THE CUSTOMER SERVICE PLAN ADOPTED AND PUBLISHED BY UNITED ON SEPTEMBER 15, 1999, WITH AN EFFECTIVE DATE OF DECEMBER 15,1999, AS IF SET FORTH HEREIN.  NOTHING IN "OUR UNITED "COMMITMENT" SHALL OVERRIDE THE SPECIFIC TERMS OF UNITED'S CONTRACT OF CARRIAGE, BUT ITS PROVISIONS SHALL CONSTITUTE AN ENFORCEABLE COMMITMENT TO UNITED'S CUSTOMERS AND PASSENGERS.

I)UNITED WILL, UPON REQUEST, PROVIDE CUSTOMERS INFORMATION RELATING TO ITS OPERATIONS OF INTEREST TO CUSTOMERS, INCLUDING BUT NOT LIMITED TO POLICIES AND PROCEDURES RELATED TO DENIED BOARDING; CHANGES IN AIRCRAFT ON A SINGLE FLIGHT WITH A SINGLE FLIGHT NUMBER; CANCELLATION POLICIES INVOLVING FAILURE TO USE EACH FLIGHT SEGMENT COUPON; MILEAGE PLUS RULES, RESTRICTIONS AND DATA RELATING TO AWARD REDEMPTIONS; INFORMATION REGARDING AIRCRAFT CONFIGURATION, INCLUDING SEAT SIZE AND PITCH; AND POLICIES AND PROCEDURES REGARDING THE TREATMENT OF PASSENGERS WITH DISABILITIES AND SPECIAL NEEDS.

## DEFINITIONS AS USED IN THIS TARIFF OR IN TARIFFS UA  RULE:005

AS USED IN THIS TARIFF OR IN TARIFFS MAKING  REFERENCE HERETO, UNLESS OTHERWISE DEFINED:

ANIMALS--IN ADDITION TO THE USUAL CONNOTATION, INCLUDES REPTILES, BIRDS, POULTRY, AND FISH.

APPLICABLE ADULT FARE--MEANS THE FARE WHICH WOULD BE APPLICABLE TO AN ADULT FOR THE TRANSPORTATION EXCEPTING THOSE SPECIAL FARES APPLICABLE TO A PASSENGER'S STATUS;E.G., MILITARY FARES, ADULT STANDBY, ETC.

APPLICABLE FULL FARE--MEANS THE FULL ADULT FARE FOR THE CLASS OF SERVICE OR COMPARTMENT OF THE AIRCRAFT USED BY THE PASSENGER.

CIRCLE TRIP--MEANS ANY TRIP, THE ULTIMATE DESTINATION OF WHICH IS THE POINT OF ORIGIN, BUT WHICH INCLUDES A STOP AT LEAST ONE OTHER POINT, AND WHICH IS NOT MADE VIA THE SAME ROUTING IN BOTH DIRECTIONS. EXAMPLES OF CIRCLE TRIPS:
EXAMPLE 1:     POINT 1 TO POINT 2 ON AIRLINE A
               POINT 2 TO POINT 1 ON AIRLINE B
EXAMPLE 2:     POINT 1 TO POINT 2 TO POINT 3 ON AIRLINE A
EXAMPLE 3:     POINT 1 TO POINT 2 ON AIRLINE A (FIRST CLASS)

POINT 2 TO POINT 1 ON AIRLINE A OR
ANY OTHER AIRLINE (COACH)

CONJUNCTION TICKET—MEANS 2 OR MORE TICKETS CONCURRENTLY ISSUED TO A
PASSENGER AND WHICH TOGETHER CONSTITUTE A SINGLE CONTRACT OF CARRIAGE.

CONNECTION--A STOP AT AN INTERMEDIATE POINT OF THE ROUTE TO BE
TRAVELED, WHERE A CHANGE OF PLANES IS MADE AND WHICH DOES NOT FALL
WITHIN THE DEFINITION OF A STOPOVER.

CONTINENTAL UNITED STATES--MEANS THE DISTRICT OF COLUMBIA AND ALL
STATES OF THE UNITED STATES OTHER THAN ALASKA AND HAWAII.

DESTINATION--MEANS THE ULTIMATE DESTINATION OF THE PASSENGER'S JOURNEY
AS SHOWN ON THE TICKET(S).

DISABLED--MEANS ANY INDIVIDUAL WHO HAS A PHYSICAL OR MENTAL IMPAIRMENT
THAT, ON A PERMANENT OR TEMPORARY BASIS, SUBSTANTIALLY LIMITS ONE OR
MORE MAJOR LIFE ACTIVITIES, HAS A RECORD OF SUCH AN IMPAIRMENT, OR IS
REGARDED AS HAVING SUCH AN IMPAIRMENT.  AS USED IN THIS DEFINITION, THE
PHRASE:

  1) PHYSICAL OR MENTAL IMPAIRMENT--MEANS (1) ANY PHYSIOLOGICAL
DISORDER, OR CONDITION, COSMETIC DISFIGUREMENT, OR ANATOMICAL LOSS
AFFECTING ONE OR MORE OF THE FOLLOWING BODY SYSTEMS:  NEUROLOGICAL,
MUSCULOSKELETAL, SPECIAL SENSE ORGANS, RESPIRATORY INCLUDING SPEECH
ORGANS, CARDIO-VASCULAR, REPRODUCTIVE, DIGESTIVE, GENITO-URINARY, HEMIC
AND LYMPHATIC, SKIN, AND ENDOCRINE; OR (2) ANY MENTAL OR PSYCHOLOGICAL
DISORDER, SUCH AS MENTAL RETARDATION, ORGANIC BRAIN SYNDROME, EMOTIONAL
OR MENTAL ILLNESS, AND SPECIFIC LEARNING DISABILITIES.  THE TERM
"PHYSICAL OR MENTAL IMPAIRMENT" INCLUDES, BUT IS NOT LIMITED TO, SUCH
DISEASES AND CONDITIONS AS ORTHOPEDIC, VISUAL, SPEECH, AND HEARING
IMPAIRMENTS; CEREBRAL PALSY, EPILEPSY, MUSCULAR DYSTROPHY, MULTIPLE
SCLEROSIS, CANCER, HEART DISEASE, DIABETES, MENTAL RETARDATION,
EMOTIONAL ILLNESS, DRUG ADDICTION, AND ALCOHOLISM.

  2) MAJOR LIFE ACTIVITIES--MEANS FUNCTIONS SUCH AS CARING FOR ONE'S
SELF, PERFORMING MANUAL TASKS, WALKING, SEEING, HEARING, SPEAKING,
BREATHING, LEARNING, AND WORKING.

  3) HAS A RECORD OF SUCH IMPAIRMENT--MEANS HAS HISTORY OF, OR HAS BEEN
CLASSIFIED, OR MISCLASSIFIED, AS HAVING A MENTAL OR PHYSICAL IMPAIRMENT
THAT SUBSTANTIALLY LIMITS ONE OR MORE MAJOR LIFE ACTIVITIES.

  4) IS REGARDED AS HAVING AN IMPAIRMENT MEANS:

    A) HAS PHYSICAL OR MENTAL IMPAIRMENT THAT DOES NOT SUBSTANTIALLY
LIMIT MAJOR LIFE ACTIVITIES BUT THAT IS TREATED BY AN AIR CARRIER AS
CONSTITUTING SUCH A LIMITATION;
    B) HAS A PHYSICAL OR MENTAL IMPAIRMENT THAT SUBSTANTIALLY LIMITS A
MAJOR LIFE ACTIVITY ONLY AS A RESULT OF THE ATTITUDES OF OTHERS TOWARD
SUCH AN IMPAIRMENT; OR
    C) HAS NONE OF THE IMPAIRMENTS SET FORTH IN THIS DEFINITION BUT IS
TREATED BY AN AIR CARRIER AS HAVING SUCH AN IMPAIRMENT.

DOT HAZARDOUS MATERIALS REGULATIONS--MEANS THE HAZARDOUS MATERIALS
REGULATIONS ISSUED BY THE MATERIALS TRANSPORTATION BUREAU OF THE

DEPARTMENT OF TRANSPORTATION IN TITLE 49 OF THE CODE OF FEDERAL
REGULATIONS, PARTS 171 THROUGH 180 (49 CFR 171-180).

HAW.--MEANS HONOLULU, HILO, KAHULUI, KONA, AND LIHUE, HAWAII.

IMMEDIATE FAMILY--MEANS SPOUSE, DOMESTIC PARTNER, CHILDREN, PARENTS,
SISTERS, BROTHERS, GRANDPARENTS, GRANDCHILDREN, AUNTS, UNCLES, NIECES,
AND NEPHEWS.
NOTE:  RELATIONSHIPS APPLY WHETHER NATURAL, ADOPTIVE, STEP, IN-LAW OR
DOMESTIC PARTNER.

INTERCHANGE FLIGHT--MEANS A FLIGHT OPERATED OVER THE ROUTES OF TWO OR
MORE CARRIERS WITHOUT CHANGE OF EQUIPMENT.

INTERLINE--MEANS ANY TRANSPORTATION WHICH INVOLVES CARRIAGE VIA TWO OR
MORE AIR CARRIERS.

INTERNATIONAL TRANSPORTATION--MEANS ANY TRANSPORTATION OR OTHER
SERVICES, FURNISHED BY ANY CARRIER, WHICH ARE INCLUDED WITHIN THE SCOPE
OF THE TERM "INTERNATIONAL TRANSPORTATION" AS USED IN THE CONVENTION
FOR THE UNIFICATION OF CERTAIN RULES RELATING TO INTERNATIONAL
TRANSPORTATION BY AIR SIGNED AT WARSAW, OCTOBER 12, 1929, OR SUCH
CONVENTION AS AMENDED, WHICHEVER MAY BE APPLICABLE TO THE
TRANSPORTATION HEREUNDER, AND TO WHICH THE SAID CONVENTION APPLIES.

JET AIRCRAFT--MEANS THE FOLLOWING AIRCRAFT (AND SERIES THEREOF); A-319,
A-320, B-737, B-747, B-757, B-767, B-777, CRJ, ERJ, FRJ.

MAIN CABIN--MEANS THE PASSENGER COMPARTMENT(S) OTHER THAN FIRST CLASS
OR BUSINESS CLASS.

MAXIMUM OUTSIDE LINEAR DIMENSIONS--MEANS THE SUM OF THE GREATEST
OUTSIDE LENGTH PLUS THE GREATEST OUTSIDE WIDTH PLUS THE GREATEST
OUTSIDE HEIGHT.

MILITARY PASSENGER--MEANS MILITARY PERSONNEL OF THE U.S. MILITARY
AGENCIES WHO ARE ON ACTIVE DUTY STATUS, OR WHO HAVE BEEN DISCHARGED
FROM ACTIVE MILITARY SERVICE WITHIN SEVEN DAYS OF THE DATE OF TRAVEL.

ONLINE--MEANS AIR TRANSPORTATION WHOLLY ON THE SAME CARRIER.

OPEN-JAW TRIP--MEANS ANY TRIP WHICH IS ESSENTIALLY OF A ROUND TRIP OR
CIRCLE TRIP NATURE, BUT THE OUTWARD POINT OF DEPARTURE AND THE INWARD
POINT OF ARRIVAL, OR THE OUTWARD POINT OF ARRIVAL AND INWARD POINT OF
DEPARTURE, ARE NOT THE SAME.
EXAMPLE OF OPEN-JAW TRIP:
POINT 1 TO POINT 2 TO POINT 3

OUTWARD DESTINATION--MEANS THAT STOPOVER POINT ON THE PASSENGER'S
ITINERARY WHICH IS FURTHEST FROM THE PASSENGER'S POINT OF ORIGIN.

PROPELLER AIRCRAFT-THE FOLLOWING AIRCRAFT (AND ALL SERIES THEREOF):
DH2, EM2, SF3.

QUALIFIED DISABLED--MEANS A DISABLED INDIVIDUAL WHO:
   1) WITH RESPECT TO ACCOMPANYING OR MEETING A TRAVELER, USE OF GROUND
TRANSPORTATION, USING TERMINAL FACILITIES, OR OBTAINING INFORMATION

ABOUT SCHEDULES, FARES OR POLICIES, TAKES THOSE ACTIONS NECESSARY TO
AVAIL HIMSELF OR HERSELF OF FACILITIES OR SERVICES OFFERED BY AN AIR
CARRIER TO THE GENERAL PUBLIC, WITH REASONABLE ACCOMMODATIONS, AS
NEEDED, PROVIDED BY THE CARRIER;

    2) WITH RESPECT TO OBTAINING A TICKET FOR AIR TRANSPORTATION ON AN
AIR CARRIER, OFFERS, OR MAKES A GOOD FAITH ATTEMPT TO OFFER, TO
PURCHASE OR OTHERWISE VALIDLY TO OBTAIN SUCH A TICKET;

    3) WITH RESPECT TO OBTAINING AIR TRANSPORTATION, OR OTHER SERVICES OR
ACCOMMODATIONS:
    A) PURCHASES OR POSSESSES A VALID TICKET FOR AIR TRANSPORTATION ON
AN AIR CARRIER AND PRESENTS HIMSELF OR HERSELF AT THE AIRPORT FOR THE
PURPOSE OF TRAVELING ON THE FLIGHT FOR WHICH THE TICKET HAS BEEN
PURCHASED OR OBTAINED; AND
    B) MEETS REASONABLE, NONDISCRIMINATORY CONTRACT OF CARRIAGE
REQUIREMENTS APPLICABLE TO ALL PASSENGERS.

REROUTE--MEANS TO ISSUE A NEW TICKET COVERING TRANSPORTATION TO THE
SAME DESTINATION AS, BUT VIA A DIFFERENT ROUTING THAN, THAT DESIGNATED
ON THE TICKET, OR PORTION THEREOF, THEN HELD BY THE PASSENGER, OR TO
HONOR THE TICKET, OR PORTION THEREOF, THEN HELD BY THE PASSENGER FOR
TRANSPORTATION TO THE SAME DESTINATION AS, BUT VIA A DIFFERENT ROUTING
THAN, THAT DESIGNATED THEREON.

ROUND TRIP--MEANS ANY TRIP, THE ULTIMATE DESTINATION OF WHICH IS THE
POINT OF ORIGIN, AND WHICH IS MADE VIA THE SAME ROUTING IN BOTH
DIRECTIONS.
EXAMPLES OF ROUND TRIPS:
EXAMPLE OF LOCAL ROUND TRIP:
POINT 1 TO POINT 2 ON AIRLINE A
POINT 2 TO POINT 1 ON AIRLINE A
EXAMPLE OF JOINT ROUND TRIP:
POINT 1 TO POINT 2 ON AIRLINE A
POINT 2 TO POINT 3 ON AIRLINE B
POINT 3 TO POINT 2 ON AIRLINE B
POINT 2 TO POINT 1 ON AIRLINE A

ROUTING--MEANS THE CARRIER(S) AND/OR THE CITIES AND/OR CLASS OF SERVICE
VIA WHICH TRANSPORTATION IS PROVIDED BETWEEN TWO POINTS, AS SPECIFIED
IN ANY TARIFF GOVERNED BY THIS TARIFF.

STOPOVER--MEANS A DELIBERATE INTERRUPTION, IN EXCESS OF FOUR HOURS, OF
A JOURNEY BY THE PASSENGER AS AGREED TO IN ADVANCE BY THE CARRIER, AT A
POINT BETWEEN THE PLACE OF DEPARTURE AND THE PLACE OF DESTINATION.

UA--MEANS UNITED AIR LINES, INC.

UA TICKET STOCK--MEANS TICKETS WHICH ARE IMPRINTED WITH THE CARRIER
CODE (016) AS PART OF THE SERIAL NUMBER AND WHICH ARE ISSUED AND
VALIDATED WITH A UA VALIDATOR BY AN AUTHORIZED UA EMPLOYEE, UA
APPOINTED TRAVEL AGENCY, OR ANY OTHER PERSON AUTHORIZED TO ISSUE UA
TICKETS.

UNITED—MEANS UNITED AIRLINES INC.

"UNITED STATES OF AMERICA", OR "THE UNITED STATES", OR "THE U.S.A." OR
"THE U.S."—EACH MEANS, UNLESS OTHERWISE SPECIFIED, THE AREA COMPRISING
THE 48 CONTIGUOUS, FEDERATED STATES; THE FEDERATED DISTRICT OF
COLUMBIA; THE FEDERATED STATES OF ALASKA AND HAWAII; PUERTO RICO; THE
U.S. VIRGIN ISLANDS; AMERICAN SAMOA; THE CANAL ZONE; CANTON; GUAM;
MIDWAY AND WAKE ISLANDS.

## CAPACITY LIMITATIONS UA  RULE: 0020

THE CARRIER SHALL LIMIT THE NUMBER OF PASSENGERS CARRIED ON ANY ONE
FLIGHT AT FARES GOVERNED BY RULES OR FARES MAKING REFERENCE HERETO, AND
SUCH FARES WILL NOT NECESSARILY BE AVAILABLE ON ALL FLIGHTS.  THE
NUMBER OF SEATS WHICH THE CARRIER SHALL MAKE AVAILABLE ON A GIVEN
FLIGHT WILL BE DETERMINED SOLELY BY THE CARRIER.

## REFUSAL TO TRANSPORT UA  RULE: 0035

UA WILL REFUSE TO TRANSPORT OR WILL REMOVE AT ANY POINT, ANY PASSENGER:

GOVERNMENT REQUEST -
    A) GOVERNMENT REQUEST OR REGULATIONS--WHENEVER SUCH ACTION IS
NECESSARY TO COMPLY WITH ANY GOVERNMENT REGULATION, OR TO COMPLY WITH
ANY GOVERNMENTAL REQUEST FOR EMERGENCY TRANSPORTATION IN CONNECTION
WITH THE NATIONAL DEFENSE, OR WHENEVER SUCH ACTION IS NECESSARY OR
ADVISABLE BY REASON OF WEATHER OR OTHER CONDITIONS BEYOND ITS CONTROL
(INCLUDING, BUT WITHOUT LIMITATION, ACTS OF GOD, FORCE MAJEURE,
STRIKES, CIVIL COMMOTIONS, EMBARGOES, WARS, HOSTILITIES, OR
DISTURBANCES) ACTUAL, THREATENED, OR REPORTED.

SEARCH OF PASSENGER -
    B) SEARCH OF PASSENGER OR PROPERTY--WHO REFUSES TO PERMIT SEARCH OF
HIS/HER PERSON OR PROPERTY FOR EXPLOSIVES OR A CONCEALED, DEADLY, OR
DANGEROUS WEAPON OR ARTICLE.

PROOF OF IDENTITY -
    C) PROOF OF IDENTITY--WHO REFUSES ON REQUEST TO PRODUCE
IDENTIFICATION WHICH REFLECTS THE SAME FULL NAME INFORMATION DISPLAYED
ON THE TICKETS(S).
NOTE:  UA SHALL HAVE THE RIGHT, BUT SHALL NOT BE OBLIGATED, TO REQUIRE
IDENTIFICATION OF PERSONS PURCHASING TICKETS AND/OR PRESENTING A
TICKET(S) FOR THE PURPOSE OF BOARDING THE AIRCRAFT.

ACROSS INT'L BOUNDARIES -
    D) ACROSS INTERNATIONAL BOUNDARIES--WHO IS TRAVELING ACROSS ANY
INTERNATIONAL BOUNDARY IF:
    1) THE TRAVEL DOCUMENTS OF SUCH PASSENGER ARE NOT IN ORDER;
    2) FOR ANY REASON, SUCH PASSENGER'S EMBARKATION FROM, TRANSIT
THROUGH, OR ENTRY INTO ANY COUNTRY FROM, THROUGH, OR TO WHICH SUCH
PASSENGER DESIRES TRANSPORTATION WOULD BE UNLAWFUL;
    3) SUCH PASSENGER FAILS OR REFUSES TO COMPLY WITH THE RULES AND
REGULATIONS OF UA.

    E) SAFETY
    1) IN THE FOLLOWING CATEGORIES WHERE REFUSAL OR REMOVAL MAY BE
NECESSARY FOR THE SAFETY OF THEMSELVES AND OTHER PASSENGERS:

A) PERSONS WHOSE CONDUCT IS DISORDERLY, ABUSIVE, OR VIOLENT (OTHER THAN A QUALIFIED DISABLED PASSENGER WHOSE APPEARANCE OR INVOLUNTARY BEHAVIOR MAY OFFEND, ANNOY, OR INCONVENIENCE CREW MEMBERS OR THEIR PASSENGER).

B) PASSENGERS WHO ARE BAREFOOT.

C) PERSONS WHO ARE UNABLE TO SIT IN THE SEAT WITH THE SEAT BELT FASTENED.

D) PERSONS WHO APPEAR TO BE INTOXICATED OR UNDER THE INFLUENCE OF DRUGS.  (OTHER THAN A QUALIFIED DISABLED INDIVIDUAL WHOSE APPEARANCE OR INVOLUNTARY BEHAVIOR MAY MAKE THEM APPEAR TO BE INTOXICATED OR UNDER THE INFLUENCE OF DRUGS.)

E) PERSONS KNOWN TO HAVE A COMMUNICABLE DISEASE OR INFECTION WHICH HAS BEEN DETERMINED, BY THE U.S. SURGEON GENERAL, THE CENTER FOR DISEASE CONTROL, OR OTHER FEDERAL PUBLIC HEALTH AUTHORITY KNOWLEDGEABLE ABOUT THE DISEASE OR INFECTION, TO BE TRANSMISSIBLE TO OTHER PERSONS IN THE NORMAL COURSE OF THE FLIGHT.  IF THE PASSENGER WITH THE COMMUNICABLE DISEASE OR INFECTION PRESENTS A MEDICAL CERTIFICATE GIVING APPROVAL TO TRAVEL AND STATING ANY CONDITIONS FOR TRAVEL, UA SHALL PROVIDE TRANSPORTATION TO THE PASSENGER UNLESS IT IS NOT FEASIBLE TO IMPLEMENT THE CONDITIONS SET FORTH IN THE MEDICAL CERTIFICATE AS NECESSARY TO PREVENT THE TRANSMISSION OF THE DISEASE OR INFECTION TO OTHER PERSONS IN THE NORMAL COURSE OF THE FLIGHT.

F) PERSONS WHO HAVE A MALODOROUS CONDITION (OTHER THAN INDIVIDUALS QUALIFYING AS DISABLED).

G) PERSONS WHO ATTEMPT TO INTERFERE WITH ANY MEMBER OF THE FLIGHT CREW IN THE PURSUIT OF THEIR DUTIES.

H) PERSONS WHO ARE MENTALLY DERANGED OR MENTALLY INCAPACITATED WHOSE BEHAVIOR MAY BE HAZARDOUS TO HIMSELF/HERSELF, THE CREW, OR OTHER PASSENGERS. HOWEVER, UA WILL ACCEPT ESCORTED MENTAL PATIENTS IF THE REQUESTING MEDICAL AUTHORITY FURNISHES A MEDICAL CERTIFICATE WHICH STATES THAT THE MENTAL PATIENT MAY BE TRANSPORTED SAFELY.  THE ESCORT MUST ACCOMPANY THE ESCORTED PASSENGER AT ALL TIMES.

I) PERSONS WHO ARE SERIOUSLY ILL, WHO CANNOT OR REFUSE TO PROVIDE A PHYSICIAN'S WRITTEN PERMISSION TO FLY.

J) PERSONS WHO WEAR OR HAVE ON OR ABOUT THEIR PERSONS CONCEALED OR UNCONCEALED DEADLY OR DANGEROUS WEAPONS; PROVIDED HOWEVER, THAT UA WILL CARRY PASSENGERS WHO MEET THE QUALIFICATIONS AND CONDITIONS ESTABLISHED IN F.A.R. 108.219.

K) MANACLED PERSONS IN CUSTODY OF LAW ENFORCEMENT PERSONNEL, OR PERSONS WHO HAVE RESISTED OR MAY REASONABLE BE BELIEVED TO BE CAPABLE OF RESISTING ESCORTS.

L) UNACCOMPANIED PASSENGERS WHO ARE BOTH BLIND AND DEAF, UNLESS SUCH PASSENGER IS ABLE TO COMMUNICATE WITH REPRESENTATIVES OF UA BY EITHER PHYSICAL, MECHANICAL, ELECTRONIC, OR OTHER MEANS.  SUCH PASSENGER MUST INFORM UA OF THE METHOD OF COMMUNICATION TO BE USED.

M) PERSONS WHO WOULD REQUIRE UNUSUAL OR UNREASONABLE TYPE OF ASSISTANCE OR MEDICAL TREATMENT ENROUTE, CONFIRMED BY A UA PHYSICIAN, UNLESS ACCOMPANIED BY A TICKETED PASSENGER CAPABLE OF GIVING NECESSARY ASSISTANCE. UNITED AIRLINES PERSONNEL ARE NOT PERMITTED TO GIVE HYPODERMIC INJECTIONS.

N) PERSONS WHO ARE UNWILLING/UNABLE TO ABIDE WITH NO-SMOKING REQUIREMENTS.

F)  PASSENGER'S CONDUCT OR CONDITION

1)  EXCEPT AS PROVIDED IN RULE 90 (OXYGEN SERVICE), AND ELSEWHERE IN THIS RULE, UA MAY REQUIRE AN ATTENDANT TO ACCOMPANY A DISABLED PASSENGER ONLY FOR SAFETY-RELATED REASONS AS OUTLINED BELOW.

A)  WHO IS TRAVELING IN AN INCUBATOR;

B)   WHO IS TRAVELING IN A AEROSTRETCHER;
C)   WHO BECAUSE OF A MENTAL DISABILITY IS UNABLE TO
COMPREHEND OR RESPOND TO SAFETY RELATED INSTRUCTIONS;
D)   WHO HAS BOTH A SEVERE HEARING AND VISION IMPAIRMENT
AND WHO IS UNABLE TO ESTABLISH A MEANS OF COMMUNICATION WITH UA
PERSONNEL SUFFICIENT TO RECEIVE THE SAFETY BRIEFING;
E)   WHO HAS A MOBILITY IMPAIRMENT SO SEVERE AS TO BE
UNABLE TO ASSIST IN HIS/HER OWN EVACUATION.
2)   CONDITIONS FOR ACCEPTANCE
EXCEPT AS NOTED BELOW, UA WILL NOT REQUIRE THAT A QUALIFIED DISABLED
PASSENGER PROVIDE ADVANCE NOTICE OF HIS/HER INTENTION TO TRAVEL OR OF
HIS/HER
DISABILITY AS A CONDITION OF RECEIVING TRANSPORTATION.  UA WILL REQUIRE
48 HOUR ADVANCE NOTICE AND ONE HOUR ADVANCE CHECK IN CONCERNING
QUALIFIED DISABLED INDIVIDUALS WHO WISH TO RECEIVE ANY ONE OF THE
FOLLOWING SERVICES.  HOWEVER, UA WILL MAKE EVERY REASONABLE EFFORT TO
ACCOMMODATE PASSENGERS WHO FAIL TO MAKE RESERVATIONS 48 HOURS OR CHECK-
IN ONE HOUR BEFORE DEPARTURE, BUT WILL NOT BE OBLIGATED TO DO SO:
A)   MEDICAL OXYGEN;
B)   CARRIAGE OF AN INCUBATOR (UNITED EXPRESS MAY NOT
PROVIDE THIS SERVICE);
C)   HOOK-UP OF A RESPIRATOR/VENTILATOR/KIDNEY TRANSPORT
MODULES TO THE AIRCRAFT ELECTRICAL POWER SUPPLY (UNITED EXPRESS MAY NOT
PROVIDE THIS SERVICE);
D)   ACCOMMODATION OF A GROUP OF 10 OR MORE DISABLED
INDIVIDUALS WHO ARE TRAVELING AS A GROUP;
E)   TRANSPORTATION OF ELECTRIC WHEELCHAIR OR OTHER BATTERY
POWERED ASSISTIVE DEVICE;
NOTE:   THE 48 HOUR ADVANCE NOTICE PROVISION IS REQUIRED ONLY ON
FLIGHTS SCHEDULED TO BE MADE WITH AN AIRCRAFT OF LESS THAN 60 SEATS FOR
WHICH THE DEVICE MIGHT HAVE TO BE COLLAPSED AND SEPARATE DANGEROUS
GOODS PACKAGING FOR THE BATTERY MAY BE REQUIRED;
F)   AEROSTRETCHER SERVICE (AVAILABLE ONLY ON LIMITED BASIS
ON SOME UNITED EXPRESS FLIGHTS);
G)   REQUEST FOR ON BOARD WHEELCHAIR ON AN AIRCRAFT THAT
DOES NOT HAVE AN ACCESSIBLE LAVATORY.  (MAY NOT BE AVAILABLE ON ALL
UNITED EXPRESS FLIGHTS).

G)   LIABILITY
UA IS NOT LIABLE FOR ITS REFUSAL TO TRANSPORT ANY PASSENGER OR FOR ITS
REMOVAL OF ANY PASSENGER IN ACCORDANCE WITH THE PRECEDING PARAGRAPHS OF
THIS RULE, BUT SUCH CARRIER WILL, AT THE REQUEST OF THE PASSENGER,
REFUND IN ACCORDANCE WITH RULE 260 (INVOLUNTARY REFUNDS) AS AN EXPRESS
PRECONDITION TO ISSUANCE OF ANY TICKET OR GRANTING OF PASSAGE BY UA
HEREUNDER, UA SHALL NOT BE RESPONSIBLE FOR COMPENSATORY OR PUNITIVE
DAMAGES.  THE PASSENGER'S SALE AND EXCLUSIVE REMEDY SHALL BE RULE 260
(REFUND INVOLUNTARY).


**ELECTRONIC SURVEILLANCE OF PASSENGERS AND BAGGAGE UA  RULE: 0040**

PASSENGERS AND/OR THEIR BAGGAGE ARE SUBJECT TO INSPECTION WITH AN
ELECTRONIC DETECTOR, WITH OR WITHOUT THE PASSENGER'S CONSENT OR
KNOWLEDGE.

**ACCEPTANCE OF CHILDREN UA   RULE: 0050**

    A)  ACCOMPANIED.  CHILDREN UNDER 12 YR. OLD ARE ACCEPTED FOR TRANSPORTATION WHEN ACCOMPANIED ON THE SAME FLIGHT AND IN THE SAME COMPARTMENT BY A PASSENGER AT LEAST 12 YR. OLD. A CHILD UNDER 2 YEARS OF AGE ON THE DATE OF COMMENCEMENT OF OUTBOUND TRAVEL AND NOT OCCUPYING A SEAT MUST BE ACCOMPANIED BY A PASSENGER AT LEAST 18 YEARS OF AGE AS DESCRIBED BELOW:

    B)  UNACCOMPANIED.
      1)  UNDER 5 YR. OLD--NOT ACCEPTED UNDER ANY CONDITIONS.
      2)  5-11 YR. OLD--CHILDREN 5-11 YEARS OF AGE NOT ACCOMPANIED ON THE SAME FLIGHT AND IN THE SAME COMPARTMENT BY A PASSENGER 12 YEARS OF AGE OR OVER ARE ACCEPTED FOR TRANSPORTATION ONLY UNDER THE FOLLOWING CONDITIONS:
        A)  5, 6 OR 7 YR. OLD--ACCEPTED FOR ONLINE TRANSPORTATION ONLY WHEN THROUGH SERVICE IS PROVIDED WITHOUT CHANGE OF AIRCRAFT. THE CHILD MUST BE BROUGHT TO THE AIRPORT OF DEPARTURE BY A PARENT OR RESPONSIBLE ADULT WHO REMAINS WITH THE CHILD UNTIL ENPLANED, AND WHO MUST FURNISH UA WITH SATISFACTORY EVIDENCE THAT THE CHILD WILL BE MET BY ANOTHER PARENT OR RESPONSIBLE ADULT UPON DEPLANING AT CHILD'S DESTINATION.  THE CHILD WILL NOT BE ACCEPTED IF THE FLIGHT(S) ON WHICH THE CHILD HOLDS A RESERVATION IS EXPECTED TO TERMINATE SHORT OF, OR BYPASS THE CHILD'S DESTINATION.
        B)  8-11 YR. OLD— ACCEPTED FOR ONLINE TRANSPORTATION OR INTERLINE TRANSPORTATION PROVIDED SPACE HAS BEEN CONFIRMED TO THE FIRST POINT OF STOPOVER OR TO FINAL DESTINATION.
        EXCEPTION: NOT ACCEPTED WHEN AN ONLINE OR INTERLINE CONNECTING
        FLIGHT IS THE LAST FLIGHT OF THE DAY SCHEDULED TO DEPART FROM THE
        CONNECTING POINT TO THE CHILD'S NEXT STOPOVER OR CONNECTING
        POINT. FURTHER, SUCH CHILDREN WILL NOT BE ACCEPTED IF THE LAST
        NONSTOP OR THROUGH SERVICE VIA ANY CARRIER IS SCHEDULED TO DEPART
        THE CONNECTING POINT TO THE CHILD'S NEXT STOPOVER POINT,
        CONNECTING POINT OR FINAL DESTINATION LESS THAN ONE HOUR LATER
        THAN THE SCHEDULED DEPARTURE OF THE CONNECTING FLIGHT ON WHICH
        THE CHILD IS CONFIRMED. THE CHILD WILL NOT BE ACCEPTED IF THE
        FLIGHT(S) ON WHICH THE CHILD HOLDS A RESERVATION IS EXPECTED TO
        TERMINATE SHORT OF OR BYPASS THE CHILD'S DESTINATION.
      3)  12-17 YR. OLD--ACCEPTED WITHOUT RESTRICTIONS. HOWEVER, ESCORT SERVICE MAY BE REQUESTED FOR PASSENGERS 12-17 YEARS OF AGE WHO ARE MAKING A CONNECTION ENROUTE. IN SUCH CASES, THE PASSENGER WILL BE ACCEPTED ONLY UNDER THE CONDITIONS SPECIFIED IN B) ABOVE FOR CHILDREN 8-11.
      NOTE: FOR THE PURPOSE OF THIS RULE, ESCORT SERVICE MEANS THAT UA WILL PROVIDE SUPERVISION FOR THE CHILD FROM THE TIME OF BOARDING UNTIL THE CHILD IS MET AT THE DESTINATION.

    C)  CHILDREN'S FARES
EXCEPT AS OTHERWISE PROVIDED IN A SPECIFIC FARE RULE, FARES FOR CHILDREN ACCEPTED PURSUANT TO PARAGRAPHS A) AND B) ABOVE WILL BE:
      1)  CHILDREN UNDER TWO YRS. OLD
        A)  UA WILL ACCEPT FOR TRANSPORTATION, WITHOUT CHARGE, NOT MORE THAN ONE CHILD UNDER TWO YR. OLD OF AGE, WHO DOES NOT OCCUPY A SEPARATE SEAT, AND IS ACCOMPANIED BY A FARE-PAYING PASSENGER AT LEAST 18 YEARS OF AGE.
        B)  WHEN MORE THAN ONE CHILD UNDER TWO YEARS OF AGE IS ACCOMPANIED BY A PASSENGER AT LEAST 18 YEARS OF AGE, EACH ADDITIONAL

CHILD MUST OCCUPY A SEPARATE RESERVED SEAT.  ANY ADDITIONAL CHILDREN
UNDER TWO YEARS OF AGE WILL BE CHARGED A FARE THAT IS THE SAME FOR A
CHILD AT LEAST TWO YEARS OF AGE, BUT LESS THAN 12 YEARS OF AGE, AS
DESCRIBED BELOW.
    2)  CHILDREN TWO YEARS OF AGE BUT LESS THAN TWELVE THE FARE,
UNLESS SPECIFICALLY PUBLISHED, FOR CHILDREN WHO ARE AT LEAST TWO YEARS
OF AGE, BUT LESS THAN 12, AND ARE ACCOMPANIED ON THE SAME FLIGHT IN THE
SAME COMPARTMENT BY A FARE-PAYING PASSENGER AT LEAST 12 YR. OLD, WILL
BE THE APPLICABLE ADULT FARE.
    3)  UNACCOMPANIED CHILDREN
THE FARE FOR CHILDREN ACCEPTED UNDER B) ABOVE, WILL BE THE APPLICABLE
ADULT FARE PLUS ANY SURCHARGES APPLICABLE UNDER 4) BELOW.

    4)  A)  APPLICABLE FOR UNACCOMPANIED CHILDREN 5-11: THERE WILL BE
AN UNACCOMPANIED MINOR SERVICE CHARGE OF USD 60.00 FOR TICKETS ISSUED
ON/BEFORE AUGUST 31, 2006, AND USD 99.00 FOR TICKETS ISSUED ON/AFTER
September 01, 2006 ASSESSED FOR EACH ONE-WAY JOURNEY FROM THE CHILD'S
BOARDING POINT TO THE POINT OF STOPOVER OR DESTINATION.  IF TWO OR MORE
CHILDREN WHO ARE IMMEDIATE FAMILY MEMBERS, ARE TRAVELING TOGETHER, ONLY
ONE UNACCOMPANIED MINOR SERVICE CHARGE WILL BE ASSESSED.  THE SERVICE
CHARGE WILL ALSO APPLY IF A CONNECTION IS BEING MADE FROM A UA FLIGHT
TO THE FLIGHT OF ANOTHER CARRIER.

    B)  APPLICABLE FOR UNACCOMPANIED CHILDREN 12-17 WHO REQUEST
ESCORT SERVICE: IN ADDITION TO THE FULL ADULT FARE APPLICABLE TO SUCH
PASSENGERS, WHEN ESCORT SERVICE IS REQUESTED PURSUANT TO RULE 50 UA
(B)(3) ABOVE, THE ACCOMPANIED MINOR SERVICE CHARGE OF USD 60.00 FOR
TICKETS ISSUED ON/BEFORE AUGUST 31, 2006 OR USD 99.00 FOR TICKETS
ISSUED ON/AFTER SEPTEMBER 01, 2006 AS OUTLINED IN (C)(4)(A) ABOVE WILL
APPLY.


## INFLIGHT ENTERTAINMENT UA RULE  0080

UA WILL PROVIDE COMPLIMENTARY AUDIO HEADSETS FOR INFLIGHT VISUAL AND/OR
AUDIO ENTERTAINMENT ON ALL FLIGHTS.  AUDIO HEADSETS WILL BE FOR USE
DURING THE FLIGHT, AND MUST BE RETURNED TO UA AT THE REQUEST OF THE
FLIGHT ATTENDANT PRIOR TO DEPLANING OR AT THE FIRST STOP AFTER THE
AUDIO AND/OR VISUAL ENTERTAINMENT HAS BEEN COMPLETED.

## PRE-PLANNED OXYGEN SESRVICE UA RULE  0090

PRE-PLANNED OXYGEN SERVICE
PASSENGERS REQUESTING THAT UA PROVIDE IN-FLIGHT OXYGEN SERVICE, ON A
PRE-PLANNED BASIS, WILL BE REQUIRED TO GIVE UA AT LEAST 48 HOURS NOTICE
THAT SUCH OXYGEN WILL BE NEEDED AND WILL BE REQUIRED TO CHECK-IN FOR
THE FLIGHT AT LEAST ONE (1) HOUR BEFORE PLANNED DEPARTURE. UNITED WILL
REQUIRE A MEDICAL CERTIFICATE FROM THE PASSENGER'S PHYSICIAN CERTIFYING
THE NEED FOR INFLIGHT OXYGEN, WHETHER ANY SPECIAL CONDITIONS OR
ATTENDANTS ARE REQUIRED, AND GIVE THE MAXIMUM USAGE PER HOUR AND THE
OXYGEN FLOW RATE PER MINUTE.  UA WILL MADE EVERY REASONABLE EFFORT TO
ACCOMMODATE PASSENGERS WHO FAIL TO MEET THE 48 HOUR
RESERVATION/NOTIFICATION REQUIREMENT OR THE ONE (1) HOUR ADVANCE CHECK-
IN REQUIREMENT, BUT WILL NOT BE OBLIGATED TO DO SO.  UA WILL ASSESS
EACH PASSENGER A USD 100.00 CHARGE PER SET UP.  THIS CHARGE IS NOT
SUBJECT TO ANY DISCOUNT.

NOTE:   OXYGEN SERVICE IS AVAILABLE ON UNITED AIRLINES, HOWEVER, IT IS
NOT AVAILABLE ON UNITED EXPRESS CARRIERS.

**CLAIMS UA RULE  0095**

CLAIMS

    A)  TIME LIMITATIONS
      1)  PERSONAL INJURY AND DEATH
        NO ACTION SHALL BE MAINTAINED FOR INJURY TO OR DEATH OF ANY
PASSENGER UNLESS:
          A)  NOTICE OF THE ALLEGED OCCURRENCE OF EVENTS RESULTING IN
THE CLAIM IS PRESENTED IN WRITING TO THE GENERAL OFFICES OF THE CARRIER
ALLEGED TO BE RESPONSIBLE WITHIN 90 DAYS, AND;
          B)  ACTION REGARDING THE CLAIM COMMENCES WITHIN ONE YEAR OF
ITS ALLEGED OCCURRENCE.
      2)  BAGGAGE CLAIMS
        NO ACTION SHALL BE MAINTAINED FOR ANY LOSS OF, OR DAMAGE TO,
OR ANY DELAY IN THE DELIVERY OF ANY PROPERTY OR BAGGAGE, OR ON ANY
OTHER CLAIM (EXCEPTING ONLY PERSONAL INJURY OR DEATH), ARISING OUT OF
OR IN CONNECTION WITH TRANSPORTATION OF, OR FAILURE TO TRANSPORT ANY
PASSENGER, PROPERTY, OR BAGGAGE UNLESS THE CLAIM IS REPORTED TO UA
WITHIN 24 HR. AND NOTICE IS PRESENTED IN WRITING TO AN OFFICE OF UA
WITHIN 45 DAYS AFTER THE ALLEGED OCCURRENCE OF THE EVENTS GIVING RISE
TO THE CLAIM, AND UNLESS THE ACTION IS COMMENCED WITHIN TWO YEARS AFTER
SUCH ALLEGED OCCURRENCE.  FAILURE TO GIVE THE ABOVE NOTICE SHALL NOT BE
A BAR IF THE CLAIMANT CAN SHOW GOOD CAUSE FOR HIS/HER FAILURE TO BRING
HIS/HER CLAIM WITHIN 45 DAYS.
    B)  OVERCHARGES
        NO CLAIMS FOR OVERCHARGES SHALL BE VALID AND NO ACTION SHALL BE
MAINTAINED THEREON MORE THAN TWO YEARS AFTER THE DATE OF THE SALE OF
THE TICKET, UNLESS SUCH CLAIM OR ACTION IS ACCOMPANIED BY THE PASSENGER
COUPON PORTION OF SAID TICKET.

**TICKETS - GENERAL UA  RULE: 0100**

A) NO PERSON SHALL BE ENTITLED TO TRANSPORTATION EXCEPT UPON
PRESENTATION OF A VALID TICKET. SUCH TICKET SHALL ENTITLE THE PASSENGER
TO TRANSPORTATION ONLY BETWEEN POINT OF ORIGIN AND DESTINATION, AND VIA
THE ROUTING DESIGNATED THEREON.

B) FLIGHT COUPONS WILL BE HONORED ONLY IN THE ORDER IN WHICH THEY ARE
ISSUED, AND ONLY IF ALL UNUSED FLIGHT COUPONS AND THE PASSENGER COUPONS
ARE PRESENTED TOGETHER.

C) USE OF COUPONS FROM TWO OR MORE TICKETS ISSUED AT ROUND TRIP FARES
FOR THE PURPOSE OF CIRCUMVENTING APPLICABLE TARIFF RULES (SUCH AS
ADVANCE PURCHASE/MINIMUM STAY REQUIREMENT) IS NOT PERMITTED. UA AGENTS
AND AUTHORIZED TRAVEL AGENTS ARE PROHIBITED FROM ISSUING TICKETS,
COMMONLY REFERRED TO AS "BACK TO BACK", UNDER SUCH CIRCUMSTANCES WHEN
THERE IS OBVIOUS INTENT TO ABUSE AND/OR MISUSE RESTRICTED ROUND TRIP
FARES. AGENTS FOUND ISSUING SUCH TICKETS MAY BE LIABLE FOR THE
DIFFERENCE BETWEEN THE FARE PAID AND THE FARE FOR TRANSPORTATION USED.
UA HAS THE RIGHT TO DENY TRANSPORTATION TO PASSENGERS FOUND UTILIZING
TICKETS IN THIS MANNER UNLESS THE DIFFERENCE BETWEEN THE FARE PAID AND
THE FARE FOR TRANSPORTATION USED IS COLLECTED.

D) A TICKET WHICH HAS NOT BEEN VALIDATED, OR WHICH HAS BEEN ALTERED, MUTILIATED OR IMPROPERLY ISSUED, SHALL NOT BE VALID.
   EXCEPTION: WRITE-YOUR-OWN TYPE TICKETS WILL BE HONORED FOR TRANSPORTATION WITHOUT VALIDATION, PROVIDED THE PERSON ISSUING SUCH TICKETS HAS A WRITTEN AGREEMENT WITH THE CARRIER SETTING FORTH ACCOUNTING, RESERVATIONS, AND TICKETING PROCEDURES.

E) TICKETS ARE NOT TRANSFERABLE, BUT UA IS NOT LIABLE TO THE OWNER OF A TICKET FOR HONORING OR REFUNDING SUCH TICKET WHEN PRESENTED BY ANOTHER PERSON.

F) THE PURCHASER OF A UA TICKET AND THE PASSENGER INTENDING TO USE SUCH TICKET ARE RESPONSIBLE FOR ENSURING THAT THE TICKET ACCURATELY STATES THE PASSENGER'S NAME. PRESENTATION OF A TICKET FOR TRANSPORTATION ON UA BY SOMEONE OTHER THAN THE PASSENGER NAMED THEREON RENDERS THE TICKET VOID. SUCH TICKET WILL BE SUBJECT TO CONFISCATION AND WILL BE INELIGIBLE FOR ANY REFUND.

G) AN ELECTRONIC TICKET (E-TICKET/ET) IS THE RECORD OF AGREEMENT MAINTAINED AND PROCESSED WITHIN THE CARRIER'S ELECTRONIC RESERVATION SYSTEM. A WRITTEN RECEIPT IS PROVIDED TO THE PURCHASER OF THE ELECTRONIC TICKET WHICH CONTAINS A REFERENCE FOR RETRIEVING THE RECORD WITHIN THE CARRIER'S RESERVATION SYSTEM AND SUMMARY OF THE TICKET INFORMATION.
   (1) UA MAY MANDATE THE ISSUANCE OF AN ELECTRONIC TICKET (ET) REGARDLESS OF MARKET, CARRIER, FORM OF PAYMENT, OR CUSTOMER TYPE (INCLUDING MILEAGE PLUS AND PARTICIPATING CARRIER FREQUENT FLYER MEMBERS.)
   (2) EFFECTIVE FOR TICKETS ISSUED IN THE UNITED STATES, PUERTO RICO AND THE U.S. VIRGIN ISLANDS, UA OR ITS AUTHORIZED AGENT WILL COLLECT A USD 75.00 SERVICE CHARGE WHEN A PASSENGER VOLUNTARILY REQUESTS THE CONVERSION OF AN ELECTRONIC TICKET (ET) TO PAPER FOR ALL ET-ELIGIBLE ITINERARIES. THIS SERVICE CHARGE IS NON-REFUNDABLE AND APPLIES IN ADDITION TO ALL OTHER APPLICABLE CHARGES.

H) EFFECTIVE FOR TICKETS ISSUED ON/AFTER 15JUN06, UA WILL ASSESS A $20.00 USD FEE FOR TICKETS PURCHASED AT ANY AIRPORT LOCATION WITHIN THE 50 U.S. STATES AND A $15.00 USD FEE FOR TICKETS PURCHASED THROUGH UNITED RESERVATIONS CENTERS. FEES ARE NON-REFUNDABLE AND APPLY IN ADDITION TO ALL OTHER APPLICABLE CHARGES.

I) EFFECTIVE 15JUN06  UNITED WILL ASSESS A USD 15.00 SERVICE FEE TO ASSIST WITH A VOLUNTARY CHANGE ON TICKETS ORIGINALLY ISSUED VIA ANY EXTERNAL TICKETING SOURCE (TRAVEL AGENCY/INTERNET AGENCY/OTHER AIRLINE/ETC). THE FEE APPLIES TO DOMESTIC TRAVEL (UNITED STATES/PUERTO RICO/U.S. VIRGIN ISLANDS) AND U.S. POINT OF SALE TO INTERNATIONAL DESTINATIONS. THE FEE IS NON-REFUNDABLE AND APPLIES IN ADDITION TO ALL APPLICABLE CHARGES.


**TICKET VALIDITY UA  RULE: 0105**

A) PERIOD OF VALIDITY
   (1) EXCEPT AS PROVIDED IN PARAGRAPH C) 1) BELOW, A REFUNDABLE ORIGINAL TICKET OR COMPLETELY REISSUED PUBLISHED FARE TICKET WILL BE VALID FOR TRANSPORTATION FOR ONE YEAR FROM THE DATE ON WHICH

TRANSPORTATION COMMENCES AT THE POINT OF ORIGIN DESIGNATED ON THE
ORIGINAL TICKET OR, IF NO PORTION OF THE TICKET IS USED, FROM THE
DATE OF ISSUANCE OF THE ORIGINAL OR REISSUED TICKET WHICHEVER IS
LATER.  WHEN AN UNUSED PUBLISHED FARE TICKET IS COMPLETELY REISSUED,
THE NEW TICKET VALIDITY ON THE REISSUED TICKET WILL BE DETERMINED
FROM THE DATE THE TICKET WAS REISSUED.

(2) NON-REFUNDABLE FARES: TICKETS HAVE NO VALUE AFTER TICKETED
    DEPARTURE DATE.
    Exception: When the passenger cancels the ticketed flight
               reservations prior to the ticketed departure
               date, the ticket will be valid for transportation
               for one year from the date of issuance of the
               original ticket. Otherwise, the ticket has no
               value after ticketed departure date.

B) EXTENSION OF VALIDITY
   1) IF THE PASSENGER IS PREVENTED FROM USING THE TICKET, OR A
PORTION OF  THE TICKET, DURING THE PERIOD OF VALIDITY SPECIFIED IN
PARAGRAPH A) ABOVE OR THE PERIOD OF VALIDITY APPLICABLE TO AN EXCURSION
OR SPECIAL FARE, DUE TO LACK OF SPACE OR FLIGHT CANCELLATION, THE
TICKET WILL REMAIN VALID UNTIL SPACE CAN BE PROVIDED ON A SCHEDULE
COMPARABLE TO THE SCHEDULE THAT THE PASSENGER HAD REQUESTED.

   2) IF THE PASSENGER IS UNABLE TO COMMENCE OR CONTINUE HIS/HER
TRAVEL DUE TO PERSONAL ILLNESS OR PHYSICAL INCAPACITY, OR THE ILLNESS
OR PHYSICAL INCAPACITY OF A MEMBER OF HIS/HER IMMEDIATE FAMILY, OR OF
AN ASSOCIATE WITH WHOM HE/SHE IS TRAVELING, UA WILL EXTEND THE PERIOD
OF VALIDITY BEYOND THE ORIGINAL LIMIT NOT TO EXCEED 30 DAYS.  THE
ILLNESS OR INCAPACITY MUST BE CERTIFIED IN WRITING BY A PHYSICIAN,
SPECIFYING THAT THE PASSENGER IS PREVENTED FROM COMPLETING HIS/HER
JOURNEY PRIOR TO THE EXPIRATION OF THE ORIGINAL TIME LIMIT BECAUSE OF
SUCH CIRCUMSTANCES.  THE CERTIFICATE MUST BE SURRENDERED TO UA, AND THE
TICKET AND ALL COUPONS AFFECTED MUST BE ENDORSED BY AN AUTHORIZED UA
TICKET AGENT TO INDICATE THAT AN EXTENSION HAS BEEN GRANTED.
NOTE:  THE ABOVE PROVISIONS WILL ALSO APPLY IF THE PASSENGER IS UNABLE
TO COMMENCE OR CONTINUE HIS/HER TRAVEL DUE TO THE DEATH OF A MEMBER OF
HIS/HER IMMEDIATE FAMILY, OR AN ASSOCIATE WITH WHOM HE/SHE IS
TRAVELING.  THE DEATH MUST BE CERTIFIED IN WRITING BY A PHYSICIAN,
SPECIFYING THAT THE PASSENGER IS PREVENTED FROM COMPLETING HIS/HER
JOURNEY PRIOR TO THE EXPIRATION OF THE ORIGINAL TIME LIMIT BECAUSE OF
SUCH CIRCUMSTANCES.  IN THE CASE OF DEATH, A COPY OF THE DEATH
CERTIFICATE SHALL BE PRESENTED TO UA.

   3) WAIVERS FOR JURY DUTY SUMMONS/SUBPOENA
WHEN PASSENGERS ARE CALLED TO JURY DUTY OR RECEIVE A SUBPOENA WHICH
CONFLICTS WITH THE TRAVEL DATES, UA WILL EXTEND VALIDITY OF TICKET
AND/OR WAIVER REQUIREMENTS AS NOTED BELOW:
     A) UA WILL EXTEND TICKET VALIDITY BEYOND THE ORIGINAL LIMIT NOT
TO EXCEED 30 DAYS.
       B) WAIVER OF SPECIAL FARE PROVISIONS:
         I)  WHEN TRANSPORTATION HAS NOT COMMENCED FROM POINT OF ORIGIN:
           AA) GROUP FARES:  PASSENGERS MAY TRAVEL WITH A SUBSEQUENT
GROUP TRAVELING ON THE SAME TYPE OF FARE.  ADVANCE
RESERVATION/TICKETING/SERVICE CHARGE/NON-CHANGEABLE PROVISIONS WILL BE
WAIVED.  INDIVIDUAL TRAVEL WILL BE PERMITTED ONLY IN ACCORDANCE WITH
APPLICABLE TARIFF RULES OF THE GROUP FARE.

BB) INDIVIDUAL FARES:  PASSENGERS WILL BE PERMITTED TO TRAVEL ON SUBSEQUENT FLIGHTS. ADVANCE RESERVATION/TICKETING/SERVICE CHARGE/NON-CHANGEABLE PROVISIONS AND LIMITED SEAT REQUIREMENTS WILL BE WAIVED.
NOTE:  TRAVEL WILL NOT BE PERMITTED ON A DAY OR AT A TIME WHEN THE FARE IS NOT APPLICABLE FOR TRAVEL, NOR WILL TRAVEL BE PERMITTED TO COMMENCE AT A FARE THAT HAS EXPIRED.
II)  WHEN TRAVEL HAS COMMENCED FROM POINT OF ORIGIN, PASSENGER WILL BE PERMITTED TO RETURN ON AN EARLIER/LATER FLIGHT.  GROUP TRAVEL, RESERVATION/TICKETING/SERVICE CHARGE/ NON-CHANGEABLE PROVISIONS, AND MINIMUM/MAXIMUM STAY REQUIREMENTS WILL BE WAIVED.
C) ANY EXTENSION OF TICKET VALIDITY OR WAIVED RESTRICTION WILL ALSO APPLY TO IMMEDIATE FAMILY MEMBERS AND TO TRAVELING COMPANION(S).
D) THE PASSENGER MUST SUBMIT A COPY OF JURY SUMMONS OR SUBPOENA WHICH ARE IN CONFLICT WITH THE TRAVEL DATES.  IF A SATISFACTORY PROOF IS NOT SUBMITTED, THE PASSENGER MUST PAY THE FARE APPLICABLE TO THE TRANSPORTATION ACTUALLY USED. THE PASSENGER MAY LATER SUBMIT A REFUND APPLICATION WITH SUPPORTING PROOF.
E) IF CIRCUMSTANCES REQUIRE THE PASSENGER TO STOP OVER AT AN INTERMEDIATE POINT, ONE STOPOVER WILL BE PERMITTED AT NO ADDITIONAL COST.
F) THE PASSENGER WILL BE ACCOMMODATED ONLY IN THE CLASS OF SERVICE, I.E. FIRST CLASS/COACH COMPARTMENT, AS ORIGINALLY TICKETED.
4) VIA ALL -N TYPE NONREFUNDABLE FARES, NO WAIVERS TO FARE RULES DUE TO ILLNESS/JURY DUTY/SUBPOENA WILL APPLY.

C) SPECIAL FARE PROVISIONS
THE PROVISIONS BELOW WILL APPLY TO FARES THAT ARE SUBJECT TO GROUP TRAVEL REQUIREMENTS, AND/OR RESERVATIONS OR TICKETING TIME LIMITATIONS, AND/OR MINIMUM OR MAXIMUM STAY REQUIREMENTS.
1) PERIOD OF VALIDITY
WHEN A TICKET INCLUDES AN EXCURSION OR SPECIAL FARE HAVING A SHORTER PERIOD OF VALIDITY THAN ONE YEAR, THE SHORTER PERIOD OF VALIDITY WILL APPLY ONLY TO THE EXCURSION OR SPECIAL FARE TRANSPORTATION.
2) EXTENSION OF VALIDITY
SEE PROVISIONS IN PARAGRAPH B) ABOVE.

3) WAIVER OF SPECIAL FARE RESTRICTIONS
A) WHEN A PASSENGER TRAVELING AT AN EXCURSION OR SPECIAL FARE IS PREVENTED FROM TRAVELING IN ACCORDANCE WITH THE TERMS OF THE APPLICABLE TARIFF DUE TO THE PASSENGER'S ILLNESS, INJURY, OR PHYSICAL INCAPACITY; OR DUE TO THE DEATH, ILLNESS, INJURY, OR PHYSICAL INCAPACITY OF A MEMBER OF HIS/HER IMMEDIATE FAMILY, THE PASSENGER WILL BE PERMITTED TO TRAVEL ACCORDING TO THE PROVISIONS BELOW.  (SEE ALSO PARAGRAPH B) BELOW.)
I) WHEN TRANSPORTATION HAS NOT COMMENCED FROM POINT OF ORIGIN AND TRAVEL IS:
AA)  GROUP TRAVEL:  THE PASSENGER WILL BE PERMITTED TO TRAVEL WITH A SUBSEQUENT GROUP TRAVELING ON THE SAME TYPE OF FARE ON WHICH THE PASSENGER WAS ORIGINALLY TICKETED, WITHOUT REGARD TO ANY MINIMUM RESERVATIONS OR TICKETING LIMIT.  THE PASSENGER WILL NOT BE PERMITTED TO COMMENCE TRAVEL INDIVIDUALLY UNLESS IN ACCORDANCE WITH THE APPLICABLE TARIFF.
BB)  INDIVIDUAL TRAVEL:  THE PASSENGER WILL BE PERMITTED TO COMMENCE TRAVEL ON A SUBSEQUENT FLIGHT WITHOUT REGARD TO ANY MINIMUM RESERVATION, OR TICKETING LIMIT, OR MAXIMUM PASSENGER LIMITATION.  THE

PASSENGER WILL NOT BE PERMITTED TO ORIGINATE TRAVEL PRIOR TO THE
ORIGINAL DEPARTURE DATE.
NOTE:  TRAVEL WILL NOT BE PERMITTED ON A DAY AT A TIME WHEN THE FARE IS
NOT APPLICABLE FOR TRAVEL, NOR WILL TRAVEL BE PERMITTED TO COMMENCE AT
A FARE THAT HAS EXPIRED.  WHEN NECESSARY THE APPROPRIATE DIFFERENCE IN
FARE WILL BE COLLECTED FROM OR REFUNDED TO THE PASSENGER.
          II)    WHEN TRANSPORTATION HAS COMMENCED FROM POINT OF ORIGIN
THE PASSENGER WILL BE PERMITTED TO RETURN TO THE FINAL DESTINATION ON
AN EARLIER OR LATER FLIGHT, AS NECESSARY, WITHOUT REGARD TO GROUP
TRAVEL REQUIREMENTS OR ANY MINIMUM RESERVATIONS OR TICKETING LIMIT.
     B) TRAVEL PERMITTED IN ACCORDANCE WITH THE PROVISIONS IN
PARAGRAPHS A) I) AND II) ABOVE IS ALSO SUBJECT TO THE FOLLOWING
PROVISIONS:
          I) THE PASSENGER WILL BE ACCOMMODATED ONLY IN THE CLASS OF
SERVICE ORIGINALLY TICKETED.
          II)    IF THE CIRCUMSTANCES REQUIRE THE PASSENGER TO STOP
OVER AT AN INTERMEDIATE POINT NAMED ON THE ROUTING APPLICABLE TO THE
FARE PAID BY THE PASSENGER, ONE STOPOVER WILL BE PERMITTED AT NO
ADDITIONAL COST.
          III)   THE PASSENGER MUST SUBMIT TO UA A PHYSICIAN'S
CERTIFICATE STATING THE CIRCUMSTANCES WHICH NECESSITATE TRAVEL UNDER
THIS PROVISION.  IN THE CASE OF DEATH OF A MEMBER OF THE PASSENGER'S
IMMEDIATE FAMILY, A COPY OF THE DEATH CERTIFICATE SHALL BE PRESENTED TO
UA.
          IV)    IF THE MEDICAL CERTIFICATE OR DEATH CERTIFICATE IS NOT
AVAILABLE AT THE TIME THE PASSENGER IS TO TRAVEL, OR IF UA HAS REASON
TO DOUBT THE VALIDITY OF SUCH CERTIFICATE, THE PASSENGER WILL BE
ACCOMMODATED ONLY UPON PAYMENT OF THE FARE APPLICABLE TO TRANSPORTATION
ACTUALLY USED, AND A REQUEST FOR REFUND MAY BE FILED WITH UA.  UPON
RECEIPT OF THE CLAIM FORM AND ALL SUPPORTING DOCUMENTS, AND AFTER
DETERMINING THE VALIDITY OF THE CLAIM, UA WILL REFUND TO THE PASSENGER
THE DIFFERENCE BETWEEN THE TOTAL FARE PAID BY THE PASSENGER AND THE
AMOUNT THE PASSENGER WOULD HAVE PAID UNDER THE PROVISIONS OF THIS RULE.
          V) ANY EXTENSION OF VALIDITY OR RESTRICTIONS WAIVED WILL
ALSO APPLY TO MEMBERS OF THE IMMEDIATE TRAVEL PARTY WHO ACCOMPANY THE
PASSENGER DESCRIBED IN PARAGRAPH C)3)A) ABOVE.


     4) WAIVER OF SERVICE CHARGES
ALL SERVICE CHARGES WILL BE WAIVED IN THE EVENT OF AN ILLNESS/DEATH TO
THE PASSENGER/IMMEDIATE FAMILY MEMBER (TRAVELING OR NOT)/TRAVELING
COMPANION, AS EVIDENCED BY A DEATH/MEDICAL CERTIFICATE.
     5) VIA ALL -N TYPE NONREFUNDABLE FARES, NO WAIVERS TO FARE
RULES DUE TO ILLNESS/JURY DUTY/SUBPOENA WILL APPLY
     6) MILITARY PERSONNEL WHO ARE ACTIVATED FOR DUTY AND IMMEDIATE
FAMILY MEMBERS AS DEFINED UNDER RULE 5UA WHO ARE ACCOMPANYING THE
QUALIFYING MILITARY PASSENGER AND ARE HOLDING VALID TICKETS FOR TRAVEL
DURING THE DATE FOR WHICH THEY MUST REPORT FOR ACTIVE DUTY OR IMMEDIATE
FAMILY MEMBERS HOLDING VALID TICKETS TO VISIT MILITARY PERSONNEL WHO
ARE ACTIVATED FOR DUTY, MAY UPON PRESENTATION TO UA A COPY OF THE
MILITARY ORDERS:
          (A)         REAPPLY THE TICKETS TO A REVISED OR NEW
               ITINERARY, REQUALIFYING FOR A FARE APPROPRIATE TO THE
               ITINERARY, AND THE TICKETS MAY BE REISSUED WITHOUT A
               SERVICE CHARGE, OR
          (B)         REFUND THE TICKETS IN THE FORM OF A UA
               TRAVEL VOUCHER OR TO THE ORIGINAL FORM OF PAYMENT
               WITHOUT A SERVICE CHARGE.

**CONFIRMATION OF RESERVED SPACE UA   RULE: 0115**

A) A RESERVATION FOR SPACE ON A GIVEN FLIGHT IS VALID WHEN THE
AVAILABILITY AND ALLOCATION OF SUCH SPACE IS CONFIRMED BY A RESERVATION
AGENT OF UA OR ITS AUTHORIZED REPRESENTATIVE AND ENTERED INTO THE
CARRIERS RESERVATIONS SYSTEM.  AT TIME OF RESERVATION UA REQUIRES THE
FULL NAME CONSISTING OF FULL FIRST AND LAST NAME FOR EACH PASSENGER TO
BE ENTERED INTO THE NAME FIELD OF THE RESERVATION.  EXCEPTION:  ONLY
ONE NAME WILL BE REQUIRED FOR RESERVATIONS FOR PASSENGERS WHOSE
PASSPORT REFLECT ONLY ONE NAME.  RESERVATIONS WHICH DO NOT CONTAIN THE
FULL NAME OF EACH PASSENGER WILL BE AUTOMATICALLY CANCELLED WITHIN 72
HOURS OF RESERVATION CONFIRMATION.   SUBJECT TO PAYMENT OR SATISFACTORY
CREDIT ARRANGEMENT, A VALIDATED TICKET WILL BE ISSUED BY UA OR ITS
AUTHORIZED REPRESENTATIVE INDICATING SUCH CONFIRMED SPACE, PROVIDED
PASSENGER APPLIES FOR SUCH TICKET AT LEAST 60 MINUTES PRIOR TO THE
SCHEDULED DEPARTURE TIME OF THE FLIGHT TO WHICH SUCH RESERVATION
APPLIES.  SUCH RESERVATION IS SUBJECT TO CANCELLATION BY UA, WITHOUT
NOTICE, IF THE PASSENGER HAS NOT OBTAINED A VALIDATED TICKET SPECIFYING
HIS/HER CONFIRMED RESERVED SPACE AT LEAST 60 MINUTES PRIOR TO THE
SCHEDULED DEPARTURE TIME OF THE FLIGHT TO WHICH SUCH RESERVATION
APPLIES.

PASSENGERS WHO CONTACT UNITED OR ITS AUTHORIZED REPRESENTATIVES FOR
TRAVEL WITHIN POINTS IN THE UNITED STATES/CANADA/PUERTO RICO/U.S.
VIRGIN ISLANDS MAY, AT THEIR DISCRETION, HOLD RESERVATIONS WHICH HAVE
BEEN CONFIRMED AT A UNITED LOCATION WITHOUT PAYMENT AT THE FARE STORED
IN THE RESERVATION UNTIL MIDNIGHT LOCAL TIME THE DAY FOLLOWING THE
CONFIRMATION OF THE RESERVATION, PROVIDED NO VOLUNTARY CHANGES ARE MADE
TO THE ITINERARY BY THE CUSTOMER, ALL FARE RULES ARE MET, AND TICKETING
OCCURS BY UNITED AIRLINES OR ITS AUTHORIZED REPRESENTATIVE.

EXCEPTION 1:  WHERE RULES APPLICABLE TO A FARE PROVIDE FOR ISSUANCE,
VALIDATION, OR PURCHASE OF A TICKET MORE THAN 60 MINUTES PRIOR TO THE
SCHEDULED DEPARTURE TIME OF THE FLIGHT TO WHICH A RESERVATION APPLIES,
THE ADVANCE TICKETING LIMIT SPECIFIED IN SUCH OTHER RULES WILL APPLY.

EXCEPTION 2:  DURING A WORK STOPPAGE RESULTING FROM A STRIKE BY ONE OR
MORE OF UA'S LABOR UNIONS, UA WILL CANCEL ONLY THOSE FLIGHTS THAT IT IS
UNABLE TO OPERATE AS A RESULT OF THE WORK STOPPAGE.

B)   ONCE A PASSENGER OBTAINS A TICKET REFLECTING CONFIRMED SPACE FOR A
SPECIFIC UA FLIGHT AND DATE, EITHER FROM UA OR FROM ANY AGENT OF UA,
THE RESERVATION IS CONFIRMED EVEN IF THERE IS NO RECORD IN UA'S
RESERVATIONS SYSTEM.

EXCEPTION 1:  TICKETS SHALL NOT BE VALID IF RESERVATIONS ARE CANCELLED
PURSUANT TO RULE 135, (CANCELLATION OF RESERVATIONS) OR CANCELLED BY
THE PASSENGER OR HIS/HER REPRESENTATIVE.

EXCEPTION 2:  "WRITE-YOUR-OWN" TYPE TICKETS SHALL BE VALID ONLY IF THE
RESERVATION IS RECORDED IN UA'S RESERVATION SYSTEM.

EXCEPTION 3:  TICKETS WHICH ARE REVALIDATED BY USE OF A STICKER TO
INDICATE A CONFIRMED RESERVATION ON UA SHALL BE VALID ONLY IF A
CONFIRMED RESERVATION IS RECORDED IN UA'S RESERVATION SYSTEM.

C)    UA FLIGHTS ARE SUBJECT TO OVERBOOKING WHICH COULD RESULT IN THE
CARRIER'S INABILITY TO PROVIDE PREVIOUSLY CONFIRMED SPACE FOR A GIVEN
FLIGHT OR FOR THE CLASS OF SERVICE RESERVED.  IN THAT EVENT, UA'S
OBLIGATION TO THE PASSENGER IS GOVERNED BY RULE 245 (DENIED BOARDING
COMPENSATION).  THE TERM "OVERBOOKING" MEANS THE LIMITED ACCEPTANCE OF
MORE CONFIRMED RESERVATIONS FOR A CLASS OF SERVICE ON A GIVEN FLIGHT
THAN THE SEATING CAPACITY OF THAT CLASS OF SERVICE ON THE AIRCRAFT. THE
PASSENGER SHALL NOT BE ENTITLED TO COMPENSATORY OR PUNITIVE DAMAGES IN
THE EVENT OF AN OVERSELL.

### CANCELLATION OF RESERVATIONS UA  RULE: 0135

A)    UA WILL CANCEL RESERVATIONS OF ANY PASSENGER WHENEVER SUCH ACTION
IS NECESSARY TO COMPLY WITH ANY GOVERNMENTAL REGULATION, WITH ANY
GOVERNMENTAL REQUEST FOR EMERGENCY TRANSPORTATION IN CONNECTION WITH
THE NATIONAL DEFENSE, OR WHENEVER SUCH ACTION IS NECESSARY OR ADVISABLE
BY REASON OF WEATHER, WORK STOPPAGE RESULTING FROM A STRIKE, OR OTHER
CONDITIONS BEYOND ITS CONTROL.

B)    FAILURE TO OCCUPY SPACE.  IF THE PASSENGER FAILS TO OCCUPY SPACE
WHICH HAS BEEN RESERVED FOR HIM/HER ON A UA FLIGHT, AND UA FAILS TO
RECEIVE NOTICE OF THE CANCELLATION OF SUCH RESERVATION PRIOR TO THE
DEPARTURE OF SUCH FLIGHT; OR IF ANY CARRIER CANCELS THE RESERVATION OF
ANY PASSENGER IN ACCORDANCE WITH THIS RULE, UA WILL CANCEL ALL
RESERVATIONS HELD BY SUCH PASSENGER ON THE FLIGHTS OF UA FOR CONTINUING
OR RETURN SPACE, PROVIDED UA ORIGINALLY RESERVED THAT SPACE.

C)    AIRPORT CHECK-IN TIME LIMITS - APPLICABLE TO/FROM ALL POINTS
       IN THE U.S.A.
UA RESERVES THE RIGHT TO CANCEL THE RESERVED SPACE, ANY PREASSIGNED
SEAT AND THE ENTIRE ITINERARY OF ANY PASSENGER WHO FAILS TO CHECK-IN
AND RECEIVE A BOARDING PASS AT LEAST THIRTY (30) MINUTES PRIOR TO
SCHEDULED DEPARTURE AND BE AVAILABLE TO BOARD AT THE DESIGNATED
BOARDING GATE AT LEAST TWENTY (20) MINUTES PRIOR TO SCHEDULED DEPARTURE
OF THE FLIGHT ON WHICH THE RESERVATION IS MADE.

D)    PASSENGERS WHO ARE UNABLE TO PRESENT THEMSELVES FOR CHECK-IN IN
ACCORDANCE WITH THE ABOVE, DUE TO THE LATE ARRIVAL OF AN INBOUND
CONNECTING FLIGHT OF UA OR ANOTHER CARRIER, WILL BE CONSIDERED
MISCONNECTIONS.

E)    UA IS NOT LIABLE WHEN IT CANCELS THE RESERVATION OF ANY PASSENGER
IN ACCORDANCE WITH THIS RULE, BUT
    1)    IF SUCH RESERVATION WAS CANCELLED PURSUANT TO PARAGRAPHS A) OR
D) OF THIS RULE, EXCEPT FOR CANCELLATIONS DUE TO A WORK STOPPAGE
RESULTING FROM A STRIKE, UA WILL TAKE SUCH ACTION AS IS PROVIDED IN
RULE 240 (FAILURE TO OPERATE ON SCHEDULE OR FAILURE TO CARRY).
    2)    IF SUCH RESERVATION WAS CANCELLED DUE TO A WORK STOPPAGE
RESULTING FROM A STRIKE, UA WILL REROUTE PASSENGERS TICKETED ON THE DAY
OF OR PRIOR TO SUCH WORK STOPPAGE VIA UA OR VIA OTHER CARRIERS WITH
WHOM UA HAS AN AGREEMENT FOR SUCH REROUTING. PASSENGERS TICKETED AFTER
ONSET OF A WORK STOPPAGE WILL BE PROTECTED ONLY OVER THE ROUTES OF UA.
IF UA IS UNABLE TO PROVIDE ALTERNATE SERVICE ACCEPTABLE TO THE
PASSENGER, UA SHALL REFUND THE FLIGHT COUPON(S) FOR THE UNFLOWN
PORTION(S) IN ACCORDANCE WITH RULE 260 (REFUNDS-INVOLUNTARY).

    3)   IF SUCH RESERVATION WAS CANCELLED PURSUANT TO PARAGRAPHS B) OR C) OF THIS RULE, UA WILL REROUTE IN ACCORDANCE WITH RULE 255 (REROUTING - WHEN ALLOWED), OR WILL REFUND IN ACCORDANCE WITH RULE 270 (REFUNDS-VOLUNTARY).
    4)   THE REMEDIES IN SUB-PARAGRAPH 1), 2) AND 3) ABOVE SHALL BE THE SOLE AND EXCLUSIVE REMEDIES FOR A PASSENGER.  THE PASSENGER SHALL HAVE NO CLAIM AS LAW OR EQUITY FOR COMPENSATORY OR PUNITIVE DAMAGES.

F)  PASSENGER'S RIGHT TO CANCEL RESERVATIONS.
NOTWITHSTANDING ANY OTHER PROVISIONS OF THE CONTRACT OF CARRIAGE, CUSTOMERS WHO PURCHASE A TICKET IN THE UNITED STATES, WHETHER THROUGH UNITED RESERVATIONS, UNITED'S CITY TICKET OFFICES, AIRPORT TICKET LOCATIONS OR UNITED.COM MAY CANCEL THAT RESERVATION AND RECEIVE A FULL REFUND FOR THE FARE PAID UP TO 24 HOURS FROM THE TIME THE TICKET WAS ISSUED.


## APPLICATION OF FARES - GENERAL UA  RULE: 0150

FARES AND CHARGES SHALL APPLY ONLY TO AIR TRANSPORTATION BETWEEN THE AIRPORTS THROUGH WHICH THE CITIES NAMED IN CONNECTION WITH SUCH FARES AND CHARGES ARE SERVED BY UA OR CARRIERS BY WHOM, OR ON WHOSE BEHALF, SUCH FARES AND CHARGES ARE PUBLISHED.  GROUND TRANSPORTATION, TO OR FROM AN AIRPORT, WILL BE ARRANGED BY THE PASSENGER, AT THEIR OWN EXPENSE.


## LOWEST FARE AVAILABLE UA  RULE: 0151

IN MAKING RESERVATIONS AND QUOTING FARES TO CUSTOMERS, UNITED EMPLOYEES WILL OFFER THE LOWEST FARE AVAILABLE FOR WHICH THE CUSTOMERS ARE ELIGIBLE, GIVEN THE DATE, FLIGHT AND CLASS OF SERVICE REQUESTED AND THE MOST LOGICAL ROUTING.


## FARE CONSTRUCTION UA  RULE: 0165

WHEN THE FARE BETWEEN ANY 2 POINTS IS NOT SPECIFICALLY PUBLISHED VIA THE DESIRED ROUTING, SUCH FARE SHALL BE CONSTRUCTED BY COMBINING THOSE FARES, APPLICABLE VIA THE DESIRED ROUTING FROM THE PASSENGER'S POINT OF ORIGIN TO POINT OF DESTINATION, WHICH PRODUCE THE LOWEST FARE FOR THE CLASS OF SERVICE USED; PROVIDED, HOWEVER, THAT SUCH FARE WILL NOT EXCEED THE LOWEST FARE DETERMINED IN ACCORDANCE WITH PARAGRAPHS 1), 2), 3), 4) AND 5) OF THIS RULE.

NOTE: FARES MAY BE CONSTRUCTED BY COMBINING END TO END IF SUCH FARES ARE LESS THAN SPECIFICALLY PUBLISHED FARES VIA THE SAME ROUTING, PROVIDED THAT TRAVEL IS VIA THE POINT OVER WHICH FARES HAVE BEEN COMBINED.
1)   NOT USED
2)   CIRCLE-TRIP/ROUND-TRIP MAXIMUM IF THE FARE CONSTRUCTED FOR SUCH ROUTING EXCEEDS THE FARE FOR A CIRCLE TRIP OR ROUND TRIP CONSTRUCTED FROM THE SAME POINT OF ORIGIN WHICH WOULD INCLUDE SUCH ROUTING, THE CIRCLE-TRIP OR ROUND-TRIP FARE WOULD APPLY.
3)   NOT USED
4)   MAXIMUM FARE - TRAVEL VIA THE SAME OR DIFFERENT CLASSES OF SERVICE A COMBINATION OF FARES OF THE SAME OR DIFFERENT CLASSES OF SERVICE (SEE

NOTES TO PARAGRAPH 4 BELOW) MAY NOT EXCEED THE LOWEST OF THE FOLLOWING FARES OR COMBINATION OF FARES VIA THE SAME CARRIER(S) BETWEEN AND VIA THE SAME POINT:

A)   A COMBINATION OF FARES VIA THE CLASS OF SERVICE USED FOR A PORTION OF THE TRANSPORTATION AND FARES FOR A HIGHER CLASS OF SERVICE FOR THE REMAINDER OF THE TRANSPORTATION, OR

B)   A COMBINATION OF FARES VIA HIGHER CLASSES OF SERVICE, OR

C)   A THROUGH PUBLISHED FARE VIA A HIGHER CLASS OF SERVICE, OR
EXCEPTION:  A THROUGH PUBLISHED FARE VIA A HIGHER CLASS OF SERVICE TO OR FROM A MORE DISTANT POINT MAY NOT BE USED TO CONSTRUCT A FARE FOR AN INTERMEDIATE POINT(S) IF THERE IS A PUBLISHED FARE FOR THE SAME HIGHER CLASS OF SERVICE TO OR FROM SUCH INTERMEDIATE POINT(S).

D) A FARE CONSTRUCTED IN ACCORDANCE WITH PARAGRAPH 5) BELOW.
NOTE:    FOR THE PURPOSE OF PARAGRAPHS A), B) AND C), FARES ARE PUBLISHED IN THE FOLLOWING DESCENDING CLASS OF SERVICE/BOOKING CODE ORDER:

1) FIRST CLASS:
    BOOKING CODE:  F
2) RESTRICTED FIRST CLASS:
    BOOKING CODE:  P
    BOOKING CODE:  A
3) BUSINESS CLASS:
    BOOKING CODE:  C
4) RESTRICTED BUSINESS CLASS:
    BOOKING CODE:  D
    BOOKING CODE:  Z
5) COACH CLASS:
    BOOKING CODE:  Y
6) RESTRICTED COACH CLASS:
    BOOKING CODE:  B
    BOOKING CODE:  M
    BOOKING CODE:  E
    BOOKING CODE:  U
    BOOKING CODE:  H
    BOOKING CODE:  Q
    BOOKING CODE:  V
    BOOKING CODE:  W
    BOOKING CODE:  S
    BOOKING CODE:  T
    BOOKING CODE:  K
    BOOKING CODE:  L
    BOOKING CODE:  G

5) A) CONSTRUCTION OF FARES FOR COMBINATION OF JET AND PROPELLER TRANSPORTATION IN THE SAME CLASS OF SERVICE  (VIA OTHER THAN AA, AS, BF, DL, EA, NW, UA AND US.) CONSTRUCTION OF FARES FOR COMBINATION OF JET PROPELLER TRANSPORTATION IN THE SAME CLASS OF SERVICE OR FOR COMBINATION OF FIRST CLASS AND COACH SERVICE  (APPLICABLE TO AS.) WHERE NO THROUGH ONE-FACTOR FARE IS PUBLISHED FROM POINT OF ORIGIN TO POINT OF DESTINATION VIA THE ROUTE OF MOVEMENT FOR A JOURNEY IN ONE CLASS OF SERVICE, PARTLY ON JET AIRCRAFT AND PARTLY ON PROPELLER AIRCRAFT, THE APPLICABLE FARE FOR SUCH TRANSPORTATION WILL BE CONSTRUCTED AS FOLLOWS: WHERE A THROUGH ONE-FACTOR FARE FOR PROPELLER AIRCRAFT IS PUBLISHED FROM POINT OF ORIGIN TO POINT OF DESTINATION VIA THE ROUTE OF MOVEMENT FOR THE CLASS OF SERVICE USED, THE APPLICABLE FARE WILL BE THE THROUGH ONE-FACTOR FARE, PLUS THE DIFFERENCE BETWEEN THE FARES FOR JET AND PROPELLER AIRCRAFT, FOR THE CLASS OF SERVICE

USED, BETWEEN THE POINTS WHERE JET AIRCRAFT IS USED.  FOR THE PURPOSE
OF PARAGRAPH 5) THE CLASSES OF SERVICE ARE:
I)  FIRST CLASS SERVICE
II)  COACH SERVICE OTHER THAN NIGHT COACH
III)  COACH SERVICE OTHER THAN NIGHT COACH/OFF-PEAK COACH (APPLICABLE
TO NW.)
IV)  NIGHT COACH SERVICE
V)  NIGHT COACH/OFF-PEAK COACH (APPLICABLE TO NW.)

## ROUND-TRIP FARES UA  RULE: 0170

WHEN A TICKET IS PURCHASED BEFORE THE TRANSPORTATION COMMENCES, OR IS
REISSUED PURSUANT TO RULE 255 (REROUTING - WHEN ALLOWED), THE FARE
APPLICABLE TO A ROUND TRIP BETWEEN TWO POINTS OVER THE LINES OF ONE OR
MORE CARRIERS SHALL BE:
A) WHEN SPECIFICALLY PUBLISHED VIA THE DESIRED ROUTING, THE APPLICABLE
ROUND-TRIP FARE PUBLISHED BY OR ON BEHALF OF SUCH CARRIER(S).
B) WHEN NOT SPECIFICALLY PUBLISHED VIA THE DESIRED ROUTING, THE SUM OF
THE ONE-WAY FARES APPLICABLE TO THE RESPECTIVE ONE-WAY SEGMENTS.

## CIRCLE-TRIP FARES UA  RULE: 0175

WHEN A TICKET IS PURCHASED BEFORE THE TRANSPORTATION COMMENCES, OR IS
REISSUED PURSUANT TO RULE 255 (REROUTING - WHEN ALLOWED), THE FARE
APPLICABLE TO A CIRCLE TRIP VIA PARTICIPATING CARRIERS SHALL BE THE SUM
OF FIFTY PERCENT OF THE APPLICABLE ROUND-TRIP FARES FOR THE RESPECTIVE
SEGMENTS.

## STOPOVERS UA  RULE: 0180

A) STOPOVERS WILL BE PERMITTED ONLY UPON PAYMENT OF THE COMBINATION OF
APPLICABLE FARES, OR STOPOVER CHARGES WHEN PROVIDED ON TRANSPORTATION
SOLELY WITHIN THE CONTINENTAL UNITED STATES, UNLESS THE APPLICABLE FARE
PERMITS SUCH STOPOVERS.  A STOPOVER, AS USED HEREIN, WILL OCCUR WHEN A
PASSENGER ARRIVES AT AN INTERMEDIATE OR JUNCTION TRANSFER POINT ON A
FLIGHT OF ANY CARRIER, AND FAILS TO DEPART FROM SUCH INTERMEDIATE OR
JUNCTION TRANSFER POINT ON:
    1) THE FIRST FLIGHT ON WHICH SPACE IS AVAILABLE; OR,
    2) THE FLIGHT THAT WILL PROVIDE FOR THE PASSENGER'S EARLIEST
ARRIVAL AT INTERMEDIATE OR JUNCTION TRANSFER POINT(S) OR DESTINATION
POINT, VIA THE CARRIER AND CLASS OF SERVICE AS SHOWN ON THE PASSENGER'S
TICKET.  PROVIDED, HOWEVER, THAT IN NO EVENT WILL A STOPOVER OCCUR WHEN
THE PASSENGER DEPARTS FROM THE INTERMEDIATE OR JUNCTION TRANSFER POINT
ON A FLIGHT SHOWN IN UA'S OFFICIAL GENERAL SCHEDULES, AND/OR SERVICE
PATTERNS AS DEPARTING WITHIN FOUR HOURS AFTER THE PASSENGER'S ARRIVAL
AT SUCH POINT.

B) ON TRANSPORTATION BETWEEN POINTS IN THE CONTINENTAL U.S./ALASKA AND
HAWAII, 4 STOPOVERS IN EACH DIRECTION WILL BE PERMITTED WITHOUT CHARGE
AT INTERMEDIATE POINTS ON THE APPLICABLE ROUTING, UNLESS THE APPLICABLE
TARIFF SPECIFICALLY EXCLUDES SUCH STOPOVER.

C) ON TRANSPORTATION BETWEEN POINTS IN THE CONTINENTAL U.S. AND ALASKA,
STOPOVERS WILL BE PERMITTED WITHOUT CHARGE AT ANC/PDX/SEA/SFO.

## TRANSFERS UA  RULE: 0183

A MAXIMUM OF 4 CONNECTIONS IN EACH DIRECTION ARE PERMITTED VIA ANY
PUBLISHED FARE.
EXCEPTION: BETWEEN HAWAII AND THE CONTINENTAL U.S./ALASKA CONNECTIONS
ARE NOT LIMITED VIA FARES GOVERNED BY DFR RULES 4825UA/4826UA/4830UA/
4831UA AND VIA C-TYPE FARES/F/FPS/F1UA/FUA/FUAS/Y/YUA/YUAS FARES.

**ROUTINGS UA   RULE: 0185**

A) EACH FARE APPLIES ONLY TO TRANSPORTATION VIA THE ROUTINGS SPECIFIED
IN CONNECTION WITH SUCH FARE.

B) A LOCAL ROUTING IN CONNECTION WITH A FARE APPLICABLE FOR
TRANSPORTATION OVER THE LINES OF UA BETWEEN ANY TWO POINTS, SHALL BE
INCLUDED IN A ROUTING IN CONNECTION WITH A PUBLISHED JOINT FARE OF THE
SAME FARE BASIS CODE WHICH INCLUDES TRANSPORTATION BETWEEN SUCH POINTS,
UNLESS EXPRESSLY EXCLUDED FROM THE JOINT FARE ROUTING OR ROUTINGS.
WHERE MORE THAN ONE LOCAL FARE OF THE SAME FARE BASIS CODE APPLIES, THE
JOINT FARE SHALL APPLY ONLY VIA THE ROUTING SPECIFIED IN CONNECTION
WITH THE LOWEST LOCAL FARE.  IN THE ABSENCE OF A LOCAL FARE WITH THE
SAME FARE BASIS CODE, THE ROUTING APPLICABLE TO THE LOWEST COACH (Y)
FARE SHALL APPLY.

**ACCEPTANCE OF BAGGAGE:   GENERAL UA  RULE: 0190**

A)  GENERAL CONDITIONS OF ACCEPTANCE
UA WILL ACCEPT FOR TRANSPORTATION AS BAGGAGE, SUCH PERSONAL PROPERTY AS
IS NECESSARY OR APPROPRIATE FOR THE WEAR, USE, COMFORT, OR CONVENIENCE
OF THE PASSENGER FOR THE PURPOSE OF THE TRIP, SUBJECT TO THE FOLLOWING
CONDITIONS:
    1)  ALL BAGGAGE IS SUBJECT TO INSPECTION BY UA; HOWEVER, THERE IS
NO OBLIGATION THAT UA PERFORM AN INSPECTION.  UA WILL REFUSE TO
TRANSPORT OR WILL REMOVE AT ANY POINT BAGGAGE THAT THE PASSENGER
REFUSES TO SUBMIT FOR INSPECTION.
    2)  UA HAS THE RIGHT TO REFUSE TO TRANSPORT BAGGAGE ON ANY FLIGHT
OTHER THAN THE ONE CARRYING THE PASSENGER.
    3)  UA WILL REFUSE TO ACCEPT PROPERTY FOR TRANSPORTATION WHICH
SIZE, WEIGHT, OR CHARACTER RENDERS IT UNSUITABLE FOR TRANSPORTATION ON
THE PARTICULAR AIRCRAFT WHICH IS TO TRANSPORT IT; WHICH CANNOT BE
ACCOMMODATED WITHOUT HARMING OR ANNOYING PASSENGERS; OR WHICH IS NOT
SUITABLE OR ADEQUATELY PACKAGED TO WITHSTAND ORDINARY HANDLING, UNLESS
THE PASSENGER EXECUTES A RELEASE FORM.
    4)  UA WILL NOT ACCEPT BAGGAGE OR OTHER PERSONAL PROPERTY FOR
STORAGE.
    5)  BAGGAGE MUST BE CHECKED AT THE AIRPORT AT LEAST 30 MINUTES IN
ADVANCE OF FLIGHT DEPARTURE TIME. IF CHECKED BAGGAGE IS ACCEPTED LESS
THAN 30 MINUTES BEFORE SCHEDULED DEPARTURE TIME, UA WILL BE EXCLUDED
FROM LIABILITY AS DEFINED BELOW.
      A)  CUTOFF TIME FOR BAGGAGE CHECK-IN IS 30 MINUTES BEFORE
DEPARTURE FOR ALL AIRPORTS IN THE U.S. EXCEPT THE FOLLOWING AIRPORTS
WHICH HAVE a 45 MINUTE CUT-OFF TIME FOR BAGGAGE CHECK-IN:
                    ATL-ATLANTA GA
                    CLT - CHARLOTTE NC
                    DEN - DENVER CO
                    JFK - JOHN F KENNEDY AIRPORT / NEW YORK NY
                    LAS - LAS VEGAS NV

```
LAX - LOS ANGELES CA
MCO - ORLANDO FL
ORD - OHARE AIRPORT / CHICAGO IL
PDX - PORTLAND OR
PHL - PHILADELPHIA PA
PHX - PHOENIX AZ
SEA - SEATTLE WA
SFO - SAN FRANCISCO CA
TPA - TAMPA FL
IAD - DULLES INTL AIRPORT / WASHINGTON DC
```

B)  THE PASSENGER'S NAME MUST APPEAR ON THE BAGGAGE.

C)  BAGGAGE WILL NOT BE CHECKED:

   I)  TO A POINT THAT IS NOT ON THE PASSENGER'S ROUTING.

   II)  BEYOND THE PASSENGER'S NEXT POINT OF STOPOVER OR, IF THERE IS NO STOPOVER, BEYOND THE FINAL DESTINATION DESIGNATED ON THE TICKET.

   III)  BEYOND A POINT AT WHICH THE PASSENGER WANTS TO RECLAIM THE BAGGAGE OR ANY PORTION THEREOF.

   IV)  BEYOND THE POINT TO WHICH ALL APPLICABLE CHARGES HAVE BEEN PAID.

   V)  BEYOND A POINT AT WHICH THE PASSENGER IS TO TRANSFER TO A CONNECTING FLIGHT, IF THAT FLIGHT IS SCHEDULED TO DEPART FROM AN AIRPORT DIFFERENT FROM THE ONE AT WHICH THE PASSENGER IS SCHEDULED TO ARRIVE.

   VI)  TO A POINT WHICH IS INTERMEDIATE TO THE PASSENGER'S NEXT POINT OF STOPOVER, OR IF NONE, INTERMEDIATE TO THE FINAL DESTINATION.

   6)  SIZE MAXIMUMS

NO ARTICLE WILL BE ACCEPTED IF THE MAXIMUM OUTSIDE LINEAR DIMENSIONS (LENGTH  WIDTH  HEIGHT) EXCEED 115 IN., OR IF THE ARTICLE WEIGHS MORE THAN 100 1B. NO SINGLE DIMENSION SHALL EXCEED 72 IN.

NOTE:  THESE PROVISIONS DO NOT APPLY TO CERTAIN SPECIAL ITEMS SUCH AS SPORTING EQUIPMENT, CABIN BAGGAGE, OR KENNELS.

   7)  MISCELLANEOUS ITEMS

   A)  UA WILL ACCEPT SPORTING EQUIPMENT AS CHECKED BAGGAGE SUBJECT TO CERTAIN CONDITIONS, LIMITATIONS, AND APPLICABLE CHARGES. INFORMATION AS TO CONDITIONS OF ACCEPTANCE AND CHARGES, IF ANY, WILL BE PROVIDED BY ANY UA RESERVATION AGENT OR AUTHORIZED TRAVEL AGENT.

   B)  UA WILL ACCEPT LIVE ANIMALS FOR CARRIAGE EITHER AS CHECKED BAGGAGE OR IN THE PASSENGER COMPARTMENT UNDER THE FOLLOWING CONDITIONS:

   I)  SPACE MUST BE RESERVED FOR ANIMALS IN EITHER THE PASSENGER OR CARGO COMPARTMENT.  ANIMALS WITHOUT RESERVED SPACE WILL BE ACCEPTED, IF SPACE IS AVAILABLE, ONLY AFTER THE ANIMALS FOR WHOM SPACE HAS BEEN RESERVED HAVE BEEN ACCOMMODATED.

   II)  THE ANIMAL MUST BE HARMLESS, INOFFENSIVE, ODORLESS, AND REQUIRE NO ATTENTION DURING TRANSIT.

   III)  THE ANIMAL MUST BE CONFINED IN A CAGE OR CONTAINER SUBJECT TO INSPECTION AND APPROVAL BY UA, AND MEET THE DEPARTMENT OF AGRICULTURE REQUIREMENTS PRIOR TO ACCEPTANCE.

   IV)  THE PASSENGER TRANSPORTING THE ANIMAL MUST MAKE ALL ARRANGEMENTS AND ASSUME FULL RESPONSIBILITY FOR COMPLYING WITH ANY APPLICABLE LAWS, CUSTOMS, AND/OR OTHER GOVERNMENTAL REGULATIONS, REQUIREMENTS, OR RESTRICTIONS OF THE COUNTRY, STATE, OR TERRITORY TO WHICH THE ANIMAL IS BEING TRANSPORTED.  UA WILL NOT BE LIABLE FOR LOSS OR EXPENSE DUE TO THE PASSENGER'S FAILURE TO COMPLY WITH THIS PROVISION, AND UA WILL NOT BE RESPONSIBLE IF ANY PET IS REFUSED PASSAGE INTO OR THROUGH ANY COUNTRY, STATE, OR TERRITORY.

V)   THE PASSENGER MUST TRAVEL ON THE SAME FLIGHT AS THE ANIMAL; UNACCOMPANIED ANIMALS MAY BE SHIPPED AS AIR FREIGHT ONLY.

VI)   KENNELS MAY BE INTERLINED TO STAR CARRIERS WITH THE EXCEPTION OF USAIR.

VII)   MAXIMUM KENNEL SIZE OF 115 IN. (LENGTH PLUS WIDTH PLUS HEIGHT) AND MAXIMUM WEIGHT OF 150 LB. WILL BE ACCEPTED AS CHECKED BAGGAGE.

VIII)  ONLY DOMESTIC CATS, DOGS, HOUSEHOLD BIRDS, OR SCIENTIFIC OR SPECIALLY TRAINED ANIMALS WILL BE CARRIED IN THE PASSENGER COMPARTMENT OF THE AIRCRAFT.   THE FOLLOWING ADDITIONAL RESTRICTIONS APPLY:

AA)   CARRIAGE OF ANIMALS IS LIMITED TO ONE ANIMAL PER CONTAINER EXCEPT THAT TWO HOUSEHOLD BIRDS OR TWO PUPPIES/KITTENS (MINIMUM 8 WEEKS/MAXIMUM 6 MONTHS) WILL BE PERMITTED IN A SINGLE CONTAINER.   CARRIAGE IS LIMITED PER AIRCRAFT COMPARTMENT BY AIRCRAFT TYPE.

BB)   DOGS, CATS, AND HOUSEHOLD BIRDS MUST BE STORED UNDER A SEAT      DIRECTLY IN FRONT OF THE PASSENGER.   THE PASSENGER WILL NOT BE PERMITTED IN A ROW IMMEDIATELY BEHIND A BULKHEAD, OR ADJACENT TO AN EMERGENCY EXIT.

CC)   SCIENTIFIC OR SPECIALLY TRAINED ANIMALS MUST BE STORED UNDER A SEAT DIRECTLY IN FRONT OF THE PASSENGER, OR IN A SEAT IMMEDIATELY BEHIND A BULKHEAD OR CLASS DIVIDER.   ACCEPTANCE OF THESE ANIMALS IS SUBJECT TO PRIOR APPROVAL BY UA.

DD)  CONTAINERS STORED UNDER A SEAT MUST NOT EXCEED 17L BY 12W BY 8H  INCHES.

EE)  THE ANIMAL MUST REMAIN IN THE CONTAINER, AND THE CONTAINER MUST REMAIN CLOSED AND SEALED FROM THE TIME OF ENTRY INTO THE AIRPLANE UNTIL AFTER DEPLANING FROM THE AIRPLANE.

NOTE:  ANIMALS WILL NOT BE ACCEPTED FOR CARRIAGE ON SOME UNITED EXPRESS FLIGHTS.

EXCEPTION:  ONE DOG TRAINED IN EXPLOSIVE DETECTION, SEARCH, AND RESCUE PER CABIN WILL BE ACCEPTED WHEN PROPERLY HARNESSED AND MUZZLED, AND ACCOMPANIED BY A HANDLER, FOR A CHARGE OF USD 30.00 EACH. THE DOG WILL BE PERMITTED TO ACCOMPANY ITS HANDLER INTO THE CABIN BUT MAY NOT OCCUPY A SEAT.  THE DOG AND ITS HANDLER MUST BE ON OFFICIAL EMERGENCY DUTY STATUS AND SUCH OFFICIAL DUTY STATUS MUST BE DOCUMENTED IN WRITING TO THE SATISFACTION OF UA.   SERVICE DOGS AND OTHER APPROVED SERVICE ANIMALS TRAINED TO ASSIST DISABLED PASSENGERS WILL BE CARRIED WITHOUT CHARGE AND MAY ACCOMPANY THE DISABLED PASSENGER OR TRAINER INTO THE CABIN. THESE SERVICE ANIMALS MAY NOT OCCUPY A SEAT.

C)   UA ACCEPTS MUSICAL INSTRUMENTS, FRAGILE OR BULKY ITEMS AS CABIN-SEAT BAGGAGE SUBJECT TO ADVANCE ARRANGEMENTS AND APPLICABLE CHARGES.  BASS VIOLINS AND CELLOS WILL ONLY BE ACCEPTED AS CABIN-SEAT BAGGAGE.

NOTE:  INFORMATION CONCERNING CONDITIONS OF ACCEPTANCE AND APPLICABLE CHARGES FOR SPECIAL ITEMS WILL BE PROVIDED BY ANY UA RESERVATION AGENT OR AUTHORIZED TRAVEL AGENT.

D)   I)   NONSPORTING FIREARMS AND AMMUNITION WILL BE ACCEPTED AS CHECKED BAGGAGE ONLY.

II)   SPORTING FIREARMS AND AMMUNITION WILL BE ACCEPTED AS CHECKED BAGGAGE ONLY, AND SUBJECT TO THE FOLLOWING CONDITIONS:

AA) RIFLES/SHOTGUNS MUST BE UNLOADED AND PACKED IN A HARD SIDED LOCKED CASE. BAGGAGE CONTAINING A HANDGUN(S) MUST BE LOCKED, AND THE BAG MUST BE OF A HARD SIDE TYPE.  A DATED DECLARATION THAT THE FIREARM(S) IS NOT LOADED MUST BE SIGNED BY THE PASSENGER AND PLACED ON THE INSIDE OF A CASE DESIGNED SPECIFICALLY FOR CARRYING RIFLES/SHOTGUNS, OR INSIDE THE CONTAINER/SUITCASE OF OTHER BAGGAGE.

BB) AMMUNITION MUST BE PACKED IN THE MANUFACTURER'S ORIGINAL
PACKAGE OR SECURELY PACKED IN FIBER, WOOD, OR METAL BOXES.  ELEVEN LB.
MAXIMUM WILL BE ACCEPTED.

8)  FRAGILE AND PERISHABLE ITEMS
    A)  UA DOES NOT ASSUME RESPONSIBILITY FOR DAMAGE TO FRAGILE
ARTICLES PRESENTED AS CHECKED BAGGAGE UNLESS APPROPRIATELY PACKAGED IN
AN ORIGINAL FACTORY SEALED CARTON, CARDBOARD MAILING TUBE OR CONTAINER,
OR CASE DESIGNED FOR SHIPPING SUCH ITEMS, OR SUITABLY PACKED WITH
PROTECTIVE INTERNAL MATERIAL.
    B)  UA WILL ACCEPT FRAGILE ITEMS WITHOUT APPROPRIATE PACKAGING
UPON EXECUTION OF A RELEASE FORM FURNISHED BY UA WHICH RELIEVES UA OF
LIABILITY FOR PRIOR DAMAGE, OR FOR DAMAGE TO FRAGILE ITEMS (OF THE TYPE
IDENTIFIED BELOW) IN CHECKED BAGGAGE.  SUCH EXCLUDED DAMAGE MUST RESULT
SOLELY FROM THE UNSUITABILITY OF FRAGILE ITEMS AS CHECKED BAGGAGE,
AND/OR THE INADEQUACY OF THEIR PACKAGING, AND NOT FROM UA'S FAILURE TO
EXERCISE THE ORDINARY STANDARD OF CARE. EXECUTION OF THE RELEASE FORM
ALSO RELIEVES UA OF LIABILITY FOR SPOILAGE, OR SUBSTANTIAL LOSS OF
VALUE OR POTENCY WHICH RESULTS FROM UA'S DELAY IN DELIVERY OF CHECKED
BAGGAGE WHEN SUCH SPOILAGE RESULTS FROM THE UNSUITABILITY OF SUCH ITEMS
AS CHECKED BAGGAGE, AND NOT FROM UA'S FAILURE TO EXERCISE THE ORDINARY
STANDARD OF CARE.  ALSO, WHEN PACKAGING IS INADEQUATE, THE RELEASE
APPLIES TO LOSS OF CONTENTS FROM THE CONTAINER WHILE IN TRANSIT.
THE CLASSES OF ITEMS LISTED BELOW ARE DEEMED BY UA TO BE FRAGILE OR
PERISHABLE, OR OTHERWISE UNSUITABLE AS CHECKED BAGGAGE, AND ARE SUBJECT
TO THE CONDITIONS OF ACCEPTANCE SET FORTH ABOVE. EXAMPLES ARE BY
ILLUSTRATION AND NOT BY LIMITATION.

    I)  ARTISTIC ITEMS - PAINTINGS, DRAWINGS, STATUES OR OTHER
SCULPTURES, PLASTICS, AND PLASTER OF PARIS MODELS AND CASTS.
    II)  CHINAWARE/CERAMICS/POTTERY (SEE ALSO GLASS) - CERAMICS,
POTS, BOWLS, CROCKERY, DISHES, GLASSES, EARTHENWARE, AND OTHER
CONTAINERS OR ORNAMENTS MADE OF PORCELAIN OR CLAY HARDENED BY HEAT.
    III)  ELECTRONIC AND MECHANICAL ITEMS - TYPEWRITERS, SEWING
MACHINES, WATCHES, CLOCKS, SENSITIVE CALIBRATED TOOLS AND INSTRUMENTS,
TELEVISIONS, RADIOS (INCLUDING CITIZEN BAND), CALCULATORS, COMPUTER
EQUIPMENT, AUDIO AND VIDEO EQUIPMENT, ELECTRON MICROSCOPES,
ELECTROGRAPHS, AND ELECTRONIC MEDICAL EQUIPMENT THAT INCLUDES TUBES AND
GLASS.
    IV)  GARMENT BAGS - GARMENT BAGS AND SUIT/DRESS COVERS OF LIGHT,
FLIMSY PLASTIC OR VINYL DESIGNED FOR CARRYING AND NOT FOR SHIPPING.
    V)  GLASS - GLASSWARE, CRYSTAL, MIRRORS, BOTTLES, AND ANY
LIQUIDS CONTAINED THEREIN (EXCLUDING REASONABLE QUANTITIES OF
TOILETRIES), TELESCOPES, BINOCULARS, BAROMETERS, AND EYEGLASSES AND
CONTACT LENSES THAT ARE NOT IN THEIR CASES.
    VI)  MUSICAL INSTRUMENTS AND EQUIPMENT - GUITARS, VIOLINS AND
VIOLAS, CELLOS, ORGANS, HARPS, DRUMS, AND AMPLIFIERS OR SPEAKERS USED
IN CONJUNCTION WITH ELECTRONIC INSTRUMENTS.
    VII)  PAPER - BUSINESS DOCUMENTS, MECHANICAL DRAWINGS,
BLUEPRINTS, MAPS, CHARTS, HISTORICAL DOCUMENTS AND PHOTOGRAPHS.
    VIII)  PHOTOGRAPHIC/CINEMATOGRAPHIC EQUIPMENT - CAMERAS (EXCLUDING
ONE CAMERA PER PASSENGER), PHOTOFLASH EQUIPMENT, PHOTOMETERS,
SPECTROSCOPES, PHOTOTUBES, OR OTHER DEVICES USING SENSITIVE TUBES OR
PLATES.
    IX)  RECREATIONAL AND SPORTING GOODS - TENNIS RACKETS, FISHING
RODS, SCULLS, SURFBOARDS, SAILBOARDS, VAULTING POLES, SCUBA-DIVING

MASKS AND PRESSURE GAUGES, SCOPES, AND SPORTING TROPHIES SUCH AS ANIMAL
HORNS AND ANTLERS.
        X)   MISCELLANEOUS ITEMS - UNCRATED/UNPROTECTED/UNSUITABLE
ITEMS, COSMETIC CASES, HAT BOXES, AND WIG BOXES.
NOTE:  INFORMATION AS TO THE ACCEPTABILITY OF FRAGILE ITEMS AS CHECKED
BAGGAGE WILL BE PROVIDED BY ANY UA RESERVATION AGENT OR AUTHORIZED
TRAVEL AGENT.
      C)   PERISHABLES (E.G., FOOD, MEDICINE, FLOWERS) WILL BE ACCEPTED
AS CHECKED BAGGAGE ONLY UPON EXECUTION OF A RELEASE FORM AS DESCRIBED
ABOVE.

    9)   RESTRICTED ARTICLES
      A)   ARTICLES RESTRICTED FROM TRANSPORTATION BY CARRIAGE ABOARD
AIRCRAFT INCLUDE ANY ARTICLE AND/OR HAZARDOUS MATERIAL CITED IN ANY OF
THE FOLLOWING RESOURCES IN EFFECT AT THE TIME OF TRAVEL:
        (i) U.S. DEPARTMENT OF TRANSPORTATION (DOT) HAZARDOUS
MATERIALS REGULATIONS (49CFR 171-177)
http://www.myregs.com/dotrspa/
        (ii) IATA DANGEROUS GOODS REGULATIONS
http://www.iata.org/NR/rdonlyres/272D036A-A21C-4508-A4C4-
909BA6036822/35880/ConditionsofContract.PDF
        (iii) U.S. TRANSPORTATION SECURITY ADMINISTRATION PERMITTED AND
PROHIBITED ITEMS
http://www.tsa.gov/public/interapp/editorial/editorial_1012.xml

      B)   DRY ICE WILL BE ACCEPTED IN BAGGAGE ONLY IF THE BAGGAGE IS
PROPERLY PACKAGED.  A MAXIMUM LIMIT OF 2 KILOS (4.4 LBS.) OF DRY ICE,
PROPERLY PACKAGED, WILL BE ACCEPTED IN BAGGAGE.  A USD 40.00 HANDLING
SERVICE CHARGE WILL APPLY.
      C)   UA MAY REQUIRE ACCEPTANCE OF SUCH ARTICLES AT OTHER THAN THE
PASSENGER TERMINAL.
   10)   CABIN-SEAT BAGGAGE
WHEN A PASSENGER REQUESTS THAT AN ITEM OF BAGGAGE BE CARRIED IN THE
CABIN, AND IT IS DETERMINED BY UA THAT THE ITEM IS ACCEPTABLE AS CABIN
BAGGAGE, BUT IT IS SO FRAGILE AND/OR BULKY AS TO REQUIRE THE USE OF A
SEAT, THE ITEM WILL BE ACCEPTED SUBJECT TO THE FOLLOWING CONDITIONS:
A)   CABIN-SEAT BAGGAGE MUST BE CARRIED ABOARD THE AIRCRAFT BY THE
PASSENGER, AND SECURED IN A SEAT.
B)   THE SEAT MUST BE IMMEDIATELY BEHIND A BULKHEAD, CLASS DIVIDER, OR
WINDSCREEN.
C)   A SEAT MUST BE RESERVED IN ADVANCE, AND APPLICABLE CHARGES PAID.
D)   UA WILL CHARGE 100 PERCENT OF THE APPLICABLE ADULT FARE FOR THE
EXTRA SEAT.
EXCEPTION:  CABIN-SEAT BAGGAGE MAY NOT ACCEPTED ON SOME UNITED EXPRESS
FLIGHTS FLIGHTS.

      B)      FREE BAGGAGE ALLOWANCE
FOR TRAVEL SOLELY BETWEEN POINTS IN THE U.S.:
1)   BAGGAGE ALLOWANCE - UA WILL ACCEPT A MAXIMUM OF TWO PIECES OF
CHECKED BAGGAGE WITHOUT SERVICE CHARGE PROVIDED:
        A)   EACH PIECE HAS A MAXIMUM OUTSIDE LINEAR DIMENSION OF 62 IN.,
AND
        B)   EACH PIECE HAS A MAXIMUM WEIGHT OF 50 LBS.
NOTE:  MAXIMUM OUTSIDE LINEAR DIMENSIONS MEANS LENGTH BY WIDTH BY
HEIGHT.

2)  CARRY-ON BAGGAGE - IN ADDITION TO (B)(1) ABOVE, UA WILL ACCEPT A
    MAXIMUM OF ONE PIECE OF CARRY-ON BAGGAGE TO ACCOMPANY THE PASSENGER
    ON BOARD THE AIRCRAFT WITHOUT SERVICE CHARGE PROVIDED:
        (A)        EACH PIECE MUST FIT UNDER A SEAT AND HAVE A MAXIMUM
            OUTSIDE DIMENSION OF 9 BY 14 BY 22IN. AND A COMBINED WEIGHT
            OF NO MORE THAN 50 LBS. )
        (B)        THE BAGGAGE WILL NOT ENDANGER THE SAFETY OF THE
            FLIGHT OR INTERFERE WITH THE SAFETY OR COMFORT OF
            PASSENGERS.
NOTE:  GARMENT STYLE BAGS MUST MEET THE SIZE AND WEIGHT LIMITATIONS
ABOVE AND ARE ACCEPTED SUBJECT TO AVAILABLE CLOSET OR SUITABLE STORAGE
SPACE.
    3)  SUBSTITUTION FOR CHECKED BAGGAGE
ONE OF THE FOLLOWING ITEMS WILL BE CARRIED FREE IN LIEU OF THE PIECE OF
CHECKED BAGGAGE ALLOWED UNDER B) 1) ABOVE: BOWLING, FISHING, GOLFING,
SHOOTING EQUIPMENT,  OR SKIING EQUIPMENT/BOWLING AND SHOOTING EQUIPMENT
AND (APPLICABLE TO MILITARY PASSENGERS ONLY) ONE DUFFEL BAG, SEA BAG,
OR B-4 BAG.
    4)  ARTICLES CARRIED FREE IN ADDITION TO STATED MAXIMUM
IN ADDITION TO THE MAXIMUM ALLOWANCES PROVIDED ABOVE, EACH FARE-PAYING
PASSENGER MAY CARRY ON OR CHECK, WITHOUT ADDITIONAL CHARGE, THE
FOLLOWING ARTICLES OF BAGGAGE:
        A)  CARRY-ON (MUST BE RETAINED IN PASSENGER'S CUSTODY).
            I) ONE PERSONAL ITEM SUCH AS A PURSE (MAXIMUM OF 25 LINEAR
            INCHES), BRIEFCASE, OR LAPTOP.
          II)  OUTER GARMENTS.
         III)  CHILD SAFETY SEATS FOR TICKETED CHILDREN.
          IV)  ASSISTIVE DEVICES FOR DISABLED PASSENGERS
        B)  CHECKED BAGGAGE
            I)  A MANUALLY OR BATTERY OPERATED COLLAPSIBLE WHEELCHAIR.
          II)  BRACES OR PROSTHETIC DEVICES.
         III)  FOR TRANSPORTATION FROM POINTS IN FLA. OR HAW., ONE BOX
OR MESH BAG OF FRUIT, OR ONE BOX OF FLOWERS, OF WHICH THE MAXIMUM
LINEAR DIMENSIONS DO NOT EXCEED 62 IN.
          IV)  ONE CHILD'S CAR RESTRAINT SEAT.
              NOTE:  ONE SEAT FOR EACH ACCOMPANIED CHILD.


    C)  EXCESS BAGGAGE
BAGGAGE IN EXCESS OF THE MAXIMUM ALLOWANCE SPECIFIED ABOVE, OR
OVERWEIGHT OR OVERSIZED BAGGAGE, WILL BE ACCEPTED FOR TRANSPORTATION
ONLY UPON PAYMENT OF EXCESS BAGGAGE CHARGES.  EXCESS BAGGAGE CHARGES
WILL APPLY FROM THE POINT AT WHICH BAGGAGE IS ACCEPTED FOR
TRANSPORTATION TO THE POINT TO WHICH BAGGAGE IS CHECKED. BAGGAGE
CONNECTING TO OTHER AIRLINES WILL ALSO BE SUBJECT TO THE CONNECTING
AIRLINE'S EXCESS CHARGES, IN ADDITION TO UA'S EXCESS CHARGES.

    D) LIABILITY-BAGGAGE
    1) GENERAL
LIABILITY FOR THE LOSS OF, DAMAGE TO, OR THE DELAY IN THE DELIVERY OF,
ANY PERSONAL PROPERTY, BAGGAGE (WHETHER SUCH PROPERTY HAS BEEN CHECKED
OR OTHERWISE DELIVERED INTO THE CUSTODY OF THE CARRIER) SHALL NOT BE
MORE THAN; FOR TRAVEL ON/BEFORE FEBRUARY 27, 2007, USD 2800.00 OR FOR
TRAVEL ON/AFTER FEBRAURY 28, 2007, USD 3000.00 PER PASSENGER UNLESS THE
PASSENGER ELECTS TO PAY FOR HIGHER LIABILITY AS PROVIDED FOR IN
PARAGRAPH 3) BELOW.  UA WILL COMPENSATE THE PASSENGER FOR ALL
REASONABLE, DOCUMENTED EXPENSES INCURRED AS A DIRECT RESULT OF LOSS OF,
DAMAGE TO, OR DELAY IN THE DELIVERY OF ANY PERSONAL PROPERTY, UP TO THE

LIMITS OF LIABILITY OR DECLARED VALUE, WHICHEVER IS HIGHER PROVIDED THE PASSENGER EXERCISED EFFORT TO MINIMIZE THE AMOUNT OF DAMAGES.  WHEN TRANSPORTATION IS VIA UA AND ONE OR MORE CARRIERS WITH DIFFERENT LIMITATIONS OF LIABILITY, AND RESPONSIBILITY FOR LOSS, DAMAGE, OR DELAY IN DELIVERY OF BAGGAGE CANNOT BE DETERMINED, THE LOWEST MAXIMUM LIABILITY WILL APPLY WHEN THE CLAIM IS FILED WITH UA.  WHERE BAGGAGE CHECKED ON UNITED IS DELAYED OR MISPLACED, UNITED WILL MAKE EVERY REASONABLE EFFORT TO RETURN THE BAGGAGE TO CUSTOMERS IN THE UNITED STATES WITHIN 24 HOURS AFTER A LOST BAGGAGE CLAIM IS FILED WITH UNITED.

    2) EXCLUSIONS FROM LIABILITY

    A) WHEN UA HAS EXERCISED THE ORDINARY STANDARD OF CARE IT SHALL NOT BE LIABLE FOR SPOILAGE ROUTING FROM DELAY IN DELIVERY OF ANY PERISHABLES, NOR FOR DAMAGE TO FRAGILE ARTICLES THAT ARE UNSUITABLY PACKED OR THAT ARE INCLUDED IN THE PASSENGER'S CHECKED BAGGAGE WITHOUT UA'S KNOWLEDGE.  UA SHALL NOT BE LIABLE FOR THE DAMAGE OR DELAY IN DELIVERY OF A PASSENGER'S CHECKED BAGGAGE AND PROPERTY ACCEPTED PURSUANT TO THE EXECUTION OF A RELEASE AS SET FORTH ABOVE, TO THE EXTENT THAT SUCH RELEASE RELIEVES UA OF LIABILITY.

    B) WHEN TRANSPORTATION IS VIA UA AND ONE OR MORE CARRIERS WHICH EXCLUDE CERTAIN ITEMS IN CHECKED BAGGAGE FROM THEIR LIABILITY, UA WILL NOT BE LIABLE FOR THE EXCLUDED ITEMS.

    C) IF CHECKED BAGGAGE IS ACCEPTED LESS THAN 30 MINUTES BEFORE SCHEDULED DEPARTURE TIME, UA WILL NOT BE LIABLE FOR ANY EXPENSES INCURRED, INCLUDING DELIVERY EXPENSES, AS A RESULT OF THE BAGGAGE NOT BEING LOADED ON THE SAME FLIGHT AS THE PASSENGER.

    NOTE: AIRPORTS WITH GREATER TIME RESTRICTIONS SEE ABOVE UNDER (A) (5) (A).

    D) UA WILL NOT BE LIABLE FOR LOSS OF MONEY, JEWELRY, CAMERAS, NEGOTIABLE PAPERS/SECURITIES, ELECTRONIC/VIDEO/PHOTOGRAPHIC EQUIPMENT, HEIRLOOMS, ANTIQUES, ARTIFACTS WORKS OF ART, SILVERWARE, IRREPLACEABLE BOOKS/PUBLICATIONS/MANUSCRIPTS/BUSINESS DOCUMENTS, PRECIOUS METALS AND OTHER SIMILAR VALUABLE AND COMMERCIAL EFFECTS.

    3) DECLARATION OF HIGHER VALUE

    A) A PASSENGER MAY, WHEN CHECKING IN FOR A FLIGHT AND PRESENTING PROPERTY FOR TRANSPORTATION, AND UPON PAYMENT OF APPLICABLE CHARGES, DECLARE A VALUE HIGHER THAN THE MAXIMUM AMOUNT SPECIFIED IN 1) ABOVE, UP TO A MAXIMUM OF USD 5000.00, IN WHICH EVENT UA'S LIABILITY SHALL NOT EXCEED SUCH HIGHER DECLARED VALUE.

NOTE:  HIGHER VALUATION MAY NOT BE DECLARED FOR TRANSPORTATION OF VALUABLE ARTICLES EXCLUDED FROM LIABILITY IN PARAGRAPH 2) D) ABOVE.

    B) WHEN PERSONAL PROPERTY, INCLUDING BAGGAGE, IS TENDERED FOR TRANSPORTATION VIA TWO OR MORE CARRIERS WITH DIFFERENT MAXIMUM LIMITS ON DECLARED VALUE, THE LOWEST LIMIT FOR ANY SUCH CARRIER SHALL APPLY TO ALL CARRIERS PARTICIPATING IN SUCH TRANSPORTATION.


    E) BAGGAGE CHARGES

    1) EXCESS PIECES

BAGGAGE IN EXCESS OF THE FREE BAGGAGE ALLOWANCE SPECIFIED IN B) ABOVE WILL BE CHARGED PER PIECE FOR EACH MAXIMUM EXCEEDED AS FOLLOWS. THESE CHARGES ARE IN ADDITION TO ANY CHARGES ASSESSED PURSUANT TO 2) 3) AND 4) BELOW.

| | |
|---|---|
| 1ST EXCESS PIECE: | $ 85.00 |
| 2ND EXCESS PIECE: | 85.00 |
| 3RD EXCESS PIECE: | 125.00 |
| 4TH EXCESS PIECE: | 125.00 |
| 5TH OR MORE EXCESS PIECE | 200.00 PER PIECE |

NOTE:  CAMERAS, FILM, AND LIGHTING AND SOUND EQUIPMENT WILL BE ACCEPTED
WHEN TENDERED BY REPRESENTATIVES OF NETWORK OR LOCAL TELEVISION
BROADCASTING COMPANIES OR COMMERCIAL FILM-MAKING COMPANIES, UPON
PAYMENT OF USD 50.00 PER ARTICLE.
       2) OVERWEIGHT PIECES - A USD 50.00 CHARGE WILL BE MADE FOR
EACH PIECE OF CHECKED BAGGAGE EXCEEDING 50 LBS., IF ANY. THESE CHARGES
ARE IN ADDITION TO ANY CHARGES ASSESSED PURSUANT TO 1) ABOVE AND 3)
BELOW.
NOTE 1:  NO PIECE OF BAGGAGE WEIGHING MORE THAN 100 LB. WILL BE
ACCEPTED.
NOTE 2:  CAMERAS, FILM, AND LIGHTING AND SOUND EQUIPMENT WILL BE
ACCEPTED WHEN TENDERED BY  REPRESENTATIVES OF NETWORK OR LOCAL
TELEVISION BROADCASTING COMPANIES OR COMMERCIAL FILM-MAKING COMPANIES,
UPON PAYMENT OF USD 50.00 PER ARTICLE.
       3) OVERSIZED PIECES - THE CHARGE FOR EACH PIECE OF CHECKED
BAGGAGE THAT EXCEEDS THE MAXIMUM OUTSIDE LINEAR DIMENSIONS WHICH WILL
BE ACCEPTED WITHOUT CHARGE AS SPECIFIED IN B) 1) ABOVE WILL BE USD
100.00. THESE CHARGES ARE IN ADDITION TO ANY CHARGES ASSESSED PURSUANT
TO 1) AND 2) ABOVE.
NOTE 1:  NO PIECE OF BAGGAGE WHOSE MAXIMUM OUTSIDE LINEAR DIMENSIONS
EXCEED 115 IN. WILL BE ACCEPTED.
NOTE 2:  CAMERAS, FILM, AND LIGHTING AND SOUND EQUIPMENT WILL BE
BROADCASTING COMPANIES OR COMMERCIAL FILM- MAKING COMPANIES UPON
PAYMENT OF USD 50.00 PER ARTICLE.
       4) OVERSIZED/OVERWEIGHT PIECES – THE CHARGE FOR EACH PIECE
OF CHECKED BAGGAGE THAT EXCEEDS BOTH THE WEIGHT RESTRICTIONS IN (2)
ABOVE AND THE MAXIMUM OUTSIDE LINEAR DIMENSIONS IN (3) ABOVE WILL BE
USD 150.00 PER PIECE. THESE CHARGES ARE IN ADDITION TO ANY CHARGES
ASSESSED PURSUANT TO (1), (2) AND (3) ABOVE.
NOTE 1:  NO PIECE OF BAGGAGE WHOSE MAXIMUM OUTSIDE LINEAR DIMENSIONS
EXCEED 115 IN. WILL BE ACCEPTED.
NOTE 2:  CAMERAS, FILM, AND LIGHTING AND SOUND EQUIPMENT WILL BE
BROADCASTING COMPANIES OR COMMERCIAL FILM- MAKING COMPANIES UPON
PAYMENT OF USD 50.00 PER ARTICLE.
       5) SPECIAL CHARGES
THE FOLLOWING ITEMS OF BAGGAGE WILL NOT BE INCLUDED IN DETERMINING THE
FREE BAGGAGE ALLOWANCE, AND WILL ALWAYS BE SUBJECT TO A SPECIAL CHARGE:
ANIMAL ANTLERS -  ACCEPTABLE TO A MAXIMUM SIZE OF 115 LINEAR INCHES.
ANTLERS MUST BE CLEANED AND TIPS MUST BE PROTECTED TO PREVENT DAMAGE TO
PERSONNEL AND OTHER BAGGAGE.
USD 200.00 WITHIN THE U.S.A.  AND U.S. TO CANADA– MAX. SIZE 115 LINEAR
INCHES
ANIMALS - USD 85.00 PER CARRY-ON KENNEL.
USD 100.00 PER CHECKED KENNEL WITH MAXIMUM SIZE OF 27X20X19 INCHES
(68X50X48 CENTIMETERS).
USD 200.00 PER CHECKED KENNEL WITH MAXIMUM SIZE OF 40X27X30 INCHES
(101X68X76 CENTIMETERS).
USD 200.00 PER CHECKED EXTRA LARGE KENNEL OR ANY KENNEL INCLUDING
ANIMAL WEIGHING OVER 100 POUNDS. EXTRA LARGE KENNELS MAY BE  RESTRICTED
ON CERTAIN AIRCRAFT TYPES AND ON CODE SHARE FLIGHTS.  KENNELS WEIGHING
OVER 100 POUNDS MAY NOT BE ACCEPTABLE ON ALL FLIGHTS.
EXCEPTION:  VIA UA OPERATED FLIGHTS, KENNELS WITH A MAXIMUM WEIGHT
GREATER THAN 100 LBS. WILL BE ACCEPTED FOR A CHARGE OF USD 200.00 PER
CHECKED KENNEL.


BIKES

$85.00 USD ONLY NON-MOTORIZED TOURING OR RACING BICYCLES WITH A SINGLE
SEAT ARE ACCEPTABLE.
FISHING EQUIPMENT
EACH SET IN EXCESS OF FREE ALLOWANCE USD 80.00
GOLF CLUBS
EACH SET IN EXCESS OF FREE ALLOWANCE USD 80.00
HANGLIDER
USD 170.00
SURFBOARD
SURFBOARD (UNDER 9 FT. IN LENGTH): PER BOARD - USD 85.00
SURFBOARD (9 FT. AND OVER IN LENGTH): PER BOARD - USD 170.00.
SAILBOARD (WINDSURFER): WITH OR WITHOUT MAST
1ST SET - USD 170.00
ADDITIONAL SETS (EACH) - USD 170.00
ANY OVERSIZE/OVERWEIGHT SET - USD 340.00
SCUBA TANK
USD 85.00
SHOOTING EQUIPMENT
EACH SET IN EXCESS OF FREE ALLOWANCE USD 170.00
SKIS
FIRST SET IN EXCESS OF FREE ALLOWANCE USD 85.00
VAULTING POLES
USD 85.00 PER POLE (MAX. LENGTH 16 FT., INCLUDING CONTAINER)
MAX. 2 POLES PER CONTAINER

EXCESS VALUATION CHARGES
EXCESS VALUATION AVAILABLE FOR PURCHASE THROUGH UA CUSTOMER SERVICE
REPRESENTATIVES, UP TO A MAXIMUM DECLARED VALUD OF USD 5000.00

SPECIAL CHARGES NOTE: SPECIAL CHARGES BAGGAGE MAY NOT BE ACCEPTED ON
SOME UNITED EXPRESS FLIGHTS


**UA RULE 240: FAILURE TO OPERATE ON SCHEDULE OR FAILURE TO CARRY (NOT
APPLICABLE TO STANDBY FARES.)**

   A)   GENERAL
THE PROVISIONS OF THIS RULE APPLY ONLY TO A PASSENGER WHO HAS A TICKET
AND A CONFIRMED RESERVATION ON A FLIGHT WHICH HE/SHE DOES NOT USE FOR
ONE OF THE REASONS NAMED BELOW.
   B)   DEFINITIONS
FOR THE PURPOSE OF THIS RULE, THE FOLLOWING TERMS HAVE THE MEANINGS
INDICATED BELOW:
   1)   COMPARABLE AIR TRANSPORTATION MEANS TRANSPORTATION PROVIDED
BY AIR CARRIERS OR FOREIGN AIR CARRIERS HOLDING CERTIFICATES OF PUBLIC
CONVENIENCE AND NECESSITY OR FOREIGN PERMITS.
   2)   CONNECTING POINT MEANS A POINT TO WHICH A PASSENGER HOLDS OR
HELD CONFIRMED SPACE ON A FLIGHT OF UA, AND OUT OF WHICH THE PASSENGER
HOLDS OR HELD CONFIRMED SPACE ON A FLIGHT OF UA OR ANOTHER CARRIER.
ALL AIRPORTS THROUGH WHICH A CITY IS SERVED BY ANY CARRIER SHALL BE
DEEMED TO BE A SINGLE CONNECTING POINT WHEN THE RECEIVING CARRIER HAS
CONFIRMED RESERVATIONS TO THE DELIVERING CARRIER.
   3)   DELIVERING CARRIER MEANS A CARRIER ON WHOSE FLIGHT A
PASSENGER HOLDS OR HELD CONFIRMED SPACE TO A CONNECTING POINT.
   4)   MISCONNECTION OCCURS AT A CONNECTING POINT WHEN A PASSENGER
HOLDING CONFIRMED SPACE IS UNABLE TO USE SUCH CONFIRMED SPACE BECAUSE

THE DELIVERING CARRIER WAS UNABLE TO DELIVER HIM/HER TO THE CONNECTING
POINT IN TIME TO CONNECT WITH THE RECEIVING CARRIER'S FLIGHT.
NOTE: THE SAME RULES REGARDING DELIVERING AND RECEIVING CARRIER
RESPONSIBILITY APPLY AT THE SUBSEQUENT POINT(S) OF MISCONNECTION AS
WOULD APPLY AT THE POINT OF ORIGINAL MISCONNECTION.
     5) NEW RECEIVING CARRIER(S) MEANS A CARRIER OR COMBINATION OF
CONNECTING CARRIERS, OTHER THAN THE ORIGINAL RECEIVING CARRIER(S),
OPERATING BETWEEN THE POINT OF MISCONNECTION AND THE DESTINATION OR
NEXT POINT OF STOPOVER OR CONNECTING POINT SHOWN ON THE PASSENGER'S
TICKET, ON WHOSE FLIGHT(S) A PASSENGER IS TRANSPORTED FROM THE ORIGINAL
CONNECTING POINT.
     6) ORIGINAL RECEIVING CARRIER(S) MEANS A CARRIER OR COMBINATION
OF CONNECTING CARRIERS ON WHOSE FLIGHT(S) A PASSENGER ORIGINALLY HELD
CONFIRMED SPACE FROM A CONNECTING POINT TO A DESTINATION, NEXT
STOPOVER, OR CONNECTING POINT.
     7) OUTBOUND FLIGHT MEANS THE FLIGHT ON WHICH A PASSENGER
ORIGINALLY HELD CONFIRMED SPACE BEYOND THE POINT WHERE THE SCHEDULE
IRREGULARITY OR FAILURE TO CARRY OCCURS.
     8) SCHEDULE IRREGULARITY MEANS ANY OF THE FOLLOWING
IRREGULARITIES OCCURRING ON DATE OF DEPARTURE:
     A) DELAY IN SCHEDULED DEPARTURE OR ARRIVAL OF A UA FLIGHT
RESULTING IN MISCONNECTION, OR
     B) FLIGHT CANCELLATION, OMISSION OF A SCHEDULED STOP, OR ANY
OTHER DELAY OR INTERRUPTION IN THE SCHEDULED OPERATION OF A UA FLIGHT,
OR
     C) SUBSTITUTION OF EQUIPMENT OF A DIFFERENT CLASS OF SERVICE,
OR
     D) SCHEDULE CHANGES WHICH REQUIRE REROUTING OF A PASSENGER AT
DEPARTURE TIME BECAUSE PRIOR NOTICE OF SUCH SCHEDULE CHANGE HAD NOT
BEEN GIVEN SUCH PASSENGER PRIOR TO THE PASSENGER'S ARRIVING AT THE
AIRPORT FOR CHECK-IN ON THE ORIGINAL FLIGHT.

    9) SCHEDULE CHANGE MEANS:
     A) THE CANCELLATION OF A SCHEDULED FLIGHT WHERE NO UA
FLIGHT OF COMPARABLE ROUTING IS AVAILABLE WITHIN 90 MINUTES HOURS
OF THE ORIGINAL TIME OF DEPARTURE;
     B) A CHANGE IN THE SCHEDULED DEPARTURE TIME OF A UA FLIGHT
WHICH EXCEEDS 90 MINUTES;
     C) A CHANGE IN THE ROUTING OF A SCHEDULED UA FLIGHT WHICH
ADDS ONE OR MORE STOPS TO THE ORIGINAL ITINERARY; OR
     D) A CHANGE IN THE ROUTING OF A SCHEDULED FLIGHT THAT
RESULTS IN A SCHEDULED ARRIVAL TIME MORE THAN 90 MINUTES LATER
THAN THE ORIGINAL SCHEDULED ARRIVAL TIME.

  C) SCHEDULE IRREGULARITY
    1) WHEN A PASSENGER WILL BE DELAYED BECAUSE OF A SCHEDULE
IRREGULARITY INVOLVING A UA FLIGHT WHICH, FOR THE PURPOSES OF THIS
RULE, FOR TICKETS ISSUED ON/AFTER SEPT. 1, 1992, FLIGHT DELAYS
EXCEEDING 2 HRS., OR UA CANCELS THE PASSENGER'S RESERVATION PURSUANT TO
PARAGRAPHS A) OR D), RULE 135 (CANCELLATION OF RESERVATIONS) EXCEPT FOR
CANCELLATIONS OF RESERVATIONS DUE TO A WORK STOPPAGE:
     A) UA WILL TRANSPORT THE PASSENGER WITHOUT STOPOVER ON ITS
NEXT FLIGHT ON WHICH SPACE IS AVAILABLE IN THE SAME CLASS OF SERVICE AS
THE PASSENGER'S ORIGINAL OUTBOUND FLIGHT AT NO ADDITIONAL COST TO THE
PASSENGER.
     B) IF UA IS UNABLE TO PROVIDE ONWARD TRANSPORTATION
ACCEPTABLE TO THE PASSENGER, UA, WITH CONCURRENCE OF THE PASSENGER,

WILL ARRANGE FOR THE TRANSPORTATION ON ANOTHER CARRIER OR COMBINATION
OF CARRIERS WITH WHOM UA HAS AGREEMENTS FOR SUCH TRANSPORTATION.  THE
PASSENGER WILL BE TRANSPORTED WITHOUT STOPOVER ON ITS (THEIR) NEXT
FLIGHT(S), IN THE SAME CLASS OF SERVICE AS THE PASSENGER'S ORIGINAL
OUTBOUND FLIGHT AT NO ADDITIONAL COST TO THE PASSENGER.
     C)  IF SPACE IS ONLY AVAILABLE AND USED ON A UA FLIGHT(S)
OF A LOWER CLASS OF SERVICE ACCEPTABLE TO THE PASSENGER, UA WILL
PROVIDE A REFUND OF THE DIFFERENCE IN FARES PURSUANT TO RULE 260
(REFUNDS-INVOLUNTARY).
     D)  IF UA IS UNABLE TO ARRANGE ALTERNATE AIR TRANSPORTATION
ACCEPTABLE TO THE PASSENGER, UA SHALL REFUND THE FLIGHT COUPON(S) FOR
THE UNFLOWN PORTION(S) IN ACCORDANCE WITH RULE 260 (REFUNDS-
INVOLUNTARY).
EXCEPTION 1:  UA SHALL HAVE NO OBLIGATION TO HONOR ANOTHER CARRIER'S
TICKET WHICH DOES NOT REFLECT A CONFIRMED RESERVATION ON UA, UNLESS THE
ISSUING CARRIER REISSUES THE TICKET FOR ANY CHANGES IN ROUTING.  IN THE
EVENT SUCH CARRIER IS NOT AVAILABLE TO DO SO, UA RESERVES THE RIGHT TO
REROUTE PASSENGERS ONLY OVER ITS OWN LINES BETWEEN THE POINTS NAMED ON
THE ORIGINAL TICKET.
EXCEPTION 2:  PASSENGERS HOLDING TICKETS FOR ANOTHER CARRIER PURCHASED
AT DE21/DE21E/ DE22/FE30/FE32 FARES (OR SIMILAR DISCOUNTED FARES WHICH
PROVIDE FOR TRAVEL ON FIRST CLASS SERVICE) WILL BE ACCEPTED ON UA FIRST
CLASS SERVICE UPON PAYMENT OF ADDITIONAL FARE TO THE LEVEL OF UA'S
NORMAL ONE-WAY FIRST CLASS FARES.
    2)  UNITED WILL, IN A TIMELY MANNER, GIVE ALL CUSTOMERS THE BEST
AVAILABLE INFORMATION REGARDING KNOWN DELAYS, CANCELLATIONS AND
DIVERSIONS INVOLVING THEIR FLIGHT.
   D)  SCHEDULE CHANGES
IN THE EVENT OF A SCHEDULE CHANGE OF A UA FLIGHT ON WHICH A PASSENGER
HOLDS A TICKET INDICATING A CONFIRMED RESERVATION, UA WILL:
     1) OFFER TO TRANSPORT THE PASSENGER OVER ITS OWN LINES IN THE
     SAME CABIN AS THE PASSENGER WAS ORIGINALLY SCHEDULED TO TRAVEL TO
     THE DESTINATION, THE NEXT STOPOVER POINT LISTED ON THE TICKET, OR
     THE TRANSFER POINT SHOWN ON ITS PORTION OF THE TICKET WITHOUT
     STOPOVER, AT NO ADDITIONAL COST TO THE PASSENGER, OR
     2) AT UNITED'S DISCRETION, ARRANGE FOR THE TRANSPORTATION ON
     ANOTHER CARRIER OR COMBINATION OF CARRIERS WITH WHOM UA HAS
     AGREEMENTS FOR SUCH TRANSPORTATION; THE PASSENGER WILL BE
     TRANSPORTED WITHOUT STOPOVER ON ITS (THEIR) NEXT FLIGHT(S), IN
     THE SAME CLASS OF SERVICE AS THE PASSENGER'S ORIGINAL OUTBOUND
     FLIGHT AT NO ADDITIONAL COST TO THE PASSENGER; OR
     3) IN THE EVENT THE PASSENGER DECLINES ALTERNATE TRANSPORTATION
     OFFERED UNDER (1) OR (2) ABOVE, REFUND IN ACCORDANCE WITH RULE
     260  (REFUNDS-INVOLUNTARY).
    E)  IN THE EVENT THAT UA CHANGES THE TIME OF DEPARTURE OR ROUTING
OF A FLIGHT IN A MANNER THAT DOES NOT CONSTITUTE A SCHEDULE CHANGE AS
DEFINED HEREIN, WHETHER OR NOT THE SAME FLIGHT NUMBER IS RETAINED, UA
WILL TRANSPORT THE PASSENGER ON THE RESCHEDULED FLIGHT AT NO ADDITIONAL
COST TO THE PASSENGER.
    F)  AMENITIES/SERVICES FOR DELAYED PASSENGERS  (NOT APPLICABLE TO
STANDBY FARES.)
    1)  LODGING
PASSENGERS WILL BE PROVIDED ON NIGHT'S LODGING, OR A MAXIMUM ALLOWANCE
FOR ONE NIGHT'S LODGING AS ESTABLISHED BY EACH LOCATION, WHEN A UA
FLIGHT ON WHICH THE PASSENGER IS BEING TRANSPORTED IS DIVERTED TO AN
UNSCHEDULED POINT, AND THE DELAY AT SUCH POINT IS EXPECTED TO EXCEED
FOUR HR. DURING THE PERIOD 10:00 P.M. TO 6:00 A.M.

EXCEPTION:  HOTEL ACCOMMODATIONS WILL NOT BE FURNISHED:
       A)  TO A PASSENGER WHOSE TRIP IS INTERRUPTED AT A CITY WHICH IS
HIS/HER ORIGIN POINT, STOPOVER POINT, CONNECTING POINT, OR PERMANENT
DOMICILE, OR
       B)  WHEN THE DESTINATION DESIGNATED AND THE FLIGHT ON WHICH THE
PASSENGER IS BEING ON THE
PASSENGER TICKET IS:  TRANSPORTED IS DIVERTED TO:  (OR VICE VERSA)

| COLUMN 1 | COLUMN 2 |
|----------|----------|
| BALTIMORE, MD | WASHINGTON, DC (IAD AIRPORT) |
| BALTIMORE, MD | WASHINGTON, DC (DCA AIRPORT) |
| CHICAGO, IL | MILWAUKEE, WI |
| CHICAGO, IL (ORD AIRPORT) | CHICAGO, IL (MDW AIRPORT) |
| CHICAGO, IL (ORD AIRPORT) | CHICAGO, IL (CHICAGO RFD AIRPORT) |
| LONG BEACH, CA | LOS ANGELES, CA |
| LONG BEACH, CA | ONTARIO, CA |
| LOS ANGELES, CA | ONTARIO, CA |
| MIAMI, FL | FT. LAUDERDALE, FL |
| NEWARK, NJ | NEW YORK, NY (JFK AIRPORT) |
| NEWARK, NJ | NEW YORK, NY (LGA AIRPORT) |
| NEW YORK, NY (JFK AIRPORT) | NEW YORK, NY (LGA AIRPORT) |
| SAN FRANCISCO, CA | OAKLAND, CA SAN FRANCISCO, CA |
|  | SAN JOSE, CA |
| WASHINGTON, DC (IAD AIRPORT) | WASHINGTON, DC (DCA AIRPORT) |

     2)  GROUND TRANSPORTATION
WHEN THE DESTINATION DESIGNATED ON THE PASSENGER'S TICKET IS A POINT
SHOWN IN 1) B) COLUMN 1, AND THE FLIGHT ON WHICH THE PASSENGER IS BEING
TRANSPORTED IS DIVERTED TO A POINT SHOWN IN 1) B) COLUMN 2, UA WILL
PROVIDE GROUND TRANSPORTATION TO THE ORIGINAL DESTINATION AIRPORT.

     3)  EXTRAORDINARY CIRCUMSTANCES
UA WILL PROVIDE SUCH AMENITIES AS ARE NECESSARY TO MAINTAIN THE SAFETY
AND/OR WELFARE OF CERTAIN PASSENGERS SUCH AS INVALIDS, UNACCOMPANIED
CHILDREN, THE ELDERLY OR OTHERS TO WHOM SUCH AMENITIES WILL BE
FURNISHED CONSISTENT WITH SPECIAL NEEDS AND/OR CIRCUMSTANCES.  IN
ADDITION, WHERE EXTRAORDINARY CIRCUMSTANCES RESULT IN THE EXTENDED
DELAY OF AN AIRCRAFT ON THE GROUND WITHOUT ACCESS TO THE TERMINAL,
WHETHER PRIOR TO DEPARTURE OR AFTER LANDING, UNITED WILL MAKE EVERY
REASONABLE EFFORT, IN ACCORDANCE WITH AN ESTABLISHED CONTINGENCY PLAN,
TO ENSURE THAT ITS PASSENGERS ARE PROVIDED WITH FOOD, WATER, RESTROOM
FACILITIES, AND ACCESS TO MEDICAL TREATMENT CONSISTENT WITH CUSTOMER
AND EMPLOYEE SAFETY AND SECURITY.
     4)  REMEDIES
THE SOLE AND EXCLUSIVE REMEDY FOR A PASSENGER WHO HAS A CLAIM UNDER
THIS RULE (RULE 240UA) SHALL BE THE EXPRESS AMENITIES PROVIDED IN THE
RULE.  THE PASSENGER SHALL HAVE NO OTHER CLAIMS OF LAW OR EQUITY FOR
ACTUAL, COMPENSATORY OR PUNITIVE DAMAGES.

     G)  CARRIER IN DEFAULT
NOTWITHSTANDING THE PROVISIONS OF THIS RULE, UA WILL NOT ACCEPT FOR ANY
PURPOSES UNDER THIS RULE PASSENGER TICKETS OR RELATED TRANSPORTATION
DOCUMENTS ISSUED BY ANY CARRIER WHICH IS IN SUBSTANTIAL DEFAULT OF ITS
INTERLINE OBLIGATIONS OR WHICH VOLUNTARILY OR INVOLUNTARILY HAS BECOME
THE SUBJECT OF BANKRUPTCY PROCEEDINGS (THE "DEFAULTING CARRIER").
EXCEPTION:  NOTWITHSTANDING THE PROVISIONS OF THIS PARAGRAPH, TICKETS
ISSUED BY THE DEFAULTING CARRIER OR ITS SALES AGENT PRIOR TO THE
DEFAULT, WILL BE ACCEPTED SOLELY FOR TRANSPORTATION OVER THE LINES OF

UA, PROVIDED SUCH TICKETS WERE ISSUED BY SUCH DEFAULTING CARRIER IN ITS
CAPACITY AS AGENT FOR UA AND SPECIFIED TRANSPORTATION VIA UA. WHEN
TICKETS ARE ACCEPTED, NO ADJUSTMENTS IN FARE WILL BE MADE WHICH WOULD
REQUIRE UA TO REFUND MONEY TO THE PASSENGER.

     H)  LIABILITY OF CARRIER
EXCEPT TO THE EXTENT PROVIDED IN THIS RULE, UA SHALL NOT BE LIABLE FOR
FAILING TO OPERATE ANY FLIGHT ACCORDING TO SCHEDULE, OR FOR CHANGING
THE SCHEDULE OF ANY FLIGHT, WITH OR WITHOUT NOTICE TO THE PASSENGER.

     I)  IN THE EVENT OF A STRIKE OR WORK STOPPAGE WHICH CAUSES ANY
CANCELLATION OR SUSPENSION OF OPERATIONS OF ANY OTHER CARRIER, THE
PROVISIONS OF THIS RULE WILL NOT APPLY WITH RESPECT TO PASSENGERS
HOLDING TICKETS FOR TRANSPORTATION ON THAT CARRIER.

     J)  UA MAY, IN THE EVENT OF A FORCE MAJEURE EVENT, WITHOUT
NOTICE, CANCEL, TERMINATE, DIVERT, POSTPONE, OR DELAY ANY FLIGHT OR THE
RIGHT OF CARRIAGE OR RESERVATION OF TRAFFIC ACCOMMODATIONS AND
DETERMINED IF ANY DEPARTURE OR LANDING SHOULD BE MADE, WITHOUT ANY
LIABILITY EXCEPT TO REFUND IN ACCORDANCE WITH RULE 260 UA (REFUNDS
INVOLUNTARY) ANY UNUSED PORTION OF THE TICKET.  AS USED IN THIS RULE
"FORCE MAJEURE EVENT" MEANS:
     1)  ANY CONDITION BEYOND UA'S CONTROL (INCLUDING, BUT WITHOUT
LIMITATION, METEOROLOGICAL CONDITIONS, ACTS OF GOD, RIOTS, CIVIL
COMMOTION, EMBARGOES, WARS, HOSTILITIES, DISTURBANCES, OR UNSETTLED
INTERNATIONAL CONDITIONS), ACTUAL, THREATENED OR REPORTED OR BECAUSE OF
ANY DELAY, DEMAND CIRCUMSTANCES OR REQUIREMENT DUE, DIRECTLY OR
INDIRECTLY, TO SUCH CONDITIONS OR
     2)  ANY STRIKE WORK STOPPAGE, SLOWDOWN, LOCKOUT OR ANY OTHER
LABOR RELATED DISPUTE INVOLVING OR AFFECTING UA'S SERVICE OR:
     3)  ANY GOVERNMENT REGULATION, DEMAND, OR REQUIREMENT OR
     4)  ANY SHORTAGE OF LABOR, FUEL OR FACILITIES OF UA OR OTHERS, OR
     5)  ANY FACT NOT REASONABLY FORESEEN, ANTICIPATED, OR PREDICTED.
     K)  THE PROVISION OF SERVICES IN ADDITION TO THOSE SPECIFICALLY SET
FORTH IN THIS RULE TO ALL OR SOME PASSENGERS SHALL NOT BE CONSTRUED AS
A WAIVER OF UA'S RIGHTS.  NEITHER SHALL ANY DELAY ON THE PART OF UA IN
EXERCISING OR ENFORCING ITS RIGHTS UNDER THIS RULE BE CONSTRUED AS A
WAIVER OF SUCH RIGHTS.


**DENIED BOARDING COMPENSATION UA  RULE: 0245**

WHEN UA IS UNABLE TO PROVIDE PREVIOUSLY CONFIRMED SPACE DUE TO MORE
PASSENGERS HOLDING CONFIRMED RESERVATIONS AND TICKETS ON A FLIGHT THAT
THERE ARE AVAILABLE SEATS ON THAT FLIGHT, UA WILL TAKE THE ACTIONS
SPECIFIED IN THE PROVISIONS OF THIS RULE.  IN NO CASE SHALL ANY
PASSENGER BE ENTITLED TO ANY DAMAGES ACTUAL, COMPENSATORY, PUNITIVE FOR
DENIED BOARDING.  THIS RULE (RULE 245UA) SHALL BE THE SOLE AND
EXCLUSIVE FOR ALL PASSENGERS UNDER THIS SECTION.

     A)  DEFINITIONS
FOR THE PURPOSE OF THIS RULE:
     1)  AIRPORT MEANS THE AIRPORT AT WHICH THE DIRECT OR CONNECTING
FLIGHT, ON WHICH THE PASSENGER HOLDS CONFIRMED RESERVED SPACE, IS
PLANNED TO ARRIVE OR SOME OTHER AIRPORT SERVING THE SAME METROPOLITAN
AREA THAT IS SERVED BY THE FORMER, PROVIDED THAT TRANSPORTATION TO THE
OTHER AIRPORT IS ACCEPTED (I.E., USED) BY THE PASSENGER.

2)  ALTERNATE TRANSPORTATION MEANS AIR TRANSPORTATION (BY AN AIRLINE LICENSED BY THE C.A.B.) OR OTHER TRANSPORTATION USED BY THE PASSENGER WHICH, AT THE TIME THE ARRANGEMENT IS MADE, IS PLANNED TO ARRIVE AT THE PASSENGER'S NEXT SCHEDULED STOPOVER (OF 4 HOURS OR LONGER), OR DESTINATION NO LATER THAN 2 HOURS FOR FLIGHTS WITHIN THE UNITED STATES, INCLUDING TERRITORIES AND POSSESSIONS, OR 4 HOURS FOR INTERNATIONAL FLIGHTS AFTER THE PASSENGER'S ORIGINALLY SCHEDULED ARRIVAL TIME.

3)  CARRIER MEANS ANY DIRECT U.S. AIR CARRIER(S), EXCEPT A HELICOPTER OPERATOR, HOLDING A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY ISSUED BY THE U.S. CIVIL AERONAUTICS BOARD.

4)  CONFIRMED RESERVED SPACE MEANS SPACE ON A SPECIFIC DATE AND ON A SPECIFIC FLIGHT AND CLASS OF SERVICE OF UA THAT HAS BEEN REQUESTED BY A PASSENGER, AND THAT UA OR ITS AGENT HAS VERIFIED, BY APPROPRIATE NOTATION ON THE TICKET OR IN ANY OTHER MANNER PROVIDED BY UA'S TARIFF, AS BEING RESERVED FOR THE ACCOMMODATION OF THE PASSENGER.

5)  COMPARABLE AIR TRANSPORTATION MEANS TRANSPORTATION PROVIDED TO PASSENGERS AT NO EXTRA COST BY U.S. AIR CARRIER(S) HOLDING A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY ISSUED BY THE U.S. CIVIL AERONAUTICS BOARD.

6)  TICKET LIFTING POINT/BOARDING AREA MEANS THE POINT WHERE THE PASSENGER'S FLIGHT COUPON IS LIFTED AND RETAINED BY THE CARRIER.

(7) SUM OF THE VALUES OF THE REMAINING FLIGHT COUPONS MEANS:

(A) UNINTERRUPTED FARE COMPONENT - THE AMOUNT EQUAL TO THE FARE AND CHARGES PAID FOR THE UNINTERRUPTED FARE COMPONENT INCLUDING ANY SURCHARGES AND TRANSPORTATION TAXES, LESS ANY APPLICABLE DISCOUNTS.

(B) INTERRUPTED FARE COMPONENT - THE FARE FOR THE UNFLOWN SEGMENT OF AN INTERRUPTED FARE COMPONENT WILL BE CALCULATED FROM THE POINT OF DENIED BOARDING TO THE DESTINATION OR NEXT STOPOVER POINT NAMED ON THE TICKET.

(C) THE VALUE OF AN INTERRUPTED FARE COMPONENT WILL BE CALCULATED BY DIVIDING THE NORMAL COACH (Y) FARE BETWEEN THE POINT OF DENIED BOARDING AND THE PASSENGERS DESTINATION OR NEXT STOPOVER POINT (UNFLOWN PORTION) BY THE SUM OF THE NORMAL COACH (Y) FARE PUBLISHED BETWEEN THE POINT OF ORIGIN AND THE POINT OF DENIED BOARDING PLUS THE NORMAL COACH (Y) FARE BETWEEN THE POINT OF DENIED BOARDING AND THE PASSENGERS DESTINATION OR NEXT STOPOVER POINT. MULTIPLY THE AMOUNT OF THE PAID FARE COMPONENT BY THE RESULTING PERCENTAGE TO DETERMINE THE VALUE OF THE UNFLOWN PORTION OF THE INTERRUPTED FARE COMPONENT.

8)  STOPOVER MEANS A DELIBERATE INTERRUPTION OF A JOURNEY BY THE PASSENGER, SCHEDULED TO EXCEED FOUR HOURS, AT A POINT BETWEEN THE PLACE OF DEPARTURE AND THE PLACE OF DESTINATION.

B)  REQUEST OF VOLUNTEERS
UA WILL REQUEST PASSENGERS WHO ARE WILLING TO DO SO, TO VOLUNTARILY RELINQUISH THEIR CONFIRMED RESERVED SPACE IN EXCHANGE FOR UNITED AIRLINES TRAVEL CREDITS.  TRAVEL CREDITS ENTITLE THE HOLDER TO A DISCOUNT OFF FUTURE UNITED AIRLINES TRAVEL, AND ARE VALID FOR ONE YEAR FROM ISSUE DATE.  IF A PASSENGER IS ASKED TO VOLUNTEER, UA WILL NOT LATER DENY BOARDING TO THAT PASSENGER INVOLUNTARILY UNLESS THAT PASSENGER WAS INFORMED AT THE TIME HE/SHE WAS ASKED TO VOLUNTEER THAT

THERE WAS A POSSIBILITY OF BEING DENIED BOARDING INVOLUNTARILY, AND
THAT THE SELECTION OF SUCH PERSONS TO BE DENIED SPACE SHALL BE IN A
MANNER DETERMINED SOLELY BY UA.

    C)  BOARDING PRIORITIES
IF A FLIGHT IS OVERSOLD (MORE PASSENGERS HOLD CONFIRMED RESERVATIONS
THAN THERE ARE SEATS AVAILABLE), NO ONE WILL BE DENIED BOARDING AGAINST
HIS/HER WILL UNTIL UA PERSONNEL FIRST ASK FOR VOLUNTEERS WHO WILL
WILLINGLY GIVE UP THEIR RESERVATIONS.  IF THERE ARE NOT ENOUGH
VOLUNTEERS, OTHER PASSENGERS WITH CONFIRMED RESERVATIONS WILL BE DENIED
BOARDING INVOLUNTARILY, IN ACCORDANCE WITH UA'S BOARDING PRIORITY
PROVIDED BELOW.
PASSENGERS WITH CONFIRMED RESERVATIONS WHO HAVE NOT RECEIVED BOARDING
AUTHORITY WILL BE PERMITTED TO BOARD IN THE FOLLOWING ORDER UNTIL ALL
AVAILABLE SEATS ARE OCCUPIED:
    1)  PASSENGERS WHO ARE PHYSICALLY HANDICAPPED TO AN EXTENT THAT
FAILURE TO CARRY WOULD, IN UA'S OPINION, CAUSE A SEVERE HARDSHIP,
UNACCOMPANIED CHILDREN UNDER 12 YEARS OF AGE, WHO WOULD SUFFER A SEVERE
HARDSHIP IN UA'S OPINION.
    2)  PASSENGERS OTHER THAN NOTED IN 1) ABOVE (INCLUDING TOUR
CONDUCTORS ACCOMPANYING A GROUP).
         NOTE:    PASSENGERS NOTED IN 2) ABOVE WILL BE ACCOMMODATED IN
THE ORDER IN WHICH THEY PRESENT THEMSELVES FOR CHECK-IN AND BOARDING AT
THE LOADING GATE OR OTHER POINTS(S)DESIGNATED BY UA FOR SUCH PURPOSE.
    3)  ACCOMPANIED CHILDREN UNDER 12 YEARS OF AGE WILL BE INCLUDED
IN THE SAME CATEGORY AS THE ACCOMPANYING PASSENGER.

    D)  TRANSPORTATION FOR PASSENGER DENIED BOARDING
WHEN UA IS UNABLE TO PROVIDE PREVIOUSLY CONFIRMED SPACE, UA WILL
PROVIDE TRANSPORTATION TO PERSONS WHO HAVE BEEN DENIED BOARDING WHETHER
VOLUNTARILY OR INVOLUNTARILY, IN ACCORDANCE WITH THE PROVISIONS BELOW.
    1)  UA WILL TRANSPORT THE PASSENGER WITHOUT STOPOVER ON ITS NEXT
FLIGHT ON WHICH SPACE IS AVAILABLE AT NO ADDITIONAL COST TO THE
PASSENGER.
    2)  IF UA IS UNABLE TO PROVIDE ONWARD TRANSPORTATION ACCEPTABLE
TO THE PASSENGER, ANOTHER CARRIER OR COMBINATION OF CARRIERS, AS
ARRANGED BY UA AND WITH THE CONCURRENCE OF THE PASSENGER, WILL
TRANSPORT THE PASSENGER WITHOUT STOPOVER ON ITS (THEIR) NEXT FLIGHT(S)
IN THE SAME CLASS OF SERVICE AS THE PASSENGER'S ORIGINAL OUTBOUND
FLIGHT, AT NO ADDITIONAL COST TO THE PASSENGER.  IF SPACE IS AVAILABLE
ON A FLIGHT(S) OF A DIFFERENT CLASS OF SERVICE ACCEPTABLE TO THE
PASSENGER, SUCH FLIGHT(S)WILL BE USED WITHOUT STOPOVER AT NO ADDITIONAL
COST TO THE PASSENGER ONLY IF IT (THEY) WILL PROVIDE AN EARLIER ARRIVAL
AT THE PASSENGER'S DESTINATION, NEXT STOPOVER POINT, OR TRANSFER POINT.

    E)  COMPENSATION FOR INVOLUNTARY DENIED BOARDING
    1)  CONDITIONS FOR PAYMENT
IN ADDITION TO PROVIDING TRANSPORTATION AS DESCRIBED IN PARAGRAPH D)
ABOVE, WHEN THE PASSENGER WHO IS DELAYED HAS NOT VOLUNTARILY
RELINQUISHED CONFIRMED RESERVED SPACE IN ACCORDANCE WITH PROVISIONS IN
PARAGRAPH B) ABOVE, UA WILL COMPENSATE THE DELAYED PASSENGER FOR UA'S
FAILURE TO PROVIDE CONFIRMED SPACE.  COMPENSATION WILL BE MADE IN
ACCORDANCE WITH THE PROVISIONS BELOW.
         A)  THE PASSENGER HOLDING A TICKET FOR CONFIRMED SPACE MUST
PRESENT HIMSELF FOR CARRIAGE AT THE APPROPRIATE TIME AND PLACE, HAVING
COMPLIED FULLY WITH UA'S REQUIREMENTS AS TO TICKETING AND CHECK-IN

PROCEDURES, AND HAVING MET ALL REQUIREMENTS FOR ACCEPTANCE FOR
TRANSPORTATION PUBLISHED IN UA'S TARIFF.
     B) THE UA FLIGHT FOR WHICH THE PASSENGER HOLDS CONFIRMED
RESERVED SPACE MUST BE UNABLE TO ACCOMMODATE THE PASSENGER, AND DEPARTS
WITHOUT HIM/HER.
EXCEPTION 1: THE PASSENGER WILL NOT BE ELIGIBLE FOR COMPENSATION IF
THE UA FLIGHT ON WHICH HE/SHE HOLDS CONFIRMED RESERVED SPACE IS UNABLE
TO ACCOMMODATE HIM/HER BECAUSE OF SUBSTITUTION OF EQUIPMENT OF LESSER
CAPACITY WHEN REQUIRED BY OPERATIONAL OR SAFETY REASONS.
EXCEPTION 2: THE PASSENGER WILL NOT BE ELIGIBLE FOR COMPENSATION IF
HE/SHE IS OFFERED ACCOMMODATIONS OR IS SEATED IN A SECTION OF THE
AIRCRAFT OTHER THAN THAT SPECIFIED ON THE PASSENGER'S TICKET AT NO
EXTRA CHARGE. IF A PASSENGER IS SEATED IN A SECTION FOR WHICH A LOWER
FARE APPLIES, THE PASSENGER SHALL BE ENTITLED TO AN APPROPRIATE REFUND.
EXCEPTION 3: THE PASSENGER WILL NOT BE ELIGIBLE FOR COMPENSATION IF
HE/SHE DOES NOT PRESENT HIM/HERSELF AT THE LOADING GATE FOR CHECK-IN
AND/OR BOARDING AT LEAST 20 MINUTES PRIOR TO SCHEDULED DEPARTURE TIME
FOR THE FLIGHT ON WHICH THE RESERVATION IS CONFIRMED.
EXCEPTION 4: THE PASSENGER WILL NOT BE ELIGIBLE FOR COMPENSATION IF
THE TICKET WAS ISSUED AT A FREE OR REDUCED FARE AVAILABLE TO EMPLOYEES
WITHIN THE TRANSPORTATION INDUSTRY.
EXCEPTION 5: THE PASSENGER WILL NOT BE ELIGIBLE FOR COMPENSATION IF UA
ARRANGES FOR COMPARABLE AIR TRANSPORTATION (OR FOR OTHER TRANSPORTATION
THAT IS ACCEPTED AND USED BY THE PASSENGER AT NO EXTRA COST TO THE
PASSENGER) WHICH, AT THE TIME EITHER ARRANGEMENT IS MADE IS PLANNED TO
ARRIVE AT THE AIRPORT OF THE PASSENGER'S NEXT STOPOVER, OR IF NONE, AT
THE AIRPORT OF THE PASSENGER'S FINAL DESTINATION WITHIN ONE HOUR AFTER
THE SCHEDULED ARRIVAL TIME OF THE PASSENGER'S ORIGINAL FLIGHT OR
FLIGHTS.
  (2) AMOUNT OF COMPENSATION
     SUBJECT TO THE PROVISIONS OF PARAGRAPH (E) (1) ABOVE UA
     WILL TENDER LIQUIDATED DAMAGES IN THE AMOUNT OF 200
     PERCENT OF THE VALUE OF THE PASSENGERS REMAINING FLIGHT
     COUPON(S) AS DEFINED IN (A) (7) ABOVE FOR A MAXIMUM
     OF USD $400.00/CAD $492.00 TO THE PASSENGER*S NEXT STOPOVER,
     OR IF NONE, TO THE PASSENGERS DESTINATION. HOWEVER
     THE COMPENSATION SHALL BE 50 PERCENT OF THE AMOUNT
     DESCRIBED ABOVE BUT NOT MORE THAN USD $200.00/CAD $246.00 IF
     UA ARRANGES FOR COMPARABLE AIR TRANSPORTATION OR
     OTHER TRANSPORTATION THAT IS ACCEPTABLE TO THE
     PASSENGER AT THE TIME EITHER ARRANGEMENT IS MADE,
     IS PLANNED TO ARRIVE AT THE AIRPORT OF THE PASSENGER*S
     NEXT STOPOVER, OR IF NONE, AT THE AIRPORT OF THE
     PASSENGERS DESTINATION NOT LATER THAN 4 HOURS AFTER THE
     PLANNED ARRIVAL AT THE AIRPORT OF THE PASSENGER'S NEXT
     POINT OF STOPOVER, OR, IF THERE IS NO NEXT OINT OF STOSPOVER,
     AT THE AIRPORT OF THE PASSENGER'S DESTINATION, OF THE FLIGHT
     ON WHICH THE PASSENGER HOLDS A CONFIRMED RESERVATION.
       NOTE 1: IF THE OFFER OF COMPENSATION IS MADE BY UA
          AND ACCEPTED BY THE PASSENGER SUCH PAYMENT
          WILL CONSTITUTE FULL COMPENSATION FOR ALL
          ACTUAL OR ANTICIPATORY DAMAGES INCURRED OR
          TO BE INCURRED BY THE PASSENGER AS A RESULT
          OF UA*S FAILURE TO PROVIDE THE PASSENGERS
          CONFIRMED RESERVED SPACE.

       NOTE 2: AT THE PASSENGERS OPTION UA MAY COMPENSATE

THE PASSENGER WITH CREDIT VALID FOR
TRANSPORTATION ON UA IN LIEU OF MONETARY
COMPENSATION. THE OFFER OF TRANSPORTATION
WILL BE EQUAL TO OR GREATER THAN THE
MONETARY COMPENSATION DUE. THE CREDIT
VOUCHER IS NON-TRANSFERABLE  HAS NO REFUND
VALUE AND MAY BE VOLUNTARILY REISSUED ONLY
BY UA.
    3)  TIME OF OFFER OF COMPENSATION
THE OFFER OF COMPENSATION WILL BE MADE BY UA ON THE DAY AND AT THE TIME
AND PLACE WHERE THE FAILURE TO PROVIDE CONFIRMED RESERVED SPACE OCCURS,
AND, IF ACCEPTED, WILL BE RECEIPTED FOR BY THE PASSENGER. PROVIDED,
HOWEVER, THAT WHEN UA ARRANGES, FOR THE PASSENGER'S CONVENIENCE,
ALTERNATE MEANS OF TRANSPORTATION THAT DEPARTS PRIOR TO THE TIME THE
OFFER CAN BE MADE TO THE PASSENGER, THE OFFER SHALL BE MADE BY MAIL OR
OTHER MEANS WITHIN 24 HOURS AFTER THE TIME THE FAILURE OCCURS.


    F)  NOTICE PROVIDED PASSENGERS
A WRITTEN NOTICE SETTING FORTH THE ABOVE PROVISIONS SHALL BE PROVIDED
ALL PASSENGERS WHO ARE DENIED BOARDING INVOLUNTARILY ON UA FLIGHTS ON
WHICH THEY HOLD CONFIRMED RESERVED SPACE.  RULE 245 UA SHALL BE THE
EXCLUSIVE COMPENSATION AND REMEDY OF PASSENGER DENIED BOARDING
HEREUNDER AS A CONDITION TO PURCHASE OF A TICKET, ALL PASSENGERS WAIVE
ANY CLAIM FOR COMPENSATORY OR PUNITIVE DAMAGES ARISING FROM DENIED
BOARDING.


**REROUTING-WHEN ALLOWED UA  RULE: 0255**

    A)   UA WILL REROUTE A PASSENGER AT THE PASSENGER'S REQUEST AND
UPON PRESENTATION OF THE TICKET OR PORTION THEREOF THEN HELD BY THE
PASSENGER.
EXCEPTION 1:  IN THE EVENT OF ILLNESS/DEATH OF THE PASSENGER/IMMEDIATE
FAMILY MEMBER (TRAVELING OR NOT)/TRAVELING COMPANION, REROUTING/FLIGHT
CHANGES MAY BE MADE IN ACCORDANCE WITH THE PROVISIONS OF THIS RULE AND
RULE 105 (TICKET VALIDITY), ANY APPLICABLE SERVICE CHARGES WILL BE
WAIVED.  IF THE FARE(S) INVOLVED ARE NONCHANGEABLE, THE NONCHANGEABLE
PROVISIONS WILL BE WAIVED.  THE PASSENGER MUST SUBMIT TO UA A
PHYSICIAN'S CERTIFICATE STATING THE CIRCUMSTANCES WHICH NECESSITATE
WAIVER UNDER THIS PROVISION.  IN THE CASE OF DEATH, A COPY OF THE DEATH
CERTIFICATE MUST BE PRESENTED TO UA.
EXCEPTION 2:  IN THE EVENT A PASSENGER/IMMEDIATE FAMILY MEMBER
(TRAVELING OR NOT)/TRAVELING COMPANION IS CALLED TO JURY DUTY, RECEIVES
A SUBPOENA OR RECEIVES NEW/REVISED MILITARY ORDERS WHICH CONFLICTS WITH
THE TRAVEL DATES; ANY SERVICE CHARGES, AND NONCHANGEABLE PROVISIONS
WILL BE WAIVED AND REROUTING/FLIGHT CHANGES MAY BE MADE IN ACCORDANCE
WITH THE PROVISIONS OF THIS RULE AND RULE 105 (TICKET VALIDITY)
PROVIDED WRITTEN PROOF OF THE CIRCUMSTANCES IS FURNISHED TO UA.
WRITTEN PROOF WILL CONSIST OF THE JURY DUTY SUMMONS, SUBPOENA OR
MILITARY ORDERS WHICH ARE IN CONFLICT WITH THE TRAVEL DATES.
EXCEPTION 3:  VIA ALL -N TYPE NONREFUNDABLE FARES, NO WAIVERS TO FARE
RULES DUE TO ILLNESS/JURY DUTY/ SUBPOENA/NEW OR REVISED MILITARY ORDERS
WILL APPLY.
    B)   FARE APPLICABLE TO REROUTING OR CHANGE IN DESTINATION
    1)   PASSENGER MAY CHANGE THE ROUTING AND/OR THE ULTIMATE
DESTINATION DESIGNATED ON HIS TICKET IN ACCORDANCE WITH PARAGRAPH 2)
BELOW, PROVIDED THAT, AFTER TRANSPORTATION HAS COMMENCED, A ONE-WAY

TICKET WILL NOT BE CONVERTED INTO A ROUND-TRIP, CIRCLE-TRIP, OR OPEN-
JAW TRIP TICKET.
     2)   EXCEPT AS OTHERWISE PROVIDED IN RULE 240 (FAILURE TO OPERATE
ON SCHEDULE), THE FARE AND CHARGES APPLICABLE TO ANY CHANGES IN
ITINERARY, CLASS OF SERVICE, OR CHANGE IN ULTIMATE DESTINATION, MADE AT
THE PASSENGER'S REQUEST AT AN OFFICE OF UA PRIOR TO ARRIVAL AT THE
ULTIMATE DESTINATION NAMED ON THE ORIGINAL TICKET, SHALL BE THE FARE
AND CHARGES IN EFFECT ON THE DATE THE REVISED ROUTING AND/OR ULTIMATE
DESTINATION IS ENTERED ON THE PASSENGER'S NEW TICKET.  ANY DIFFERENCE
BETWEEN THE FARE AND CHARGES SO APPLICABLE TO THE ORIGINAL TICKET
ISSUED TO THE PASSENGER WILL BE COLLECTED FROM OR REFUNDED TO THE
PASSENGER, AS THE CASE MAY BE.
   C)   FARE APPLICABLE TO UPGRADING CLASS OF SERVICE WHILE IN FLIGHT
    1)   WHEN A PASSENGER MOVES FROM ONE COMPARTMENT TO ANOTHER
COMPARTMENT OF A COMBINATION COMPARTMENT AIRCRAFT WHILE IN FLIGHT, AN
ADDITIONAL COLLECTION WILL BE MADE IN AN AMOUNT EQUAL TO THE DIFFERENCE
BETWEEN:
     A)   THE ONE-WAY FARE FROM PASSENGER'S POINT OF ORIGIN ON SUCH
FLIGHT TO THE LAST SCHEDULED STOP PRIOR TO THE PASSENGER'S CHANGE IN
COMPARTMENT, APPLICABLE TO THE CLASS OF SERVICE USED, PLUS THE ONE-WAY
FARE FROM SUCH STOP TO THE PASSENGER'S DESTINATION ON SUCH FLIGHT,
APPLICABLE TO TRANSPORTATION IN THE COMPARTMENT TO WHICH THE PASSENGER
IS MOVING, AND
     B)   THE FARE PAID FOR TRANSPORTATION FROM THE PASSENGER'S
ORIGIN TO DESTINATION ON SUCH FLIGHT.
     NOTE:  WHEN THE AMOUNT DESCRIBED IN A) ABOVE IS LESS THAN THE
AMOUNT DESCRIBED IN B) ABOVE, NO ADDITIONAL COLLECTION WILL BE MADE.
EXCEPTION:  PASSENGERS TRAVELING AT A ROUND-TRIP FARE OR ANY FARE NOT
HAVING A ONE-WAY VALUE, MAY UPGRADE ALL OR ANY PORTION OF THEIR
ITINERARY ONLY UPON PAYMENT OF THE FULL NORMAL FARE FOR THE TOTAL
ITINERARY.
    2)   THE ACCEPTANCE OF SUCH PASSENGER IN THE COMPARTMENT TO WHICH
HE/SHE IS MOVING FOR TRAVEL BEYOND THE NEXT SCHEDULED STOPPING POINT IN
THE FLIGHT WILL BE SUBJECT TO THE AVAILABILITY OF SPACE.  DISCOUNTS,
OTHER THAN FOR CHILDREN AS PROVIDED IN RULE 8000 (CHILDREN'S FARES), OF
THE NORTH AMERICAN PASSENGER TARIFF, WILL NOT APPLY.
NOTWITHSTANDING THE PROVISIONS OF THIS RULE, UA WILL NOT ACCEPT FOR ANY
PURPOSES UNDER THIS RULE, PASSENGER TICKETS OR RELATED TRANSPORTATION
DOCUMENTS ISSUED BY ANY CARRIER WHICH IS IN SUBSTANTIAL DEFAULT OF ITS
INTERLINE OBLIGATIONS OR WHICH HAS VOLUNTARILY OR INVOLUNTARILY BECOME
THE SUBJECT OF BANKRUPTCY PROCEEDINGS (THE "DEFAULTING CARRIER").
NOTWITHSTANDING THE PROVISIONS OF THIS PARAGRAPH, TICKETS ISSUED BY THE
DEFAULTING CARRIER OR ITS SALES AGENT WILL BE REISSUED/REROUTED ONLY
BETWEEN THE POINTS NAMED ON THE ORIGINAL TICKET THAT ARE SERVED BY UA,
AND SOLELY FOR TRANSPORTATION VIA UA, PROVIDED THAT SUCH TICKETS WERE
ISSUED BY SUCH DEFAULTING CARRIER OR ITS SALES AGENT IN EITHER'S
CAPACITY AS AN AGENT FOR UA AND SPECIFIED TRANSPORTATION VIA UA.  WHEN
TICKETS ARE ACCEPTED, NO ADJUSTMENTS IN FARE WILL BE MADE THAT WOULD
REQUIRE UA TO REFUND MONEY TO THE PASSENGER.


**REFUNDS - INVOLUNTARY UA  RULE: 0260**


(A) THE AMOUNT UA WILL REFUND UPON SURRENDER OF THE UNUSED
    PORTION OF THE PASSENGERS TICKET PURSUANT TO RULE 35
    (REFUSAL TO TRANSPORT) (OR) RULE 50 (ACCEPTANCE OF
    CHILDREN) OR RULE 240 (FAILURE TO OPERATE ON SCHEDULE OR

FAILURE TO CARRY) WILL BE:

(1) IF NO PORTION OF THE TICKET HAS BEEN USED: AN AMOUNT
    EQUAL TO THE FARE AND CHARGES PAID.
    EXCEPTION:  UA SHALL NOT BE OBLIGATED TO REFUND ANY
    ----------  PORTION(S) OF A FULLY UNUSED TICKET WHICH
    DOES NOT REFLECT A CONFIRMED RESERVATION ON A UA FLIGHT
    INVOLVED IN A SCHEDULE IRREGULARITY UNLESS SUCH TICKET
    WAS ISSUED BY UA.

(2) IF A PORTION OF THE TICKET HAS BEEN USED:

    (A) UNINTERRUPTED FARE COMPONENT(S) FOR UNFLOWN
        SEGMENT(S) - THE AMOUNT EQUAL TO THE FARE AND
        CHARGES PAID FOR THE UNINTERRUPTED FARE
        COMPONENT WILL BE REFUNDED.
    (B) INTERRUPTED FARE COMPONENT - THE FARE FOR THE
        UNFLOWN SEGMENT OF AN INTERRUPTED FARE
        COMPONENT WILL BE CALCULATED FROM THE POINT OF
        TERMINATION TO THE DESTINATION NAMED ON THE
        TICKET, NEXT STOPOVER POINT OR POINT WHERE AIR
        TRANSPORTATION WILL BE RESUMED VIA:

        (I) THE ROUTING SPECIFIED ON THE TICKET IF THE
            POINT OF TERMINATION WAS ON THE ROUTING OF THE
            TICKET OR

        (II) IF THE POINT OF TERMINATION WAS NOT ON THE
             ROUTING SPECIFIED ON THE TICKET  THE DIRECT
             ROUTING OF ANY CARRIER OPERATING SERVICE
             BETWEEN SUCH POINTS.

    (C) THE AMOUNT OF REFUND OF AN INTERRUPTED FARE COMPONENT
        WILL BE CALCULATED BY DIVIDING THE NORMAL COACH (Y)
        FARE BETWEEN THE POINT OF TERMINATION AND THE PASSENGERS
        DESTINATION OR NEXT STOPOVER POINT BY THE SUM
        OF THE NORMAL COACH (Y) FARE PUBLISHED BETWEEN
        THE POINT OF ORIGIN AND THE POINT OF TERMINATION
        AND THE POINT OF TERMINATION AND THE PASSENGERS
        DESTINATION OR NEXT POINT OF STOPOVER. MULTIPLY
        THE AMOUNT OF THE PAID FARE COMPONENT BY THE
        RESULTING PERCENTAGE TO DETERMINE THE VALUE OF
        THE UNFLOWN PORTION OF THE INTERRUPTED FARE
        COMPONENT.

        EXCEPTION:  UA SHALL NOT BE OBLIGATED TO REFUND ANY
        ----------  PORTION(S) OF A TICKET WHICH DOES NOT
        REFLECT A CONFIRMED RESERVATION ON A UA FLIGHT
        INVOLVED IN A SCHEDULE IRREGULARITY UNLESS SUCH
        TICKET WAS ISSUED BY UA.

    (D) THE AMOUNT OF REFUND WILL NOT EXCEED THE FARE COMPONENT
        FOR THE PORTION OF THE TICKET FROM THE LAST POINT OF
        STOPOVER TO THE NEXT POINT OF STOPOVER OR FINAL
        DESTINATION.

B)    UA WILL MAKE NO REFUND BUT WILL PROVIDE GROUND TRANSPORTATION
TO THE DESTINATION AIRPORT WITHOUT CHARGE WHEN:

| THE DESTINATION AIRPORT DESIGNATED ON THE PASSENGER TICKET IS: | AND THE FLIGHT TERMINATES AT: (OR VICE VERSA) |
|---|---|
| BALTIMORE, MD | WASHINGTON, DC (IAD AIRPORT) |
| BALTIMORE, MD | WASHINGTON, DC (DCA AIRPORT) |
| CHICAGO, IL | MILWAUKEE, WI |
| CHICAGO, IL (ORD AIRPORT) | CHICAGO, IL (MDW AIRPORT) |
| COLORADO SPRINGS, CO | DENVER, CO |
| LOS ANGELES, CA | ONTARIO, CA |
| MIAMI, FL | FT. LAUDERDALE, FL |
| NEWARK, NJ | NEW YORK, NY (JFK AIRPORT) |
| NEWARK, NJ | NEW YORK, NY (LGA AIRPORT) |
| NEW YORK, NY (JFK AIRPORT) | NEW YORK, NY (LGA AIRPORT) |
| SAN FRANCISCO, CA | OAKLAND, CA |
| SAN FRANCISCO, CA | SAN JOSE, CA |
| WASHINGTON, DC (IAD AIRPORT) | WASHINGTON, DC (DCA AIRPORT) |
| LONG BEACH, CA | LOS ANGELES, CA |
| LONG BEACH, CA | ONTARIO, CA |

C)    WHEN FOR OPERATIONAL REASONS A PASSENGER HOLDING A FIRST CLASS
TICKET, OR BUSINESS CLASS TICKET, WITH CONFIRMED RESERVATIONS ENTERED
THEREON, IS ACCOMMODATED IN OTHER THAN THE TICKETED COMPARTMENT, UA
WILL REFUND TO THE PASSENGER THE DIFFERENCE, IF ANY, BETWEEN THE
INVOLUNTARY REFUND VALUE OF SUCH TICKETED CLASS (DETERMINED IN
ACCORDANCE WITH PARAGRAPH A) ABOVE), AND THE DIRECT ONE-WAY FARE
APPLICABLE TO THE CLASS OF SERVICE USED BETWEEN THE POINTS WHERE
TICKETED ACCOMMODATION WAS NOT PROVIDED.

**REFUNDS - VOLUNTARY UA  RULE: 0270**

A)    GENERAL
WHEN RULE 35 (REFUSAL TO TRANSPORT), RULE 50 (ACCEPTANCE OF CHILDREN),
OR RULE 240 (FAILURE TO OPERATE ON SCHEDULE) IS NOT APPLICABLE, UA
WILL, AT THE REQUEST OF THE PASSENGER, AND UPON SURRENDER OF THE UNUSED
PORTION OF A UA ISSUED TICKET, REFUND TO THE PASSENGER ON THE FOLLOWING
BASIS:
    1)    IF NO PORTION OF THE TICKET HAS BEEN USED, THE REFUND WILL
BE AN AMOUNT EQUAL TO THE TOTAL FARE AND CHARGES PAID.
    2)    IF A PORTION OF THE TICKET HAS BEEN USED, THE REFUND WILL BE
AN AMOUNT EQUAL TO THE DIFFERENCE BETWEEN THE FARE AND CHARGES
APPLICABLE TO THE TICKET ISSUED TO THE PASSENGER, AND THE FARE AND
CHARGES APPLICABLE TO THE TRANSPORTATION OF THE PASSENGER COVERED BY
THE USED PORTION OF THE TICKET. TO DETERMINE THE LOWEST APPLICABLE FARE
AND CHARGES FOR THE USED PORTION OF THE TICKET, USE THE PREVIOUSLY
BOOKED CLASS OR ANY HIGHER BOOKING CLASS AS SPECIFIED IN DGR-1 RULE 165
FOR UA.
    3)    WHEN ORIGINAL FORM OF PAYMENT IS CASH OR CHECK, UA SHALL
MAKE ALL OR ANY INDIVIDUAL REFUNDS THROUGH ITS GENERAL ACCOUNTING
OFFICES VIA A REFUND APPLICATION PREPARED BY THE CARRIER.
    4)    ANY APPLICABLE SERVICE CHARGE OR CANCELLATION PENALTY WILL
BE DEDUCTED FROM THE REFUND AMOUNT IN 1) OR 2) ABOVE.
EXCEPTION 1:  IN THE EVENT OF ILLNESS/DEATH OF THE PASSENGER/IMMEDIATE
FAMILY MEMBER (TRAVELING OR NOT)/ TRAVELING COMPANION, ANY APPLICABLE

CANCELLATION/REFUND SERVICE CHARGES WILL BE WAIVED.  IF THE FARE(S)
INVOLVED ARE NON-REFUNDABLE, THE NON-REFUNDABLE PROVISIONS WILL BE
WAIVED.  THE PASSENGER MUST SUBMIT TO UA A PHYSICIAN'S CERTIFICATE
STATING THE CIRCUMSTANCES WHICH NECESSITATE WAIVER UNDER THIS
PROVISIONS. IN THE CASE OF DEATH, A COPY OF THE DEATH CERTIFICATE MUST
BE PRESENTED TO UA.
EXCEPTION 2:  IN THE EVENT A PASSENGER/IMMEDIATE FAMILY MEMBER
(TRAVELING OR NOT)/TRAVELING COMPANION IS CALLED TO JURY DUTY, RECEIVES
A SUBPOENA OR RECEIVES NEW/REVISED MILITARY ORDERS WHICH CONFLICT WITH
THE TRAVEL DATES; ANY SERVICE CHARGES AND NONREFUNDABLE PROVISIONS WILL
BE WAIVED AND REFUNDS MAY BE MADE IN ACCORDANCE WITH THIS RULE PROVIDED
WRITTEN PROOF OF THE CIRCUMSTANCES IS FURNISHED TO UA.  WRITTEN PROOF
WILL CONSIST OF THE JURY DUTY SUMMONS, SUBPOENA OR MILITARY ORDERS
WHICH ARE IN CONFLICT WITH THE TRAVEL DATES.
EXCEPTION 3:  VIA ALL -N TYPE NONREFUNDABLE FARES, NO WAIVERS TO FARE
RULES DUE TO ILLNESS/JURY DUTY/SUBPOENA/NEW OR REVISED MILITARY ORDERS
WILL APPLY.
     5)    REFUND WILL BE MADE IN ACCORDANCE WITH 1) OR 2) ABOVE
PROVIDED APPLICATION HAS BEEN MADE NOT LATER THAN ONE YEAR AFTER THE
EXPIRATION DATE OF THE TICKET.
     6)    UA ASSUMES NO OBLIGATION TO ISSUE A VOLUNTARY REFUND UNLESS
SUCH TICKET WAS ISSUED ON UA TICKET STOCK.  THE TERM "UA TICKET STOCK"
MEANS TICKETS PRINTED OR IMPRINTED WITH THE UA CARRIER CODE (O16) AS
PART OF THE TICKET SERIAL NUMBER.

     7)    WHEN CUSTOMERS ARE DUE A REFUND UNDER THE CONTRACT OF
CARRIAGE, UNITED WILL ISSUE SUCH REFUND WITHIN SEVEN (7) BUSINESS DAYS
FROM THE DATE OF ITS RECEIPT OF A COMPLETED REFUND APPLICATION FOR
CREDIT CARD PURCHASES AND, FOR CASH PURCHASES, WITHIN TWENTY (20)
BUSINESS DAYS FROM THE DATE UNITED RECEIVES ALL OF THE INFORMATION
NEEDED TO PROCESS THE REFUND APPLICATION.

     B)    PERSON TO WHOM REFUND IS MADE
EXCEPT AS PROVIDED BELOW, UA WILL REFUND IN ACCORDANCE WITH THIS RULE
ONLY TO THE PERSON NAMED AS THE PASSENGER ON THE TICKET.
EXCEPTION 1:
     1)    TICKETS ISSUED IN EXCHANGE FOR A PREPAID TICKET ADVICE (PTA)
WILL BE REFUNDABLE ONLY TO THE PURCHASER OF THE PTA.
     2)    TICKETS ISSUED UNDER A UNIVERSAL AIR TRAVEL PLAN (UATP) WILL
BE REFUNDABLE ONLY TO THE SUBSCRIBER AGAINST WHOSE ACCOUNT THE TICKET
WAS CHARGED.
     3)    TICKETS ISSUED AGAINST A TRANSPORTATION REQUEST ISSUED BY A
GOVERNMENT AGENCY, OTHER THAN THE U.S. GOVERNMENT, WILL BE REFUNDED
ONLY TO THE GOVERNMENT AGENCY WHICH ISSUED THE TRANSPORTATION REQUEST.
     4)    TICKETS ISSUED AGAINST A U.S. GOVERNMENT TRANSPORTATION
REQUEST, (GTR) WILL BE REFUNDED ONLY TO THE U.S. GOVERNMENT AGENCY
WHICH ISSUED THE U.S. GOVERNMENT TRANSPORTATION REQUEST, BY CHECK MADE
PAYABLE TO THE "TREASURER OF THE UNITED STATES."
     5)    TICKETS ISSUED AGAINST A CREDIT CARD HONORED BY UA WILL BE
REFUNDED ONLY TO THE ACCOUNT OF THE PERSON TO WHOM SUCH CREDIT CARD WAS
ISSUED.
EXCEPTION 2:  TICKETS REFUNDABLE TO PERSON OTHER THAN PASSENGER.  IF,
AT THE TIME OF PURCHASE, THE PURCHASER DESIGNATES ON THE TICKET ANOTHER
PERSON OR ENTITY TO WHOM REFUND SHALL BE MADE, THE REFUND WILL BE MADE
TO THE PERSON SO DESIGNATED.  A REFUND MADE IN ACCORDANCE WITH THIS
PROCEDURE TO A PERSON REPRESENTING HIM/HERSELF AS THE PERSON SO
DESIGNATED ON THE TICKET OR EXCHANGE ORDER SHALL BE DEEMED A VALID

REFUND, AND UA WILL NOT BE LIABLE TO THE TRUE PASSENGER FOR ANOTHER
REFUND.
EXCEPTION 3:  IF AT THE TIME OF APPLICATION FOR REFUND, EVIDENCE IS
SUBMITTED THAT A COMPANY PURCHASED THE TICKET ON BEHALF OF ITS
EMPLOYEE, OR THE TRAVEL AGENT HAS MADE REFUND TO ITS CLIENT, SUCH
REFUND WILL BE MADE DIRECTLY TO THE EMPLOYEE'S COMPANY OR THE TRAVEL
AGENT.

    C)    LOST TICKETS
      1)    AMOUNT OF REFUND
WHEN A PASSENGER LOSES A UA TICKET, OR THE UNUSED PORTION THEREOF, UA
WILL MAKE A REFUND TO THE PASSENGER IN THE FOLLOWING AMOUNTS, AS
APPLICABLE:
      A)    IF NO PORTION OF THE TICKET HAS BEEN USED, THE REFUND WILL
BE AN AMOUNT EQUAL TO THE FARE AND CHARGES PAID, LESS SERVICE CHARGES
AS INDICATED BELOW.
      B)    IF A PORTION OF THE TICKET HAS BEEN USED, AND
      I)    THE PASSENGER HAS PURCHASED A NEW TICKET COVERING THE
SAME TRANSPORTATION AS THAT COVERED BY THE UNUSED PORTION OF THE LOST
TICKET, THE REFUND WILL BE AN AMOUNT EQUAL TO THE FARE AND CHARGES PAID
FOR SUCH NEW TICKET, OR;
      II)    THE PASSENGER HAS NOT PURCHASED A NEW TICKET COVERING THE
SAME TRANSPORTATION AS THAT COVERED BY THE UNUSED PORTION OF THE LOST
TICKET, AND FREE TRANSPORTATION IS NOT PROVIDED BY UA, THE REFUND WILL
BE AN AMOUNT EQUAL TO THE DIFFERENCE BETWEEN THE FARE AND CHARGES PAID,
AND THE FULL NORMAL FARE AND CHARGES APPLICABLE TO THE TRANSPORTATION
OF THE PASSENGER COVERED BY THE USED PORTION OF THE TICKET.
      III)    WHERE IN UA'S JUDGMENT A HARDSHIP EXISTS, AND UA PROVIDES
A FREE TICKET COVERING THE LOST PORTION(S) UPON PAYMENT OF SERVICE
CHARGES SHOWN BELOW, NO FURTHER REFUND SHALL BE DUE.
      2)    APPLICATION FOR REFUND OF LOST TICKETS
      A)    TIME LIMIT  A REFUND WILL BE MADE IN ACCORDANCE WITH 1)
ABOVE, PROVIDED APPLICATION HAS BEEN MADE NOT LATER THAN ONE MONTH
AFTER THE EXPIRATION DATE OF THE LOST TICKET.
      B)    FORM OF APPLICATION THE APPLICATION MUST BE MADE ON FORMS
PRESCRIBED BY UA FOR SUCH REFUNDS.
      C)    WHEN PAYABLE
      I)    A REFUND WILL BE MADE BY UA UPON APPLICATION FOR SUCH
REFUND, PROVIDED THAT THE LOST TICKET OR LOST PORTION THEREOF HAS NOT
PREVIOUSLY BEEN HONORED FOR TRANSPORTATION OR REFUNDED TO ANY PERSON,
AND;
      II)    PROVIDED THAT THE PERSON TO WHOM REFUND IS MADE AGREES,
IN SUCH FORM AS MAY BE PRESCRIBED BY UA, TO INDEMNIFY UA FOR ANY LOSS
OR DAMAGE WHICH IT MAY SUSTAIN BY REASON OF SUCH REFUND.
      3) SERVICE CHARGE
UA WILL IMPOSE A SERVICE CHARGE OF USD 100.00 PER TICKET FOR HANDLING
SUCH REQUEST FOR REFUND OF A LOST TICKET/EXCHANGE ORDER.
EXCEPTION:  NO SERVICE CHARGE WILL BE IMPOSED FOR MILITARY PASSENGERS
TRAVELING ON A GOVERNMENT FARE. (FORM NO. 1169.)

    D)    AGED REFUNDS
      1) IN ADDITION TO ALL OTHER APPLICABLE CHARGES, CHARGE WILL BE
USD 100.00/CAD 145.00 WHEN THE TICKET, WHETHER PAPER OR ELECTRONIC
FORM, IS PRESENTED FOR REFUND LATER THAN:
      a) ONE YEAR FROM THE DATE TRANSPORTATION BEGINS FROM POINT
OF ORIGIN ON THE ORIGINAL TICKET FOR A PARTIALLY USED TICKET OR,

b) ONE YEAR FROM THE DATE OF ISSUANCE OF THE ORIGINAL
TICKET IF NO PORTION OF THE TICKET IS USED.
2) WITH THE EXCEPTION OF THOSE TICKETS DESIGNATED AS WHOLLY NON-
REFUNDABLE, TICKETS ARE VALID FOR REFUND UP TO ONE YEAR AFTER
THE DATE OF EXPIRATION AS DEFINED IN RULE 105UA (A)(1).

E)    FARE OVERCHARGES
UA WILL, ON REQUEST, REFUND TO THE PASSENGER ANY PORTION OF A FARE
CHARGED IN EXCESS OF THE APPLICABLE FARE FOR THE SERVICE PROVIDED
SUBJECT TO ALL TERMS AND CONDITIONS.  A REQUEST FOR REFUND WILL,
HOWEVER, SUBJECT THE PASSENGER'S ENTIRE TICKET TO A FARE AUDIT AND MAY
RESULT IN EITHER A LOWER OR HIGHER FARE CAUSING EITHER A REFUND OR
COLLECTION OF ADDITIONAL FARE.

## REFUNDS INVOLVING FOREIGN CURRENCY UA  RULE: 0275

EXPORT CONTROL  UA RESERVES THE RIGHT TO REFUSE TO MAKE ANY REFUND
AUTHORIZED BY THIS TARIFF IN A CURRENCY OTHER THAN THAT USED IN THE
PURCHASE OF THE TICKET TO BE REFUNDED, OR AT A PLACE OTHER THAN THAT AT
WHICH PAYMENT FOR SUCH TICKET WAS MADE.

## PREPAID TICKET ADVICE CHARGES : UA  RULE: 0390

FOR EACH PREPAID TICKET ADVICE ISSUED BY UA, UA WILL IMPOSE A SERVICE
CHARGE OF USD 100.00. THIS SERVICE CHARGE IS NOT SUBJECT TO ANY
DISCOUNT AND CANNOT BE REFUNDED.
EXCEPTION:  THE PREPAID TICKET ADVICE SERVICE CHARGE WILL NOT APPLY:
1)  WHEN PREPAYMENT IS MADE BY THE STATE GOVERNMENTS FOR OFFICIAL
BUSINESS.
2)  WHEN PREPAYMENT IS MADE BY THE U.S. DEPARTMENT OF DEFENSE
USING A U.S. GOVERNMENT TRANSPORTATION REQUEST (GTR - FORM 1169).
3)  WHEN TRAVEL IS FOR THE FOLLOWING CATEGORIES OF U.S. FEDERAL
GOVERNMENT OFFICIAL AUTHORIZED TRAVEL:
A)  U.S. FEDERAL GOVERNMENT EMPLOYEES OR THEIR DEPENDENTS
TRAVELING ON OFFICIAL BUSINESS (EXCEPT FOR DEPARTMENT OF DEFENSE USING
GTR FORM 1169 AS COVERED IN ITEM 2 ABOVE); OR
B)  MEMBERS/EMPLOYEES OF THE U.S. SENATE/HOUSE OF
REPRESENTATIVES WITH APPROPRIATE OFFICIAL TRAVEL AUTHORIZATION GPO 81-
76229-1PP; OR
C)  EMPLOYEES OF THE AMERICAN RED CROSS WITH APPROPRIATE
IDENTIFICATION AND ON OFFICIAL RED CROSS BUSINESS.
NOTE:    FOR PASSENGER CATEGORIES 3)A -3)C  ABOVE WHEN TRAVEL IS
WHOLLY WITHIN THE 50 U.S. THE PREPAID TICKET ADVICE WILL APPLY WHEN:
A) THE PREPAID TICKET IS ISSUED MORE THAN 01 DAY PRIOR TO
PASSENGERS DEPARTURE OR
B) THE PASSENGER IS LOCATED WITHIN 25 MILES OF A UNITED
AIRLINES TICKETING FACILITY.

## SURCHARGES UA  RULE: 0395

(A) THE SURCHARGE LISTED BELOW WILL BE ASSESSED FOR EACH FARE
PAYING PASSENGER. THE SURCHARGE APPLIES IN ADDITION TO ALL
OTHER CHARGES AND IS NOT SUBJECT TO ANY DISCOUNT.

(1) ANY POINT IN HAWAII TO ANY POINT IN THE MAINLAND U.S.:
USD 9.30

NOTE: THE FUEL SURCHARGE ABOVE IS ASSESSED ON EACH FARE
        COMPONENT AND WILL BE ADDED TO THE APPLICABLE
        FARE.

(2) BETWEEN PUERTO RICO AND THE U.S.: USD 15.00 PER
    DIRECTION.
(3) BETWEEN VIRGIN ISLANDS AND THE U.S.: USD 15.00 PER
    DIRECTION AND AN AIRPORT/TERMINAL SURCHARGE
    USD 6.50 PER DIRECTION.
    NOTE: RULES GOVERNING FARES FOR TRAVEL ON A SEGMENT
          ON WHICH A SURCHARGE APPLIES WILL ALSO
          GOVERN THE SURCHARGE.
    EXCEPTION: THE FOLLOWING PASSENGERS ARE EXEMPT FROM
              THESE SURCHARGES:
    (1) PASSENGERS WHO ARE TRAVELLING ON ANY UA FREE
        TICKET OR ON UA/OTHER AIRLINES EMPLOYEE REDUCED
        FARE TICKETS.
    (2) PASSENGERS TRAVELING ON FARES EXCLUDED WITH
        CATEGORY 12 - SURCHARGE - IN THE FARE RULES.

## UNITED SHARED DESIGNATOR/UNITED EXPRESS : UA  RULE: 0500

A)    AN INDEPENDENT OPERATOR WILL PROVIDE SERVICE UNDER AN
AGREEMENT WITH UA.  THE INDEPENDENT OPERATOR IS CONSIDERED EITHER A
UNITED SHARED DESIGNATOR OPERATOR OR A UNITED EXPRESS OPERATOR AS
IDENTIFIED BY THE FLIGHT NUMBERS SHOWN IN PARAGRAPH (B).
    1)    FOR UNITED SHARED DESIGNATOR FLIGHTS, ALL TERMS OF
TRANSPORTATION APPLICABLE TO UA SPECIFIED IN THIS TARIFF APPLY EXCEPT
FOR SECTION V - BAGGAGE, OR EXCEPT WHERE SPECIFICALLY NOTED.  SEE THE
INDEPENDENT OPERATOR'S SECTION OF THIS TARIFF FOR BAGGAGE PROVISIONS
APPLICABLE TO THEIR FLIGHTS.
    2)    FOR UNITED EXPRESS FLIGHTS, ALL TERMS OF TRANSPORTATION
APPLICABLE TO UA SPECIFIED IN THIS TARIFF APPLY EXCEPT WHERE
SPECIFICALLY NOTED.
    B)    TRANSPORTATION IS PROVIDED BY THE UNITED EXPRESS
OPERATOR (*)/UNITED SHARED DESIGNATOR OPERATOR (@) AS INDICATED BELOW:

| OPERATOR | FLIGHT NO. |
|---|---|
| @U.S. AIRWAYS (US) | 1700-2829 |
| @U.S. AIRWAYS EXPRESS (US) | 2830-3899 |
| @ALOHA AIRLINES (AQ) | 4900-4963 |
| @ALOHA ISLANDAIR (WP) | 4964-4999 |
| @GREAT LAKES AIRLINES (ZK) | 5000-5199 |
| *COLGAN AIRLINES (9L) | 5200-5279 |
| *REPUBLIC (RW) | 5280-5299 |
| *GO JET (G7) | 5550-5699 |
| *SKY WEST AIRLINES (OO) | 5700-6999 |
| *MESA AIRLINES (YV) | 7000-7499 |
| *SHUTTLE AMERICA (S5) | 7500-7774 |
| *CHAUTAUQUA (RP) | 7775-7874 |
| *TRANS STATES (AX) | 7875-8099 |
| @AIR CANADA (AC) | 8100-8574 |
| @AIR CANADA JAZZ (QK) | 8100-8574 |
| @CO CONNECTION (CO) | 9593-9669 |

United Airlines, Inc.

Updated: 2/12/2007