## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

RICHARD DOMINGUEZ, ON BEHALF )
OF HIMSELF AND ALL OTHERS )
SIMILARLY SITUATED, )
               Plaintiff )
                          )    **Civil Action No. 07-cv-418 RJL**
                          )
                          )
                          )    ORAL ARGUMENT REQUESTED
            v. )
                          )
UAL CORPORATION, )
                          )
and )
                          )
UNITED AIRLINES, INC. )
                          )
               Defendants. )

## PLAINTIFF RICHARD DOMINGUEZ'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

FACTUAL BACKGROUND...................................................................................4

ARGUMENT.....................................................................................................7

I.  PLAINTIFF HAS STATED A CLAIM UNDER SECTION 1 OF THE
    SHERMAN ACT BECAUSE THE "CONTRACT OF CARRIAGE"
    CONTAINING THE "NO RESALE OR TRANSFER" RULE AMOUNTS
    TO AN UNREASONABLE AGREEMENT IN RESTRAINT OF TRADE........7

    A.  The "No Transfer or Resale" Rule Is A Product of An Agreement
        Between United And Its Customers, And As Such Is Not Sheltered By
        The Limited *Colgate* Doctrine...............................................................8

            1.  The Complaint Properly Alleges An Agreement...................12

            2.  In Any Event, United' Actions Go Beyond the Refusal
                To Deal Privilege Recognized In *Colgate*..........................16

    B.  United's "No Transfer Or Resale" Rule Is Properly Alleged To Be An
        Unlawful Restraint of Trade..................................................................17

            1.  Plaintiff Has Properly Alleged Foreclosure Of Competition
                Caused By The "No Transfer or Resale" Restraint, Thereby
                Alleging An Unreasonable Restraint of Trade.........................18

            2.  United's Claim That Its Prohibition On Ticket Resale Is Per Se
                Lawful Is Inapplicable To An Alleged Monopolist Like United. .20

II. PLAINTIFF HAS PROPERLY ALLEGED A SECTION 2 CLAIM FOR
    MONOPOLIZATION...........................................................................21

    A.  United's Conduct Is Not Governed By *Trinko*, Which Is Inapplicable
        Here, But Is Instead Prohibited By The Supreme Court's Decision in
        *Lorain Journal*.................................................................................22

    B.  Even Assuming *Arguendo* That *Trinko* Were Applicable, It
        Does Not Bar Plaintiff's Monopolization Claim...................................25

    C.  United's Alternative Argument That Its "No Transfer" Rule Is
        Justified By A Legitimate Business Justification Is Unavailing At This
        Motion to Dismiss Stage......................................................................29

# TABLE OF CONTENTS (CONT'D)

| | | |
|---|---|---|
| III. | UNITED'S ATTACK ON PLAINTIFF'S STANDING IS MERITLESS | 30 |
| IV. | PLAINTIFF STATES A VALID UNJUST ENRICHMENT CLAIM | 33 |
| | A. United's ADA Preemption Argument Fails | 33 |
| | B. Plaintiff Can Plead An Unjust Enrichment Claim As In the Alternative To His Antitrust Claims That Allege A Contract | 35 |

CONCLUSION .................................................................................35

# TABLE OF AUTHORITIES

## Cases:

*Airco Indus. Gases v. Teamsters Health and Welfare Pension Fund,*
618 F. Supp 943 (D. Del. 1985)..........................................................................34

*Albert H. Cayne Equipment Corp. v. Union Asbestos & Rubber Co.,*
220 F.Supp. 784 (S.D.N.Y. 1963).......................................................................11

*Aspen Skiing Co .v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)...............................................................................26-28

*Associated General Data Contractors, v. California State Council of Carpenters,*
459 U.S. 519 (1983)..............................................................................31

*Balogh's of Coral Gables, Inc. v. Getz,*
510 F.Supp. 741 (S.D.Fla. 1981).......................................................................17

*Bell v. Dow Chemical Co.,*
847 F.2d 1179 (5th Cir. 1988)..........................................................................30

*Bitterman v. Louisville & Nashville R. Co.,*
207 U.S. 205 (1907)...................................................................................20

*Christensen v. American Airlines,*
967 F.2d 410 (10th Cir. 1992).........................................................................15

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)....................................................................................9

*Deiro v. American Airlines, Inc.,*
816 F.2d 1360 (9th Cir. 1987)..........................................................................34

*Delta Air Lines, Inc. v. Black,*
116 S.W.3d 745 (Tex. 2003)............................................................................14

*Eastman Kodak Co. v. Image Technical Srvcs., Inc.,*
504 U.S. 451 (1992)...................................................................................21

*Eisen v. Carlisle & Jacqueline,*
391 F.2d 555 (2d Cir. 1968), *vacated on other grounds* 417 U.S. 156 (1974).....33

*Federal Trade Comm'n v. Beech-Nut Packing Co.,*
257 U.S. 441 (1922)...................................................................................10

*First Pennsylvania Bank. N.A. v. Eastern Airlines, Inc.,*
    731 F.2d 1113 (3d Cir. 1984)..................................................................34

*Gilmore v. Gonzales,*
    435 F.3d 1125 (9th Cir. 2006)................................................................29

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,*
    352 F.3d 367 (9th Cir. 2003)..................................................................31

*Gluckman v. American Airlines,*
    844 F. Supp 151 (S.D.N.Y. 1994).....................................................14, 34

*GTE New Media Srvcs., Inc. v. Ameritech Corp.,*
    21 F.Supp.2d 27 (D.D.C. 1998).................................................................9

*Guzowski v. Hartman,*
    969 F.2d 211 (6th Cir. 1992)...................................................................15

*High Technology Careers v. San Jose Mercury News,*
    996 F.2d 987 (9th Cir. 1993)...................................................................30

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)...............................................................................31

*In re Nifedipine Antitrust Litig.,*
    335 F. Supp.2d 6 (D.D.C. 2004)..............................................................31

*In re Visa Check/MasterMoney Antitrust Litig.,*
    192 F.R.D. 68 (S.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001)...............33

*LePage's Inc. v. 3M,*
    1999 WL 346223 (E.D. Pa. May 14, 1999)................................................30

*Lorain Journal Co. v. United States,*
    342 U.S. 143 (1951)...........................................................................23-25

*Mao v. Eastern Air Lines, Inc.,*
    310 F. Supp. 844 (S.D.N.Y. 1970)...........................................................14

*Newberry v. Washington Post Co.,*
    438 F. Supp 470 (D.D.C. 1977)..................................................................9

*Provident Life & Accident Ins. Co. v. Waller,*
    906 F.2d 985 (4th Cir. 1990)...................................................................34

*SAS v. Puerto Rico Tel. Co.*,
   48 F.3d 39 (1st Cir. 1995)..............................................................................31

*Servicetrends, Inc. v. Siemens Medical Sys., Inc.*,
   870 F. Supp 1042 (N.D. Ga. 1994).......................................................................30

*State Oil v. Khan*,
   522 U.S. 3(1997)...........................................................................................8

*Toscano v. PGA*,
   258 F.3d 978 (9th Cir. 2001).............................................................................15

*Trans World Airlines, Inc. v. American Coupon Exchange, Inc.*,
   913 F.2d 676 (9th Cir. 1990)............................................................................15

*United States v. Bausch & Lomb Optical Co.*,
   321 U.S. 707 (1944)......................................................................................10

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)..............................................................................passim

*United States v. Microsoft*,
   1998 WL 614485 (D.D.C. Sept. 14, 1998).............................................................21

*United States v. Parke, Davis & Co.*,
   362 U.S. 29 (1960).................................................................................16, 17

*Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..............................................................................passim

*Vogelsang v. Delta Air Lines, Inc.*,
   302 F.2d 709 (2d Cir. 1962)..............................................................................14

*Wells v. American Airlines*,
   1991 WL 79396 (S.D.N.Y. May 9, 1991)...............................................................34

*Winter Hill Frozen Foods and Services, Inc. v. Haagen-Dazs Co., Inc.*,
   691 F.Supp. 539 (D. Mass. 1988).......................................................................11

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980)...............................................................................11

This is a putative consumer class action that challenges United Air Lines' "no resale or transfer" ticket rule forming part of United's Contract of Carriage with its passengers.[1] Plaintiff Richard Dominguez's Complaint alleges a claim under Section 1 of the Sherman Act, asserting an agreement in restraint of trade, as well as separate counts under Section 2 of the Sherman Act for unlawful monopolization, and a common law claim under the doctrine of unjust enrichment. United's motion to dismiss the Complaint switches the order of these counts, addressing the monopolization claim first, and misstates the applicable law. In our Opposition, we address Dominguez's claims in their proper order, and show why United's motion lacks merit.

At the end of the day, when all is said and done, and when the facts and applicable law are properly characterized, the ineluctable conclusion is that United's arguments simply do not fly. As such, United's motion should be rejected out of hand and denied.

## INTRODUCTION

Dominguez properly alleges that United's rule that prohibits United's customers from transferring or reselling their tickets amounts to an unlawful agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. United's contention that the "no transfer or resale" rule is an independent announcement by United as to the terms under which it will deal with others, and does not rise to concerted action misses the mark. *See* Dfts' Br. at 16-18. The "no transfer or resale" rule is not a mere independent announcement by United. Instead, it is a term forming part of a binding

---

[1] The term United is used here to refer collectively to defendants UAL Corporation, United Air Lines, Inc., and their agents.

1

contract to which both United and its customer-passengers have agreed. As such, the "no transfer or resale" rule falls squarely within Section 1's prohibition on unlawful concerted action.

United's alternative contention is that, even if the "no transfer or resale" rule forms part of a contractual agreement between the parties, it still is not actionable under Section 1 because it does not unreasonably restrain trade. *See* Dfts' Br. at 18. That argument is unavailing because it ignores the allegation that in the specific nonstop air route between Washington and the San Francisco Bay area (the relevant market), United has monopoly market power. *See* Complt, at ¶¶ 2, 13, 15. The restriction forbidding others from reselling United's tickets along this route works to ensure that United's monopoly power is cemented by preventing a secondary market from emerging that would compete against United. United inappropriately relies on cases that do not involve a defendant with alleged monopoly market power, and as such have no bearing on Dominguez's allegations. The Supreme Court and this Court have long recognized that conduct and restrictions that may be lawful when implemented by other actors, may very well be anticompetitive and actionable under the antitrust laws when undertaken by a monopolist.

Defendants fare no better in challenging Plaintiff's monopolization claim brought under Section 2 of the Sherman Act. United misrepresents the Complaint as one attacking United's failure to assist its rivals. *See* Dfts' Br. at 6-9. In fact, what the Complaint alleges is that United, as the alleged monopolist, discriminates against passengers who would purchase their tickets not from United, but from competing resellers of United's tickets. *See* Complt., at ¶ 16. Longstanding Supreme Court

2

precedent holds that employing such discrimination, as a means to preserve a monopoly, is unlawful under Section 2. Further, United's refusal to sell tickets to those who would resell in competition with United, while making those same tickets available at retail to non-competing customers, similarly provides basis for a Section 2 monopolization claim.

United recites a host of purported business justifications that it claims excuses its otherwise monopolizing conduct. *See* Dfts' Br. at 10-15. It is black letter law, however, that determination of whether an antitrust defendant's conduct is excused by a claimed legitimate business justification is a fact-based question that cannot be resolved on a motion to dismiss.

Defendants' attack on Plaintiff's standing to bring suit is plainly meritless. Ignoring the long line of cases holding that a direct purchaser in the allegedly foreclosed market is the proper antitrust plaintiff to bring suit, United instead urges that the more appropriate plaintiff would be a customer who had purchased United's tickets from a reseller. *See* Dfts' Br. at 23, n.9. That assertion would turn the law of antitrust standing on its head by giving indirect purchasers priority over direct purchasers-- the very opposite of what the applicable case law holds. As a direct customer of Defendants, who alleges he was overcharged due to United's stifling of competition, Dominguez assuredly has standing to bring suit.

Lastly, United's attack on Plaintiff's unjust enrichment claim as being preempted by the Airline Deregulation Act ("ADA") also fails. *See* Dfts' Br. at 24-26. The ADA preempts state law claims pertaining to a carrier's services and prices. It does not displace other applicable federal law. An airline carrier's contractual or quasi-contractual liability to its passengers is a product of federal common law, not state common law, and

3

as such is not preempted by the ADA. It is also beyond dispute that under the Federal Rules of Civil Procedure, a plaintiff may plead claims in the alternative, even if they are mutually inconsistent. *See* Fed. R. Civ. P. 8(e). Thus, at the pleadings stage, nothing prevents Dominguez from asserting an unjust enrichment claim in quasi-contract, while separately pleading alternative antitrust claims that allege the existence of a contract.

For all these reasons, and as is more fully detailed below, Defendants' motion to dismiss the Complaint should be denied.

## FACTUAL BACKGROUND

This is an antitrust putative class action brought on behalf of direct purchasers of United tickets for nonstop air travel between the Washington metropolitan area and the San Francisco Bay area. The Washington metropolitan area is served by three airports: Reagan National ("DCA"); Washington-Dulles International ("IAD"); and, the Baltimore-Washington International Airport ("BWI"). Complaint, at ¶¶ 1, 11. Similarly, the San Francisco Bay area is also served by three major airports: the San Francisco International Airport ("SFO"); Oakland's International Airport ("OAK"); and, the San Jose International Airport ("SJC"). *Id.*

United is the monopolist carrier along the relevant market comprising nonstop air travel between the Washington metropolitan area and the San Francisco Bay area. *Id.* at ¶¶ 2, 13. By way of example, United operates 100 percent of the nonstop flights between IAD and SFO, the principal airports serving these metropolitan city pairs. *Id.* Even accounting for the remaining airports serving Washington and the San Francisco Bay area, United still possesses an over 80 percent market share of the nonstop air travel market between these two locales, and thus has monopoly market power. *Id.*

4

The Complaint is centered around a contractual restriction imposed by United on all tickets it sells in this relevant market, pursuant to which United customers are prohibited from transferring or reselling their nonstop Washington - San Francisco tickets. *Id.* at ¶¶ 1, 2, 32-40. This contractual bar prevents customers who purchase their tickets from United from ever reselling their ticket to a third party.

The anticompetitive effect of this contractual restriction is readily apparent. In the absence of United's unlawfully imposed restriction, if a passenger paid $ 400 for a ticket from IAD to SFO, and subsequently found that he was unable to use the ticket, he would have been able to attempt to resell that ticket to a third party to recoup part or all of his original purchase price. *Id.* at ¶ 2. In this manner, competition would be present between United Airlines and the secondary marketplace comprised of such passengers seeking to resell their tickets, and the presence of such a secondary marketplace would serve as price-constraining competition on United's ticket prices along this nonstop route. *Id.* at ¶¶ 1, 2, 17, 19, 20, 22. After all, no rational consumer would pay United $ 400 for a ticket between IAD and SFO, if the same consumer could purchase the same ticket for a lower price on a secondary marketplace such as eBay or the like from a customer who was reselling a ticket that he originally purchased from United. *Id.* at ¶¶ 2, 22.

United's contractual restriction barring all resales and transfers, however, prevents this competition from ever taking place. The effect of this contractual restriction is to insulate United from competition from any secondary market sales of airline tickets for nonstop travel between these two destinations. In the absence of United's unlawful contractual prohibitions on ticket resales or transfers, consumers would be able to sell and purchase airline tickets for nonstop travel between these two destinations in an open

5

secondary market at prices that would not be dictated or controlled by United. *Id.* at ¶¶ 2.
18, 19, 20, 21. Thus, absent United's unlawful restrictions on resale or transfer of airline
tickets, any willing seller would be able to sell his or her airline ticket to any willing
buyer in an open marketplace, on the price terms negotiated by the open marketplace. *Id.*
at ¶¶ 19, 22, 23, 35, 37. United would, therefore, face competition from such secondary
marketplace sales for its nonstop tickets between the metropolitan Washington, D.C. area
and the San Francisco Bay Area airports, and would have to compete against the pricing
prevailing in this secondary marketplace. *Id.* at ¶¶ 19, 22.

By imposing a contractual bar on transfer or resale of ticket along the relevant
market, however, United is able to prevent this secondary market from emerging, control
the pricing of tickets along the relevant market, and maintain its monopoly market power.
Count I of the Complaint alleges that the contractual bar imposed by United that forbids
the transfer or resale of its tickets along the relevant market amounts to an unlawful
agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §
1. *Id.* at ¶¶ 32-40. It alleges that this restraint has caused Plaintiff and the putative class
members to pay supra-competitive prices for their purchases from United within the
relevant market. *Id.* at ¶ 36. Count II alleges that by imposing a bar on the transfer or
resale of its tickets within the relevant market, United ensures that consumers will have
no effective competitive choice but to purchase their airline tickets from United, the
monopolist defendant or its agents, as consumers are forbidden from purchasing their
tickets from a secondary reseller of the tickets. *Id.* at ¶ 44. Thus, Count II alleges that the
bar amounts to unlawful maintenance of monopoly power by United in violation of

6

Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* at ¶¶ 41-47. Count III alleges a common law claim under the doctrine of unjust enrichment. *Id.* at ¶¶ 48-50.

## **ARGUMENT**

### I     PLAINTIFF HAS STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT BECAUSE THE "CONTRACT OF CARRIAGE" CONTAINING THE "NO RESALE OR TRANSFER" RULE AMOUNTS TO AN UNREASONABLE AGREEMENT IN RESTRAINT OF TRADE.

Count I of Dominguez's Complaint alleges a violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1. *See* Complaint at ¶¶ 32-40. Specifically, that claim alleges

that the Contract of Carriage entered into between United and its passengers is an

unlawful contract or agreement in restraint of trade because it contains the "no transfer or

resale" limitation. *Id.* at ¶ 38 . Dominguez pled that the Contract of Carriage containing

that "no transfer or resale" restriction is both an agreement representing the requisite

concerted action under Section 1, and is an unlawful restraint because it forecloses

competition by forbidding resellers to compete on price with United for the sale of

United's tickets. *Id.* Through this contractual restriction, Dominguez alleges that United

is able to charge supra-competitive prices for its tickets on the nonstop Washington -San

Francisco air travel market where it allegedly possesses monopoly market power. *Id.* at ¶

36.

United admits that, through its Contract of Carriage, it bars the resale or transfer

of its airline tickets on the nonstop route between Washington and San Francisco. *See*

Dfts' Br. at 3, n.3. Thus, United neither contests the existence of a Contract of Carriage

between itself and its passenger customers, nor the inclusion within that Contract of

Carriage of the "no transfer or resale" rule. Despite this, United seeks to dismiss Count I

of Dominguez's Complaint on two grounds. First, relying on its misinterpretation of the

*Colgate* doctrine, United argues that its inclusion of a "no transfer or resale" rule within

its Contract of Carriage is a product of United's own unilateral and independent decision-

making that does not give rise to the concerted action required for Section 1 liability. *Id.*

at 16-17. Second, United argues that even if its agreement with customers barring them

from reselling their tickets is encompassed within an actual contract between the parties,

that agreement is still not actionable under Section 1 because it is not anticompetitive in

nature. *Id.* at 18.

Below, we address each of these arguments in turn, and show that neither has any

merit. United's motion to dismiss Count I of the Complaint, therefore, must be denied.

## A. The "No Transfer or Resale" Rule Is A Product of An Agreement Between United And Its Customers, And As Such Is Not Sheltered By The Limited *Colgate* Doctrine.

Section 1 of the Sherman Act provides in pertinent part that:

> Every contract, combination in the form of trust or otherwise, or
> conspiracy, in restraint of trade or commerce among the several States, or
> with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

By its terms, Section 1 imposes two requirements: first, the existence of an

agreement, combination, or trust (i.e. contract); and second, the finding that such a

contract, agreement, or combination restrain trade, meaning that it be anticompetitive. *See*

*State Oil v. Khan*, 522 U.S. 3, 10 (1997) (Section 1 outlaws those restraints on trade that

are unreasonable). While Section 2 of the Sherman Act reaches unlawful attempts or

actions by a *single* firm to monopolize a market, Section 1, by virtue of requiring a

combination, agreement, or contract, necessarily implies concerted effort involving at

8

least two actors. As the Supreme Court has explained, while Section 2 deals with unilateral conduct, "Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy' between separate entities. It does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

The hallmark of a Section 1 case, therefore, is the presence of an agreement between two parties. *See GTE New Media Srvcs., Inc. v. Ameritech Corp.*, 21 F.Supp.2d 27, 42 (D.D.C. 1998). It is equally clear, however, that the requirement of an agreement or combination between parties is met even if one of the parties entered into the agreement involuntarily and/or through coercion. *See Newberry v. Washington Post Co.*, 438 F. Supp 470, 475 n.6 (D.D.C. 1977) ("[T]he Sherman Act does not differentiate between contracts enforced by coercion and those maintained by agreement.").

While Section 1 prohibits agreements and combinations that restrain trade, it does not prohibit independent conduct by two or more actors that are aligned in interest and serves to achieve the same goals as if the two had actually entered into an agreement. This is so because the Sherman Act recognizes the general right (subject to a few exceptions) that a party may choose the terms under which it will deal with others. As such, *in United States v. Colgate & Co.*, 250 U.S. 300 (1919), the United States Supreme Court announced the principle that a supplier "may announce in advance the circumstances under which he will refuse to sell [to others]." *Id.* at 307. And, in keeping with that provision, the same supplier may refuse to deal or to continue dealing with dealers who do not meet the terms previously announced independently by the supplier. *Id.* So long as the supplier does no more than independently pre-announce the terms

under which he will deal with others and subsequently acts on that announcement, by either dealing or not dealing with those who meet or fail to meet its terms, *Colgate* holds that the supplier does not run afoul of Section 1.

The reason for *Colgate's* holding is straightforward. By independently pre-announcing the terms under which he will deal with others, the supplier is not entering into any contract or combination. His action is entirely unilateral, and therefore does not fall within the sweep of Section 1's prohibition on concerted conduct. By contrast, where the supplier seeks to enforce the terms under which he will deal by entering into actual restrictive agreements with its dealers, that act *does* amount to concerted conduct and does fall within the sweep of Section 1. *Id.* at 307-08 (contrasting its holding with the Court's previous condemnation of the conduct at issue in *Dr. Miles v. Park Sons & Co.*, because "[i]n Dr. Miles Medical Co. v. Park & Sons Co., the unlawful *combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell*.") (emphasis added).

The limited reach of the *Colgate* doctrine was underscored by Supreme Court decisions issued shortly after *Colgate. See Federal Trade Comm'n v. Beech-Nut Packing Co.*, 257 U.S. 441 (1922). For example, in *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707 (1944), the Court explained that:

> The *Beech-Nut* case recognizes that a simple refusal to sell to others who do not maintain the first seller's fixed resale prices is lawful but adds as to the Sherman Act, 'He (the seller) *may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.*'

*Id.* at 722 (emphasis added).

10

Ever since its announcement, therefore, an antitrust defendant's ability to invoke

the *Colgate* doctrine as a means of avoiding Section 1 liability has been understood to

turn on whether there is an allegation (and ultimately, proof) of an actual explicit or

implied agreement or contract between the parties. As one court has explained,

> The boundary separating the *Colgate* doctrine -the simple unilateral refusal
> to deal- from the non-simple unilateral refusal to deal is the presence of a
> 'contract, combination, or conspiracy:' that is, either an express, implied
> or tacit agreement among two or more parties, or an involuntary
> acquiescence to one party's trade restraining policy.

*Winter Hill Frozen Foods and Services, Inc. v. Haagen-Dazs Co., Inc.*, 691 F.Supp. 539,

544 (D. Mass. 1988), *citing* 2 Kintner *Federal Antitrust Law* sec. 10.22 at 137 (1980);

*see Albert H. Cayne Equipment Corp. v. Union Asbestos & Rubber Co.*, 220 F.Supp. 784,

787 (S.D.N.Y. 1963) ("The *Colgate* remnant may sanction simple refusals to deal *but*

*refusals to continue to deal unless the buyer join with the seller in a contract violative of*

*the antitrust laws are clearly illegal*.") (internal citations omitted, emphasis added).

Thus, following *Colgate*, a plaintiff satisfies the concerted action requirement for

imposing Section 1 liability "by proof of (1) an express or implied agreement, or (2) the

securing of actual adherence to prices by means beyond mere refusal to deal." *Yentsch v.*

*Texaco, Inc.*, 630 F.2d 46, 52 (2d Cir. 1980).

In assessing United's primary argument to dismiss Count I of the Complaint, the

pertinent question, therefore, becomes: has Dominguez sufficiently alleged facts from

which a fact-finder could conclude that the "no transfer or resale" rule was a product of

an agreement between United and its customers, as opposed to merely a unilateral pre-

announcement by United of the terms under which it will deal with others ? As we show

11

below, the answer to this question is assuredly in the affirmative, thereby dooming United's motion to dismiss this claim.

## 1. The Complaint Properly Alleges An Agreement.

Even a cursory review of the Complaint leaves no doubt that Dominguez has properly pleaded an actual contractual agreement between United and its customers under whose terms the customers agree not to transfer or resell their tickets. *See* Complaint, at ¶¶ 1, 2, 3, 9, 15-17, 19-23, 27, 30, 34, 38. United merely denies the notion that such a contractual agreement exists, and insists that the "no transfer or resale" rule is a mere product of United's independent decision-making. Dfts' Br. at 16-17. At this motion to dismiss stage, however, plaintiff's allegations of the existence of a contract must be taken as true, and as such United's self-serving assertions to the contrary must be rejected.

The Court, however, need not merely rely on Dominguez's allegations of the existence of a contract that incorporates the "no transfer or resale" restriction. As part of its motion to dismiss, United has now introduced as an exhibit the actual (and aptly titled) "Contract of Carriage" document that represents the actual agreement, or as its name indicates, "contract" between United and its customers. *See generally* Exhibit A to United's Mtn. to Dismiss. The plain text of that contract demonstrates that the "no transfer or resale" rule is encompassed within the agreement of the parties, i.e. within the Contract of Carriage. Specifically, the Contract provides that:

Tickets are not transferable but UA is not liable to the owner of the ticket for honoring or refunding such ticket when presented by another person.

Ex. A to United's Mtn. to Dismiss ("Contract of Carriage"), at p. 14, ¶ E.

12

United's inclusion of this "no transfer or resale" rule in its actual Contract of Carriage that it enters into with its purchasing customers necessarily means that United cannot rely on the *Colgate* doctrine to shield itself from Section 1 liability. The "no transfer" rule is a term of the contract that has been agreed upon by both parties, i.e. United and its purchasing customers, and as such, cannot possibly be said to be merely United's independent and unilateral pre-announcement of the terms under which it will deal with others. This much is made clear by the very first sentence in the Contract of Carriage, which provides that:

> Rules in this Tariff constitute the conditions upon which UA transports or agrees to transport, *and are expressly agreed to by the passenger* to the same extent as if such rules were included as conditions in the Contract of Carriage.

Ex. A to United's Mtn. to Dismiss, at 2, ¶ A (emphasis added).

That admission suffices to dispose of United's assertion of a *Colgate* defense. At the very least it suffices to defeat the motion to dismiss. The express language of the Contract of Carriage documents that the terms of the Contract of Carriage are not a mere declaration of United's policies, but are terms that "are expressly agreed to by the passenger." *Id.* Under any objective view, this is an agreement, contract, of combination under Section 1.

Review of the Contract of Carriage document as a whole, moreover, further belies United's suggestion that, though styled as a "Contract of Carriage," the document merely amounts to United's own pre-announced unilateral policies. To the contrary, the Contract of Carriage provides for rights and remedies to *both* parties. In this regard, it sets forth not only the terms under which United is to transport passengers, but also delineates

13

remedies available to the passenger who agrees to the terms of the Contract of Carriage. These include: compensation of up to $400 for an involuntary denied boarding compensation (*id.* at p. 38); ability to obtain a refund (*id.* at p. 33); and, the right to be quoted the lowest available fare by United's agents (*id.* at p. 20).

As a matter of law, far from being mere unilateral policy pronouncements, the terms of a Contract of Carriage are binding on both parties. *See Vogelsang v. Delta Air Lines, Inc.*, 302 F.2d 709, 712 (2d Cir. 1962); *Gluckman v. American Airlines*, 844 F. Supp 151, 160 (S.D.N.Y. 1994) ("The tariff constitutes the incorporated terms of the contract between passenger and airline, and if valid, conclusively and exclusively govern[s] the rights and liabilities between the parties.") (internal quotations omitted); *Mao v. Eastern Air Lines, Inc.*, 310 F. Supp. 844, 846 (S.D.N.Y. 1970) ("Moreover, limitations of liability in tariffs required to be filed by air carriers with the CAB *are binding on passengers and shippers* whether or not the limitations are embodied in the transportation documents.") (emphasis added); *see also Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 754 (Tex. 2003) ("When Black purchased the airline tickets, a binding contract of carriage was created between Black and Delta.").

That the terms of the Contract of Carriage serve to actually bind both the air carrier and the passenger further underscores that the *Colgate* doctrine is wholly inapplicable here. The law under *Colgate* is clear that while a mere unilateral pre-announcement by a supplier of the terms under which he will deal will not give rise to concerted action liability under Section 1, any attempt to bind his suppliers to those terms by way of contractual agreements takes the defendant's actions out of the refuge of *Colgate*. As the Sixth Circuit has succinctly explained:

14

> A review of *United States v. Colgate & Co.*, 250 U.S. 300 (1919) and its progeny . . . reflects that the Supreme Court in *Colgate* directed that a manufacturer is not guilty of a combination or conspiracy if he merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them . . .; *however, there is unlawful combination where a manufacturer enters into agreements-whether express or implied from a course of dealing or other circumstances-with all customers . . . which undertake to bind them.*

*Guzowski v. Hartman*, 969 F.2d 211, 214 n.2 (6th Cir. 1992) (internal quotations omitted,

emphasis added).

Here, both by its very language and by operation of law, United's Contract of

Carriage undertakes to actually bind both United and its customers to the terms of that

Contract, including the "no transfer or resale" restriction.[2] As such, this "no resale"

limitation is not sheltered by the *Colgate* doctrine, and United cannot rely upon *Colgate*

to shield itself from Section 1 liability.[3]

---

[2] United's reliance on *Toscano v. PGA*, 258 F.3d 978 (9th Cir. 2001) is misplaced. *Toscano* was decided on summary judgment, not on a motion to dismiss, and merely held that, under the facts of that case, the plaintiff did not adduce sufficient evidence of concerted action to defeat summary judgment. It did not hold that an allegation of a contract that binds two parties, as is alleged here, is insufficient at the pleadings stage to state a case for concerted action.

[3] Similarly, United's reliance on *Christensen v. American Airlines*, 967 F.2d 410 (10th Cir. 1992) is also misplaced. Like *Toscano*, *Christensen* was decided on summary judgment, not on the pleadings. *Id.* at 412. Only after reviewing the record evidence, the court found that "[n]o evidence in the record" suggested that American's imposition of a "no sale" rule for its frequent flier awards was not the product of its own independent announcement. *Id.* at 413-14. *Christensen* did not (and could not) hold that the existence of a binding Contract of Carriage to which both parties had agreed was insufficient to state concerted action within the meaning of Section 1. Indeed, *Christensen* did not even deal with a Contract of Carriage (which by operation of law is deemed to bind both the carrier and passenger), but dealt only with whether policies set forth in a carrier's frequent flier program application and contract amounted to unilateral decisions by the carrier as to how it would award its free tickets. *Id.* at 412-13. Tellingly, the Ninth Circuit has left open the question of whether a carrier's restriction barring the sale of its frequent flier awards could violate Sections 1 and 2 of the Sherman Act. *See Trans World Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 688-89 (9th Cir. 1990).

15

## 2.    In Any Event, United' Actions Go Beyond the Refusal To Deal Privilege Recognized In *Colgate*.

Aside from the foregoing, United's attempt to shoehorn its Contract of Carriage and the included "no transfer or resale" rule into the *Colgate* doctrine fails for an independent reason. As stated, under *Colgate*, a supplier is permitted to independently pre-announce ahead of time the terms under which the supplier will deal with others. If the supplier's customers do not abide by these terms then, under *Colgate*, the supplier's sole permissible remedy is to cut off those customers and cease future dealings with them.

But that is not at all what United's Contract of Carriage and the "no resale or transfer" rule entails. Neither the Complaint nor the Contract of Carriage state that if a ticket is resold by Customer X to Customer Y then United will discontinue selling tickets to Customer X in the future. Rather, as alleged in the Complaint, under the Contract of Carriage, the parties have agreed that United may dishonor the resold ticket in *Customer Y's* possession. *See* Complaint at ¶ 16 ("If the passenger resells or transfers his ticket, defendant United dishonors the ticket, and does not allow *the third-party purchaser* to travel on the resold or transferred ticket."). The Contract of Carriage does not cut off Customer X's right to continue dealing with United by purchasing its tickets in the future, even if Customer X has previously resold or attempted to resell his ticket to a third party.

That United enforces its "no transfer or resale" rule not by merely ceasing to deal with any would-be resellers, but by going after purchasers of such resellers, also takes its actions out of the ambit of *Colgate*. In *United States v. Parke, Davis & Co.*, 362 U.S. 29 (1960), the Supreme Court made clear that where a supplier goes beyond merely cutting off dealers who do not abide by the suppliers previously announced terms, and instead

16

resorts to enforce its terms by retaliating against third-parties down the distribution chain, the supplier can no longer seek shelter under *Colgate. Id.* at 44. Thus, courts have recognized that, "[i]n recent years the *Colgate* doctrine's protection has been narrowed. Today, the unilateral right to determine with whom one will transact business, is limited to the 'mere announcement of ... policy and the simple refusal to deal.'" *Balogh's of Coral Gables, Inc. v. Getz*, 510 F.Supp. 741, 744 (S.D.Fla., 1981), *quoting Parke, Davis & Co.*, 362 U.S. at 44.

By dishonoring the tickets of third parties who purchase tickets from resellers, United has gone beyond merely refusing to deal with those customers who resell its tickets. It has taken its enforcement of the "no transfer or resale" rule down the distribution chain to the customers of its own customers. For this independent reason, United's actions fall outside the limited dispensation of *Colgate*.

## B. United's "No Transfer Or Resale" Rule Is Properly Alleged To Be An Unlawful Restraint of Trade.

As an alternative argument, United maintains that even if its "no transfer or resale" restriction amounts to part of a concerted action, it still is not actionable under Section 1 because there is no allegation that that restriction is an agreement that restrains trade. *See* Dfts' Br. at 18. That contention can be disposed of summarily. In allegations that must be accepted as true at this motion to dismiss stage, the Complaint spells out precisely how United's contractual bar on the transfer or resale of its tickets is anticompetitive and restrains trade. *See* Complaint at ¶¶ 2, 18, 19-23, 35, 37.

17

## 1. Plaintiff Has Properly Alleged Foreclosure Of Competition Caused By The "No Transfer or Resale" Restraint, Thereby Alleging An Unreasonable Restraint of Trade.

The Complaint makes clear that United possesses over 80 percent market share in

the nonstop air travel market between the Washington and San Francisco Bay areas. *Id.*

at ¶ 13. By imposing a "no transfer or resale" restriction, United is able to assure itself

that only United will be able to set the prices at which United's tickets on these air routes

are ever sold. As the Complaint explains:

> In the absence of United's unlawfully imposed restriction, if a passenger paid $ 400 for a ticket from IAD to SFO, and subsequently found that he was unable to use the ticket, he would have been able to attempt to resell that ticket to a third party to recoup part or all of his original purchase price. In this manner, competition would be present between United Airlines and the secondary marketplace comprised of such passengers seeking to resell their tickets, and the presence of such a secondary marketplace would serve as price-constraining competition on United's ticket prices along this nonstop route. After all, no rational consumer would pay United $ 400 for a ticket between IAD and SFO if the same consumer could purchase the same ticket for the same route and dates for a lower price on a secondary marketplace such as eBay or the like from a customer who was reselling a ticket that he originally purchased from United. United's unlawful contractual restriction barring all resales and transfers, however, prevents this competition from ever taking place.

*Id.* at ¶ 2.

Similarly, the Complaint further alleges that:

> The effect of this contractual restriction is to insulate defendant United from competition from any secondary market sales of airline tickets for nonstop travel between these two destinations (i.e. to insulate it from any secondary market sales in the relevant market). Thus, consumers wishing to purchase domestic airline tickets for nonstop travel between the airports serving the metropolitan Washington, D.C. area and the San Francisco Bay area airports have no effective competitive choice but to purchase United tickets sold by United or its agents. . . . In the absence of United's unlawfully imposed contractual bar on the resale or transfer of tickets, consumers would be able to shop competitively for tickets for nonstop airline travel between these two destinations (in either direction) by

18

comparing the price for the tickets offered for sale by United and its agents against the price being demanded for such tickets by secondary market sellers (i.e. passengers who were reselling their tickets). United's contractual bar, however, has prevented and destroyed this price-competition and has forced consumers of domestic airlines tickets for nonstop travel between airports serving the metropolitan Washington, D.C. area and the San San Francisco Bay Area airports to pay supra-competitive prices for their airline tickets.

*Id.* at ¶ 17.

And, as if that were not enough, the Complaint again reiterates that:

In the absence of United's unlawful contractual prohibitions on ticket resales or transfers, consumers would be able to sell and purchase airline tickets for nonstop travel between these two destinations in an open secondary market at prices that would not be dictated or controlled by United. Thus, absent United's unlawful restrictions on resale or transfer of airline tickets, any willing seller would be able to sell his or her airline ticket to any willing buyer in an open marketplace, on the price terms negotiated by the open marketplace. United would, therefore, face competition from such secondary marketplace sales for its nonstop tickets between the metropolitan Washington, D.C. area and the San Francisco Bay Area airports, and would have to compete against the pricing prevailing in this secondary marketplace.

Thus, in the absence of United's unlawful contractual restrictions on resale or transfer of tickets, a consumer would not be limited to purchasing his airline tickets for nonstop travel between the airports serving the metropolitan Washington, D.C. area and the San Francisco Bay Area airports on only the price terms set by United. He would be able to comparison shop amongst all secondary sellers of such tickets for the best price, and United would also have to compete against such secondary sellers in making its own pricing decisions.

*Id.* at ¶¶ 20-21.

Whether or not Dominguez will be able to ultimately prove that prices would be reduced if United's "no transfer or resale" bar were lifted is a question of fact that is not subject to resolution at this motion to dismiss stage. But it is beyond dispute that Dominguez has alleged the requisite fact that United's contractual restriction barring

ticket resales has the effect of imposing supra-competitive prices on consumers like Domniguez and the putative class members. For this reason, United's self-serving conclusions asserting that lifting the no resale bar would act to inflate prices, or that Dominguez cannot demonstrate the resultant price in a market devoid of United's "no transfer or resale" restriction is unavailing.

## 2. United's Claim That Its Prohibition On Ticket Resale Is Per Se Lawful Is Inapplicable To An Alleged Monopolist Like United.

Similarly unavailing is United's claim its "no resale or transfer" rule that is embodied within its Contract of Carriage cannot be found to be an unreasonable restraint of trade because such a bar has been held to be lawful *per se*. United, however, mischaracterizes the authority on which it relies. For its proposition, United cites *Bitterman v. Louisville & Nashville R. Co.*, 207 U.S. 205, 221 (1907), *cited in* Dfts' Br. at 10. But *Bitterman* does not aid United's cause, and is readily distinguishable in one crucial respect. In *Bitterman*, it was stipulated that the defendant railroad had a 25 percent of the market. *See Bitterman*, 207 U.S. at 207 ("it was expected would necessitate the transportation by the railroads entering New Orleans of 100,000 visitors, *one fourth of which number would pass over the lines of railway of the complainant*.") (emphasis added). Thus, there was no possible assertion that the defendant railroad possessed monopoly market power. Absent an allegation of market power, no contractual restriction could be used as means of thwarting competition and raising prices because consumers would still have access to 75 percent of the remaining supply of the market if the *Bitterman* defendants sought to impose unduly restraining terms in their contract.

Here, by contrast, Dominguez has alleged that United is the monopolist carrier in the nonstop route between Washington and the San Francisco Bay area city pairs. This distinction is crucial because as this Court has recognized:

> As Justice Scalia wrote in *Eastman Kodak*, '[w]here a defendant maintains substantial market power, his activities are examined through a special lens: *Behavior that might otherwise not be of concern to the antitrust laws-or that might even be viewed as procompetitive-can take on exclusionary connotations when practiced by a monopolist.*'

*United States v. Microsoft*, 1998 WL 614485, at \*23 (D.D.C. Sept. 14, 1998), *quoting Eastman Kodak Co. v. Image Technical Srvcs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) (emphasis added). Tellingly, United cites no case in which an alleged monopolist was found to legally be permitted to restrict by agreement the resale terms of its product.

Because the Complaint properly alleges both an agreement or concerted action and that such an agreement restrains trade unlawfully, Plaintiff has satisfied the elements of a Section 1 claim. United's motion to dismiss this count of the Complaint must, therefore, be denied.

## II.   PLAINTIFF HAS PROPERLY ALLEGED A SECTION 2 CLAIM FOR MONOPOLIZATION.

Dominguez also alleged a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, for unlawful monopolization. That count alleges that United has monopoly market power in the nonstop Washington-San Francisco air travel market. *Id.* at ¶¶ 13, 42. It further asserts that by including a "no transfer or resale" rule within its Contract of Carriage, United is able to assure that all tickets on that travel route must be purchased

21

solely from United or its agents, thereby cementing United's monopoly. That is, as a result of its "no transfer or resale" rule, United prevents customers to erect a secondary market for United's tickets along this routing wherein market prices would be governed not solely by United, but by the competitive market forces.

## A.   United's Conduct Is Not Governed By *Trinko*, Which Is Inapplicable Here, But Is Instead Prohibited By The Supreme Court's Decision in *Lorain Journal*.

United's principal argument against Plaintiff's monopolization count is that it is shielded from Section 2 liability based on the Supreme Court's decision *in Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), *cited in* Dfts' Br. at 8-9. *Trinko* reiterates the general proposition that, subject to a few exceptions, even a monopolist has no duty to deal with its rivals. 540 U.S. at 407-08. Yet, this is not a case about United's duty to deal with its rivals. It is a case about the restrictions that United imposes upon its customers, and as such *Trinko* is wholly inapplicable.

To be more precise, no one suggests that United refuses to deal with its rivals or would-be rivals. There is no allegation that United has ceased selling tickets to any of its customers (even those that have resold its tickets). Rather, the Contract of Carriage and the Complaint make clear that United may or will dishonor a ticket presented by a passenger if that passenger purchased a ticket not from United or its agents, but from a reselling passenger. Complt, at ¶ 16. ("If the passenger resells or transfers his ticket, defendant United dishonors the ticket, and does not allow the third-party purchaser to travel on the resold or transferred ticket."). The pertinent question then becomes: may United, as an alleged monopolist, refuse to do business with customers who patronize

22

United's competitors (i.e. the reselling customers who resell United tickets in competition
with United) ? The United States Supreme Court addressed this precise question over
half a century ago in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), and
squarely held that an alleged monopolist may not impose such a restriction because to do
so would violate Section 2 of the Sherman Act.

In *Lorain Journal*, the defendant published a daily newspaper in Lorain, Ohio that
reached over 99 percent of the city's families. *Id.* at 146. As a result of this circulation,
the defendant publisher enjoyed a monopoly over the advertising services in the city of
Lorain. *Id.* at 147. In 1948, however, a radio station bearing the call sign WEOL was
licensed by the FCC to start broadcasting into Lorain, and as such posed a competitive
alternative to the Lorain Journal for the sale of advertisements disseminated in the city of
Lorain. *Id.* at 147-48. In order to deal with this competitive challenge, the defendant
responded by "refus[ing] to accept local advertisements in the Journal from any Lorain
County advertiser who advertised or who appellants believed to be about to advertise over
WEOL." *Id.* at 148. That is, the monopolist defendant refused to do business with any
customer who also patronized its competitor, WEOL. *Id.*

The Supreme Court had no trouble in affirming an injunction issued against the
publisher, finding that its imposed restrictions violated Section 2 of the Sherman Act. *Id.*
at 154. The Court explained that:

> [I]f all the newspapers in a city, in order to monopolize the dissemination
> of news and advertising by eliminating a competing radio station,
> conspired to accept no advertisements from anyone who advertised over
> that station, they would violate Sections 1 and 2 of the Sherman Act. It is
> consistent with that result to hold here that a single newspaper, already
> enjoying a substantial monopoly in its area, violates the 'attempt to

23

monopolize' clause of Section 2 when it uses its monopoly to destroy threatened competition.

*Id.* (internal citations omitted).

The Court went on to address the monopolist publisher's arguments, also invoked

by United here, that it had an absolute right to refuse to deal with whomever it chose. *Id.*

at 155. The Court rejected that absolute characterization, noting that a refusal to deal

whose purpose is to perpetuate a monopoly, such as is the case when a monopolist refuses

to deal with customers who patronize its competitors, is actionable under the Sherman

Act:

> The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisement from whomever it pleases. We do not dispute that general right. But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified. The right claimed by the publisher is neither absolute nor exempt from regulation. *Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act.* The operator of the radio station, equally with the publisher of the newspaper, is entitled to the protection of that Act. *In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

*Id.* (emphasis added) (internal citations and quotations omitted).

The same principle applies here and dooms United's argument. Like the

defendant publisher in *Lorain Journal*, United is an alleged monopolist in the pertinent

relevant market. Like the defendant in *Lorain Journal*, United is attempting to perpetuate

its monopoly by refusing to do business with customers who patronize its competitors

(i.e. resellers of United tickers). As such, United will not fly customers who purchased

their United tickets from a reselling customer, who United views as being a competitor.

24

This is precisely what *Lorain Journal* forbids. Under *Lorain Journal*, United cannot, as a means of preserving its monopoly, refuse to fly passengers who purchase their United tickets from a competing source other than United. Yet, that is precisely what United does in the nonstop Washington - San Francisco market by way of the "no resale or transfer" rule.

Tellingly, United's brief does not even cite once to *Lorain Journal*, much less discusses it. Because *Lorain Journal* bars United's conduct, or at the very least provides a means by which Plaintiff may state a monopolization claim against United, United's motion to dismiss this claim must also be denied.

## B. Even Assuming *Arguendo* That *Trinko* Were Applicable, It Does Not Bar Plaintiff's Monopolization Claim.

As shown, the Complaint does not assert a "refusal to deal" claim that is governed by *Trinko*. Even assuming *arguendo*, however, that Trinko could be read to somehow apply to this fact pattern, it would still not advance United's argument. In *Trinko*, the Supreme Court was called upon to analyze the interplay between the Sherman Act and the Telecommunications Act. *Trinko*, 540 U.S. at 401. To jump-start competition in the telecommunications arena, Congress passed the Telecommunications Act of 1996 ("Telco Act"). *Id.* at 402. The Telco Act required incumbent telephone carriers to provide competing local exchange carriers access to its network and network elements, and set forth a detailed array of access requirements that incumbent carriers were statutorily required to provide to its competitors. *Id.* at 402-03. When Verizon, the incumbent carrier in New York failed to meet some of these Telco Act access obligations, a customer of AT&T, Verizon's competitor, sued Verizon under the Sherman Act, claiming

that by failing to live up to its Telco Act obligations to competitors like AT&T to offer access to its network elements, Verizon thwarted competition and monopolized the local telephone market in New York. *Id.* at 404-05.

The Court rejected the claim. It held that Verizon's duty to provide competitors like AT&T with access to network elements like loops and Operations Support Systems arose, not from the Sherman Act, but solely from the Telco Act. *Id.* at 410. As such, the failure to deal with AT&T under those circumstances, while possibly violating the Telco Act, did not, without more, give rise to a Sherman Act violation. There was simply no duty imposed by the Sherman Act requiring Verizon to deal with its competitor.

While so holding, however, the Court, citing to its prior holding in *Aspen Skiing Co .v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), did acknowledge that there were circumstances where the antitrust laws would forbid a monopolist from refusing to deal with its rivals. *Trinko,* 540 U.S. at 408-10. Central to the Court's holding that no such duty existed in *Trinko* was the fact that the product or service that Verizon was alleged to have failed to deliver to its competitor, AT&T, i.e. network loops and Operations Support Systems, was not a product or service that Verizon made available at retail to its own customers. As the Court explained:

> The sharing obligation imposed by the 1996 Act created "something brand new"-"the wholesale market for leasing network elements." The unbundled elements offered pursuant to § 251(c)(3) exist only deep within the bowels of Verizon; they are brought out on compulsion of the 1996 Act and *offered not to consumers but to rivals*, and at considerable expense and effort.

*Trinko,* 540 U.S. at 410.

26

Under these circumstances, Verizon could plainly not be liable under Section 2 of

the Act. The Court contrasted its decision in *Trinko* with the different fact pattern at issue

in *Aspen Skiing*, where the Court did find that the monopolist defendant's failure to sell

ski lift tickets to its competing ski mountain operator amounted to a Section 2 violation.

*Aspen Skiing*, 474 U.S. at 608.

The *Trinko* Court described and distinguished the *Aspen Skiing* facts as follows:

> The Aspen ski area consisted of four mountain areas. The defendant, who
> owned three of those areas, and the plaintiff, who owned the fourth, had
> cooperated for years in the issuance of a joint, multiple-day, all-area ski
> ticket. After repeatedly demanding an increased share of the proceeds, the
> defendant canceled the joint ticket. The plaintiff, concerned that skiers
> would bypass its mountain without some joint offering, tried a variety of
> increasingly desperate measures to re-create the joint ticket, *even to the
> point of in effect offering to buy the defendant's tickets at retail price.*
> *Aspen Skiing*, 474 U.S. at 593-594. *The defendant refused even that.* We
> upheld a jury verdict for the plaintiff, reasoning that '*[t]he jury may well
> have concluded that [the defendant] elected to forgo these short-run
> benefits because it was more interested in reducing competition ... over the
> long run by harming its smaller competitor.*' *Id.*, at 608.

*Trinko*, 540 U.S. at 408-09 (emphasis added).

Underscoring why a refusal to deal was found to violate Section 2 in *Aspen Skiing*

and not in *Trinko*, the Court explained that while the network elements allegedly denied

AT&T by Verizon in *Trinko* were never even offered by Verizon at retail to any of its

customers, in *Aspen Skiing*:

> The unilateral termination of a voluntary (and thus presumably profitable)
> course of dealing suggested a willingness to forsake short-term profits to
> achieve an anticompetitive end. Similarly, the defendant's unwillingness to
> renew the ticket *even if compensated at retail price* revealed a distinctly
> anticompetitive bent.

*Trinko*, 540 U.S. at 409 (italics in original, underlining added).

27

The Court, thus explained that:

> The contrast between the cases is heightened by the difference in pricing behavior. In *Aspen Skiing*, the defendant *turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher*. Verizon's reluctance to interconnect at the cost-based rate of compensation available under § 251(c)(3) tells us nothing about dreams of monopoly.

*Id.* at 409 (emphasis added).

Application of the Supreme Court's holdings and distinctions in *Trinko* and *Aspen Skiing* shows precisely why United's argument is fatally flawed, even under its recasting of the complaint. Specifically, United reads *Trinko* as holding that it is entitled to sell tickets to customers at the retail price set by United, but is entitled to discontinue selling its tickets to those customers, even if they are willing to pay United's retail price charged to al other similarly situated consumers, if those customers elect to compete with United by reselling their tickets. This is exactly what *Trinko* holds is *not* necessarily permitted. As *Trinko* explained in distinguishing *Aspen Skiing*, when a monopolist rebuffs an existing customer's offer to continue doing business with the monopolist by so much as refusing to accept to sell the goods to that customer at the retail price charged by the monopolist to all its other customers, a jury may be allowed to infer that "the defendant *turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher*." *Trinko*, 540 U.S. at 409.

Because *Trinko* is inapplicable to Plaintiff's monopolization claim, and in any event, even if applied to these facts, does not prohibit the claim, United's motion to dismiss Count II of the Complaint must also be denied.

## C.    United's Alternative Argument That Its "No Transfer" Rule Is Justified By A Legitimate Business Justification Is Unavailing At This Motion to Dismiss Stage.

United's alternative argument in support of its motion to dismiss Dominguez's

monopolization claim is that its "no transfer or resale" rule is motivated by legitimate

business interests or justifications. Specifically, United cites to three such purportedly

legitimate business interests that it claims the "no transfer or resale" is aimed at

furthering. These include: conforming its rules to those of its rivals because it claims that

"the only other competitors in the relevant market – JetBlue and Southwest - both

prohibit ticket resale" (Dfts' Br. at 14-15)[4]; furthering United's duties to comply with

federal security regulations (*id.* at 12-14)[5]; and, aiding United' business interest in

offering discounted restricted tickets.[6] *Id.* at 10-12.

---

[4] In fact, this is not accurate. While United's Contract of Carriage contains an absolute bar on any transfer of tickets, Southwest's practice is different. Its Contract of Carriage provides that, ""[*t*]*ickets are not transferable unless specified thereon*." *See* Dfts' Br. at 15, n.7 (*quoting* Southwest's Contract of Carriage) (italics in original, underlining added). Unlike United's absolute bar, Southwest's Contract of Carriage suggests that while some of its tickets may be non-transferable, others do not bear this restriction.

[5] As alleged in the complaint, "[n]o government regulation, statute, or rule requires the imposition of this [no transfer] contractual bar," (Complt., at ¶ 4), and United does not deny as much. Further, the existing government regulations do not even require that a customer show identification, as a passenger may instead agree to subject himself to selectee secondary screening in lieu of providing identification. *See Gilmore v. Gonzales*, 435 F.3d 1125, 1133 (9th Cir. 2006) ("The [TSA] Security Directive imposes an obligation by requiring airline passengers to present identification *or* be a 'selectee.'") (emphasis added); *id.* at 1135 ("They [airline personnel] told him that in order to board the aircraft, he must *either* present identification *or* be subject to a 'selectee' search.") (emphasis added).

[6] Lifting United's "no transfer or resale" rule would not prevent United from imposing any restrictions of its choosing on customers wishing to obtain restricted or discounted pricing from United. It would only impact what prices reselling customers may be able to charge third parties, but United cites no authority for the proposition that it has the right to control the price of these subsequent sales.

29

United's reliance on these supposedly legitimate business interests to justify its "no transfer or resale" rule fails because it is black letter law that an antitrust defendant's supposed legitimate business justification defense is a factually based issue that cannot be resolved on a motion to dismiss. *See High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("Whether valid business reasons motivated a monopolist's conduct is a question of fact."); *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988) ("The fact determination that may be left to a jury is whether the defendant has a legitimate business reason for its refusal."); *LePage's Inc. v. 3M*, 199 WL 346223, at *5 (E.D. Pa. May 14, 1999) ("The existence of a legitimate business reason is ordinarily a question of fact."); *Servicetrends, Inc. v. Siemens Medical Sys., Inc.*, 870 F. Supp 1042, 1057 n.8 (N.D. Ga. 1994) ("Although legitimate business reasons can serve as a defense for a monopolist's exclusionary acts and refusal to deal, whether valid business reasons motivated a monopolist's conduct is a question of fact.") (internal citations omitted).

Because, as a matter of law, United's purported business justifications for its monopolizing conduct raise factual questions that cannot be resolved on a motion to dismiss, United's reliance on these asserted justifications to dismiss Count II of the complaint must be rejected.

## III. UNITED'S ATTACK ON PLAINTIFF'S STANDING IS MERITLESS.

Aside from its attacks specific to each of the counts of Plaintiff's Complaint, United makes a throw-away argument, claiming that Dominguez lacks antitrust standing to bring any of his claims because he is not the proper antitrust plaintiff. Dfts' Br. at 21-

30

23. In this regard, United argues that more immediate plaintiffs than Dominguez (who purchased his ticket directly from United) include customers who would have purchased their tickets from reselling customers absent the "no transfer or resale" rule (i.e. indirect purchasers). *See* Dfts' Br. at 23, n.9. The law is precisely opposite.

As this Court has explained, "[i]n *Illinois Brick*, the Supreme Court held that the 'overcharged direct purchaser, and not others in the chain of manufacture or distribution' is the proper plaintiff in an action for damages under federal antitrust laws. " *In re Nifedipine Antitrust Litig.*, 335 F. Supp.2d 6, 13 (D.D.C. 2004) (Leon, J.), *quoting Illinois Brick Co. v. Illinois*, 431 U.S. 720, 727-28 (1977). The Complaint alleges that Dominguez purchased a ticket in the relevant market directly from United. *See* Complt., at ¶ 9. It also alleges that, as a result of United's anticompetitive conduct in barring resales of its tickets along the nonstop Washington - San Francisco Bay area route, Dominguez was forced to pay supra-competitive prices for his ticket. *Id.* at ¶ 22. These allegations suffice to confer antitrust standing on Dominguez as the overcharged direct purchaser. *In re Nifedipine Antitrust Litig.*, 335 F. Supp.2d at 13; *see Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003)("Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44-45 (1st Cir. 1995) ("The presumptively proper plaintiff is a customer who obtains services in the threatened market"); *accord Associated General Data Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and . . . [to] protect [ ] the economic freedom of participants in the relevant market.").

Equally unavailing is United's claim that Dominguez was not injured because he does not allege that he, personally, ever attempted to buy or resell a United ticket. Dfts' Br. at 22. The gravamen of the Complaint is not that any particular customer was unable to resell or buy a particular United ticket. Rather, the crux of the Complaint is that by enacting a blanket prohibition on the transfer or resale of tickets as part of its Contract of Carriage, United has prevented a secondary market from emerging, and as such has managed to charge more for its own ticket sales then it would have charged its own customers had it had to compete against sales from this secondary market. See Complt. at ¶ 2 ("In this manner, competition would be present between United Airlines and the secondary marketplace comprised of such passengers seeking to resell their tickets, and the presence of such a secondary marketplace would serve as price-constraining competition on United's ticket prices along this nonstop route."). Thus, it is alleged that all passengers, even those who would have bought there ticket directly from United, were injured because all paid inflated prices as a result of the stifling of competition. In this regard, the Complaint specifically alleges that:

Each consumer-passenger of United in the relevant markets alleged herein has been forced to pay supra-competitive prices for his or her airline purchase from United. Absent United's anticompetitive conduct described herein, United would have faced competition for its ticket sales from the secondary marketplace, and would no longer be able to demand monopoly prices for the tickets it or its agents sell for travel within the relevant market alleged herein in which United is alleged to possess monopoly market power. Put simply, if a consumer were free to purchase his airline ticket not only from United or its agents, but also from any willing seller on such secondary marketplaces as eBay and the like, United's pricing power would be constrained and checked by such secondary marketplaces. By thwarting and destroying such secondary marketplaces for the relevant market alleged herein, United has been able to charge supra-competitive prices for its airline ticket sales within the relevant market, and has thereby caused Plaintiff and the class members to sustain antitrust injury.

*Id.* at ¶ 22.

Thus, whether or not a customer resold, or would have resold his United ticket absent United's contractual bar is irrelevant to the question of injury. By thwarting competition through this contractual bar, United has assured that all customers, even those who would have continued purchasing tickets solely from United overpaid for their purchases. *See In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 82-83 (S.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001) (classwide injury to all consumers alleged even if some class members would have continued dealing solely with defendants absent the contractual restriction because all consumers were overcharged as a result of the defendants' contract in restraint of trade); *see also Eisen v. Carlisle & Jacqueline*, 391 F.2d 555, 562 (2d Cir. 1968), *vacated on other grounds* 417 U.S. 156 (1974) ("Defendants have argued that . . . other class members may be satisfied with the present price policy. Nonetheless, all members of the class, including those who would otherwise prefer to abide by the status quo, will be helped if the rates are found to be excessive.").

## IV.   PLAINTIFF STATES A VALID UNJUST ENRICHMENT CLAIM.

Dominguez alleges a valid claim under the doctrine of unjust enrichment. United attacks this claim on the basis that it is preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 419713(b)(1). *See* Dfts' Br. at 24. United also argues that Dominguez may not allege an unjust enrichment claim because his other two counts allege the presence of a valid contract. *Id.* at 26. Both of these arguments fail.

### A.   United's ADA Preemption Argument Fails.

The ADA provides, in pertinent part, that: "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation,

33

or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 419713(b)(1). By its terms, therefore, the ADA preempts any state law affecting related to the price or service of an air carrier. The ADA, however, does not displace any other applicable federal law that may relate to air transportation.

Count III of the Complaint asserts an unjust enrichment claim under the common law. Just because a common law claim is asserted, however, does not mean that this common law claim is governed by state law as opposed to federal common law. Federal common law, as opposed to state law, is not displaced by the ADA. In fact, courts that have considered the issue have held that federal common law, as opposed to any particular state's common law, govern an airline's contractual or quasi-contractual obligations. *Gluckman*, 844 F. Supp at 160 ("Federal common law governs the validity of an air carrier's limitation of its liability."); *Wells v. American Airlines*, 1991 WL 79396, at *3 (S.D.N.Y. May 9, 1991) (same); *see also Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir. 1987) (applying federal common law to adjudicate airline carrier's liability to passenger); *First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1115 (3d Cir. 1984) (holding that federal common law rather than Pennsylvania law applied to adjudicate airline carrier's liability). Further, courts have repeatedly recognized the existence of a federal common law of unjust enrichment. *See Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir. 1990) ("[W]e nonetheless conclude that fashioning a federal common law rule of unjust enrichment is appropriate in the circumstances of this case."); *Airco Indus. Gases v. Teamsters Health and Welfare Pension Fund*, 618 F. Supp 943, 950 (D. Del. 1985) ("[P]laintiff does have a right of action under the federal common law for unjust enrichment.").

Because Plaintiff's unjust enrichment claim may be governed by federal, as opposed to state common law, and because the federal common law is not displaced by the ADA, United's preemption argument fails.

## B. Plaintiff Can Plead An Unjust Enrichment Claim As In the Alternative To His Antitrust Claims That Allege A Contract.

United's final argument is that Dominguez cannot recover in quasi-contract for unjust enrichment, on the one hand, while at the same time alleging the existence of a legal contract as part of his antitrust claims. Dfts' Br. at 26. United's argument is misplaced for two reasons. First, under Federal Rule of Civil Procedure 8(e)(2), Plaintiff is allowed to plead alternative causes of action, even if the alternative claims are inconsistent with one another. *See* Fed. R. Civ. P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency."). Second, United's argument is ill-founded because, if Dominguez actually proves that United violated the antitrust laws, then any contract that Dominguez had with United would, *a fortiorari*, be rendered void, as antitrust violations represent a criminal offense. *See* 15 U.S.C §§ 1 and 2 (violation of either section is a felony). Any impediment to a party to a *valid* contract recovering under an unjust enrichment quasi-contract theory would, therefore, necessarily be removed.

There is, therefore, no bar to Plaintiff pleading an alternative unjust enrichment claim.

## CONCLUSION

For all of the foregoing reasons, United's motion to dismiss Plaintiff's Complaint should be DENIED.

Dated: May 11, 2007

Respectfully submitted,


_____/s/_____
Roy A. Katriel, Esq. (D.C. Bar No. 460840)
THE KATRIEL LAW FIRM
1101 30th Street, NW  Suite 500
Washington, DC 20007
Telephone: (202) 625-4342
Facsimile:  (202) 330-5593

Counsel for Plaintiff


Additional Counsel for Plaintiffs
Gary B. Friedman, Esq. (*pro hac vice* application to be filed)
Tracey Kitzman, Esq.
Friedman Law Group, L.L.P..
270 Lafayette Street, 14th Floor
New York, NY 10012
Telephone: (212) 680-5150

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

RICHARD DOMINGUEZ, ON BEHALF )
OF HIMSELF AND ALL OTHERS )
SIMILARLY SITUATED, )
                        )    **Civil Action No. 07-cv-418**
          Plaintiff, )
      v. )
                        )
UAL CORPORATION, )
                        )
and )
                        )
UNITED AIRLINES, INC. )
                        )
          Defendants. )
_____ )

## [PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE CLASS ACTION COMPLAINT

This matter came before the Court on defendants' UAL Corporation and United

Air Lines, Inc's motion to dismiss the complaint. Upon consideration of the motion and

memoranda in support and opposition thereto, as well as the arguments of counsel,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss The Class

Action Complaint is hereby DENIED;

IT IS FURTHER ORDERED that Defendants shall file and serve their Answer to

the Class Action Complaint no later than ten (10) days from the date of this Order.

### IT IS SO ORDERED.

Dated: _____, 2007

                                  _____

                                  Hon. Richard J. Leon
                                  United States District Judge

## PARTIES TO BE NOTIFIED

Roy A. Katriel
The Katriel Law Firm
1101 30th Street, N.W. Suite 500
Washington, DC 20007
*Counsel for Plaintiff*

Gary B. Friedman (pro hac vice application to be filed)
Friedman Law Group, L.L.P.
270 Lafayette Street, 14th Floor
New York, NY 10012
*Co-counsel for Plaintiff*

Richard J. Favretto
John Roberti
Mayer, Brown, Rowe and Maw, L.LP.
1909 K Street, N.W.
Washington, DC 20006
*Counsel for Defendants*