UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP 2 9 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| RICHARD DOMINGUEZ, on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>UAL CORPORATION,<br><br>and<br><br>UNITED AIR LINES, INC.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Case No. 07-0418 (RJL)<br>      **FILED UNDER SEAL** |

MEMORANDUM OPINION
(September 28, 2010) [#49, 50, 51, 52, 53, 69]

Richard Dominguez, the plaintiff in this purported class-action antitrust suit

("plaintiff" or "Dominguez"), challenges United's prohibition on ticket resale or transfer,

which is incorporated into every domestic ticket United sells. Specifically, plaintiff

challenges this restriction as it applies to tickets for air travel between the Washington,

D.C. and San Francisco Bay metropolitan areas.[1] Dominguez alleges that this restriction

---

[1] The Washington, D.C. area airports are Dulles International Airport ("IAD"), Reagan International Airport ("DCA"), and Baltimore-Washington International Airport ("BWI"). The San Francisco Bay area airports are San Francisco International Airport ("SFO"), Oakland International Airport ("OAK"), and San Jose International Airport ("SJC"). The route between the Washington, D.C. and San Francisco Bay metropolitan areas will be referred to as the "Washington, D.C. to San Francisco route," regardless of direction of travel.

violates both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as the

common law prohibition on unjust enrichment.

Now before the Court are the defendants' Motion for Summary Judgment [#49],

the plaintiff's Motion for Partial Summary Judgment [#69], the plaintiff's Motion for

Class Certification [#53], and four motions to strike or exclude expert testimony [#50, 51,

52, 69].  After careful consideration of the pleadings, the relevant case law, and the entire

record, summary judgment is GRANTED for the defendants and DENIED for the

plaintiff, and the motion for class certification as well as the motions to strike or exclude

expert testimony are DENIED as moot.[2]

## BACKGROUND

### 1. The Parties

On April 18, 2006, Dominguez purchased a ticket with United Airlines for three

flights. Defs.' Stmt of Mat. Facts ("Defs.' Stmt") ¶3.  On June 27, 2006, he flew nonstop

on United from Dulles International Airport in the Washington, D.C. area, to Oakland

International Airport, in the San Francisco Bay area. *Id.*  Plaintiff had hoped to fly into

San Francisco International Airport instead of Oakland, but because the rest of his family

used frequent flier miles to book their trip, and because the frequent flier award tickets

routed his family into Oakland, Dominguez chose to fly into Oakland to be with his

family. *Id.* ¶6.  On July 3, 2006, he flew nonstop on United from San Francisco

International Airport to Seattle-Tacoma International Airport. *Id.* ¶4.  On July 8, 2006,

---

[2] No opposition to United's Motion to Exclude the Testimony of Mr. Novak Niketic
[#50] was ever filed, but this motion is denied as moot instead of being granted as
conceded because the issue is moot.

he flew nonstop on United from Seattle back to Dulles. *Id.* ¶5. He paid $633.03 for his itinerary, exclusive of taxes. *Id.* ¶8. Plaintiff's only other flight on the Washington, D.C. to San Francisco route during the alleged class period was on Virgin America. *Id.* ¶12.

UAL Corporation is a holding company whose primary subsidiary is United Airlines, Inc. Compl. ¶10. United Airlines is one of the country's largest domestic and international airline carriers. *Id.* The defendants refer to themselves collectively as "United." Defs.' Mot. Summ. J. ("Defs.' Mot.") 1 n.1. On February 1, 2006, United emerged from Chapter 11 bankruptcy. Compl. ¶10. The proposed class period begins the next day, on February 2, 2006.

SFO became a hub airport for United in 1983; IAD became a hub airport for United in 1985. Defs.' Ex. 20. The parties have stipulated that from February 2, 2006 to April 14, 2008, United's share of nonstop airline travel on the Washington, D.C. to San Francisco route was 80 percent. Defs.' Ex. 4, ¶1.

## 2. The Relevant Market and United's Ticketing Practices and Policies

United has conceded for the purposes of its summary judgment motion that the relevant market is the market for non-stop air travel on the Washington, D.C. to San Francisco route, and that it has monopoly power in this market.[3] Defs.' Mot. 1 n.2.

---

[3] These concessions, however, are made only for the purposes of United's summary judgment motion. They remain disputed: for example, United's expert claims that United's share of origin-destination passengers (i.e., passengers not connecting in Washington, D.C. or San Francisco) on the relevant route is only 37 percent and that this figure is a more accurate representation of United's market share. Defs.' Ex. 8, ¶28. These disputes are why, among other reasons, the plaintiff's motion for partial summary judgment must be denied.

United has many different fare classes and types. *See* Defs.' Ex. 11, Decl. of Valerie Havens ¶2. Within each cabin of service (first, business, economy), there are a variety of fare classes and sub-classes that are based on certain restrictions, such as advance-purchase, minimum stay, or penalty-free refund. *Id.* ¶3-4. A full-fare economy ticket has fewer restrictions than a discount economy ticket. *Id.* ¶4. Possible restrictions include, for example, advance purchase requirements, a minimum stay, or non-refundability. *Id.*

United implements an inventory strategy that allocates seats on the airplane among the various fare types. *Id.* ¶5. Seats within a fare type are sold on a first-come, first-serve basis, until such seats are no longer available. *Id.* Offering discounted, but restricted, fares is common practice in the airline industry. Defs.' Ex. 9. The various restrictions, including advance-purchase, Saturday-night stay, and penalty-free refunds, help airlines distinguish between business travelers and leisure travelers, who each have different travel requirements. *Id.*

United sells only non-transferrable tickets. Its Contract of Carriage sets forth the conditions of carriage and is incorporated by reference into each domestic ticket sold by United. Defs.' Stmt ¶28; Defs.' Ex. 4, ¶11. United considers a ticket to be a contract between the airline and the passenger, in which United agrees to provide air transportation on the specific dates and flights, and the passenger agrees to the conditions of contract. Pl.'s Ex. 8. One of those conditions is that the ticket cannot be transferred. Defs.' Stmt ¶ 29. The pertinent portion of the Contract of Carriage provides as follows:

> No person shall be entitled to transportation except upon presentation of a valid ticket. . . . Tickets are not transferable, but UA [United Airlines] is not liable to the owner of a ticket for honoring or refunding such ticket when presented by another person.
>
> The purchaser of a UA ticket and the passenger intending to use such ticket are responsible for ensuring that the ticket accurately states the passenger's name.  Presentation of a ticket for transportation on UA by someone other than the passenger named thereon renders the ticket void.  Such ticket will be subject to confiscation and will [be] ineligible for any refund.

Defs.' Ex. 4, ¶10.  This is the restriction being challenged by Dominguez.

United maintains that it sets this policy independently of other air carriers.  Defs.' Stmt ¶31.  Plaintiff has not alleged that United has conspired with any other airlines in creating this condition.  *See generally*, Compl.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper where the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing same).  The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  A party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c).  In doing so, the opposing party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing

a genuine issue for trial." Fed. R. Civ. P. 56(e).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Though the Court must draw all justifiable inferences in favor of the non-moving party in deciding whether there is a disputed issue of material fact, "[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

**B. Section 1 Claim[4]**

Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  Though the language of the statute is broad, "the courts have long interpreted this language to prohibit only *concerted* activity which *unreasonably* restrains trade." *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1485 (D.C. Cir. 1984) (citations omitted) (emphasis added); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).  To that end, a plaintiff making a Section 1 claim must prove existence of (1) an agreement, that (2) unreasonably restrains trade.

---

[4] United also contends that Dominguez lacks standing.  Though the Court recognizes that Dominguez's claims of injury are indeed speculative, it is difficult to distinguish whether that is because he lacks standing or whether he has failed to demonstrate a violation of the antitrust laws.  However, because the Court has concluded as a matter of law that no antitrust violation has occurred, there is no need to address standing.

Because Section 1 protects against *concerted* action—either by competitors (horizontal) or by parties in a distribution chain (vertical)—"[i]ndependent action is not proscribed." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Thus, an agreement for Section 1 purposes must evince a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764 (citation omitted); *see also* 7 Phillip E. Areeda et al., Antitrust Law ¶1438c, at 10-12 (2d ed. 2003) (hereinafter Areeda et al.).

Though an agreement may be found to exist between a buyer and a seller, courts have distinguished such instances (which are subject to antitrust scrutiny) from mere contracts of sale (which are not) by looking to elements of coercion or "secur[ing] adherence . . . beyond [the seller's] mere declination to sell to a customer who will not observe his announced policy." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43 (1960); *see also United States v. Microsoft*, 253 F.3d 34, 87 (D.C. Cir. 2001) (per curiam) (recognizing that Supreme Court's "core concern" with tying "is that tying prevents goods from competing directly for consumer choice on their merits, *i.e.*, being selected as a result of buyers' independent judgment.") (quotation omitted); *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1142 (10th Cir. 1997) ("a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by the seller.").

By contrast, a unilateral refusal to deal, without more, does not satisfy the concerted action requirement of Section 1. *United States v. Colgate*, 250 U.S. 300, 307 (1919); *see also Monsanto*, 465 U.S. at 761. Thus, a contract of sale resulting from such

7

a declination is insufficient to constitute an agreement subject to antitrust scrutiny.  *See,*

*e.g.*, *Toscano v. Professional Golfers' Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (finding

contracts between local sponsors and the PGA Tour, where the local sponsors "merely

accepted the PGA Tour's rules and regulations and played no role in creating or

enforcing them," did not constitute an agreement under Section 1).  To hold otherwise

would be "tantamount to eliminating the agreement requirement altogether," as nearly all

firms engaged in buying and selling "are the parties to *some* agreement."  7 Areeda et al.

¶1437b, at 4, 3 (2d ed. 2003).

For example, in a similar context, the Tenth Circuit has found that the frequent

flier miles program contract between American Airlines and its passengers, which

included a "no-sale" restriction, did not constitute an agreement under Section 1 because

there was "[n]o evidence in the record [to] suggest[] that American did not independently

set the terms under which it would offer its travel awards."  *Am. Airlines v. Christensen*,

967 F.2d 410, 413-14 (10th Cir. 1992).  "The mere fact that its members accepted those

terms [did] not generate the kind of concerted action needed to violate Section 1."  *Id.* at

414.

Here, Dominguez alleges that the ticket between United and the passenger, which

incorporates the contract of carriage prohibiting resale, is an agreement within the

meaning of Section 1.[5]  Pl.'s Opp'n 34-35.  But in doing so, he stretches the language of

---

[5] Dominguez cites two cases for the proposition that the ticket forming the contract
between him and United is sufficient to constitute an agreement under Section 1.  Pl.'s
Opp'n 36 (citing *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997);
*United States v. Am. Linen Supply Co.*, 141 F. Supp. 105, 114-15 (N.D. Ill. 1956)).  Yet,

the law beyond its meaning.  It is undisputed that United independently set the terms of

its Contract of Carriage, and that United did nothing to actively acquire Dominguez's

acquiescence to its terms.  It is also undisputed that the ticket is a valid, enforceable

contract that binds both parties.  Defs.' Reply 20; *Am. Airlines, Inc. v. Wolens*, 513 U.S.

219, 228-29 (1995).  But Section 1 requires something more for a *contract* to constitute

an *agreement*, and plaintiff's literal reading of the Sherman Act ignores decades of

judicial interpretations of the statute that delineate those requirements.  Thus, because

plaintiff has not met his burden in proving the existence of an agreement, I need not even

analyze whether the agreement unreasonably restrains trade.  Summary judgment must be

granted for the defendants.

### C.  Section 2 Claim

Dominguez also charges United with unlawful maintenance of monopoly power

through "adher[ence] to the contractual bar on ticket resale, which allows United to exact

supra-competitive prices for airline travel in the relevant market routes."  Pl.'s Opp'n 9.

Unlike Section 1, which requires an agreement, Section 2 covers unilateral

anticompetitive activity.  It provides that: "Every person who shall monopolize, or

---

both are distinguishable on their facts.  *American Linen Supply* involved vertical
contracts between a manufacturer and its distributors that prohibited the distributors from
competing for customers.  141 F. Supp. at 115 (describing contracts between seller and
distributors as "horizontal agreement to allocate customers" that was "effectuated through
the instrumentality of . . . the common seller.").  *Systemcare* dealt with a tying
arrangement that forced customers purchasing software support services to also purchase
hardware support services.  117 F.3d at 1139.  As discussed above, both of those
agreements involve an element of coercion beyond a mere unilateral refusal to deal
absent acceptance to an announced policy.

attempt to monopolize . . . any part of the trade or commerce among the several States, or

with foreign nations, shall be deemed guilty of a felony . . ." 15 U.S.C. § 2.  Acquisition

of monopoly power is not necessarily unlawful; instead, "[a] firm violates § 2 only when

it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in

exclusionary conduct 'as distinguished from growth or development as a consequence of

superior product, business acumen, or historic accident.'"  *Microsoft*, 253 F.3d at 58

(quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).

     As discussed above, United has conceded monopoly power for the purposes of its

summary judgment motion.  Defs.' Mot. 1 n.2; Pl.'s Opp'n 8-9.  However,

> [t]he mere possession of monopoly power, and the
> concomitant charging of monopoly prices, is not only not
> unlawful; it is an important element of the free-market
> system.  The opportunity to charge monopoly prices—at least
> for a short period—is what attracts "business acumen" in the
> first place; it induces risk taking that produces innovation and
> economic growth.  To safeguard the incentive to innovate, the
> possession of monopoly power will not be found unlawful
> unless it is accompanied by an element of anticompetitive
> *conduct*.

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407

(2004); *see also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243,

252 (D.C. Cir. 1987) ("[A]n excessive price alone does not establish a violation of the

antitrust laws, because imposition of a high price is not, in and of itself, an

anticompetitive act."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274-75

n.12 (2d Cir. 1979) (a monopolist is not "ordinarily precluded from charging as high a

price for its product as the market will accept. . . . [H]igh prices, far from damaging

competition, invite new competitors into the monopolized market.") (citations omitted).

Accordingly, a Section 2 offense also requires evidence of exclusionary conduct.

*Trinko*, 540 U.S. at 407.  "[T]o be condemned as exclusionary, a monopolist's act must

have an 'anticompetitive effect.'  That is, it must harm the competitive *process* and

thereby harm consumers."  *Microsoft*, 253 F.3d at 58.  The plaintiff bears the burden of

"demonstrat[ing] that the monopolist's conduct has the requisite anticompetitive effect."

*Id.* at 58-59 (citations omitted).  However, as one commentator has noted, though the

"'anticompetitive conduct' requirement—also called 'exclusionary conduct,'

'deliberateness,' or 'willfulness'—has long been a part of Section 2 jurisprudence[,]

[d]efining the contours of this element [] has been one of the most vexing questions in

antitrust law."  1 ABA Section of Antitrust Law, Antitrust Law Developments 241

(Jonathan M. Jacobson et al., eds., 6th ed. 2007).  Indeed, our Circuit Court has warned

that "[t]he challenge for an antitrust court lies in stating a general rule for distinguishing

between exclusionary acts, which reduce social welfare, and competitive acts, which

increase it."  *Microsoft*, 253 F.3d at 58.

While those caveats may apply where there are more credible allegations of

antitrust violations, here, there is no question that the conduct claimed to be

"exclusionary" by the plaintiff is not so.  Dominguez argues that United's conduct is

anticompetitive because it allows United to price discriminate, and because it prevents a

secondary market for tickets from forming.  Essentially, his argument is that if United

lifts the ban on resale of its tickets, a secondary market will emerge sufficient to exert

11

downward price pressure on United's sale of tickets in the primary market and erode United's ability to price discriminate. I disagree.

## 1. Effect on Prices

Dominguez challenges United's no-resale provision as anticompetitive because it prevents arbitrage, thereby facilitating price discrimination. However, as discussed above, the charging of high prices (even monopoly prices) is not in and of itself unlawful because it is not exclusionary—in fact, high prices encourage new entrants to the market. Pricing is considered exclusionary when it is predatory—that is, when it is designed to drive out rivals—which requires a two-fold showing that: (1) the offending firm is pricing below cost; and (2) it has a dangerous probability of recouping those losses. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993). Dominguez does not allege that United's lowest prices are below cost; accordingly, its pricing cannot be characterized as predatory.

In fact, antitrust experts agree that price discrimination *enhances* competition by increasing output. *See, e.g.*, 2B Areeda et al. ¶ 517c1, at 156-57 (3d ed. 2007) (in markets with high fixed costs, "[f]ar from being a sign of market power, the lower price to the marginal customers is evidence of competition."); *see also R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper*, 462 F.3d 690, 695 (7th Cir. 2006) (Easterbrook, J.) ("So far as the Sherman Act is concerned, however, there's nothing wrong with price discrimination"); *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 783 (7th Cir. 1999) (Posner, J.) ("There is no general rule against the possession of market power or the use of price discrimination to exploit it"). Indeed, the experts in this

case have testified that United's pricing practices *increase* United's output.  Defs.' Reply

9.  Thus, there is no dispute that United's pricing practices are not anticompetitive.

### b. Effect on Intrabrand Competition

Dominguez also argues that United's resale prohibition is exclusionary because it

restrains intrabrand competition.  He relies heavily on *In re Northwest Airlines*, 208

F.R.D. 174 (E.D. Mich. 2002), a class-action suit claiming that several airlines' policy

prohibiting "hidden-city" ticketing violated Section 2 of the Sherman Act.[6]  The

defendant airlines each operated flights between their main or "hub" airports, as well as

between "spoke" airports via connecting flights through the hubs.  "Hidden-city"

ticketing referred to the practice "whereby a passenger who wishes to travel to or from

one of the [a]irlines' hub airports is able to obtain a cheaper fare by purchasing a 'spoke-

hub-spoke' ticket that encompasses the desired 'hub-spoke' route, and then simply

discarding the unused portion of the ticket."  *Id.* at 178.  The Section 2 claim alleged that

the prohibition against hidden-city ticketing "defeat[ed] a mechanism through which

consumers in the relevant city-pair markets could otherwise avoid the supra-competitive

'hub premiums' imposed."  *Id.* at 187.  The airlines argued that they were entitled to

summary judgment because the restrictions had only intrabrand effects and were

therefore not exclusionary.  *Id.* at 207.  The court denied summary judgment, finding that

even though the restraint only limited intrabrand competition, the plaintiffs had put forth

a sufficient showing that the "[a]irlines' dominant market shares and barriers to entry at

---

[6] The *Northwest Airlines* plaintiffs also brought a Section 1 claim; however, as
Dominguez only relies on the case to support his Section 2 claim, the discussion of the
case will be limited to its Section 2 analysis.

their hub airports leave them largely free to impose supracompetitive fares on their hub-spoke routes, without having to account for competitive pressures that otherwise would keep prices in check." *Id.* at 211.

As United points out in its reply, the *Northwest* court strays from the mainstream in holding that a Section 2 claim can be based on restraints on intrabrand competition, no doubt in part due to its principal reliance on a Section 1 case in its Section 2 analysis.[7] As Areeda et al. point out, Section 2 is not concerned with restraints on intrabrand competition because they are not exclusionary:

> [S]o-called "intrabrand" restraints, which include resale price
> maintenance and vertical nonprice restrictions, are generally
> irrelevant for Sherman Act § 2 purposes, because they do not
> impair the competitive opportunities of rivals. Nor should
> they ordinarily be considered "abuses" of the monopolist's
> power, for either they generally make distribution more
> efficient or indicate that the monopolist ill-served its own

---

[7] Moreover, the case is also distinguishable on its facts: in *Northwest*, the travel agents that were allegedly excluded from the market "sold 80% or more of Northwest's tickets." *Chase v. Northwest Airlines Corp.*, 49 F. Supp. 2d 553, 555 (E.D. Mich. 1999) (an earlier decision in the same case). The plaintiffs claimed that if the airlines' restriction against hidden-city ticketing were lifted, the travel agents would compete to publicize and sell hidden-city tickets at lower prices along the relevant city-pair routes. *In re Northwest Airlines*, 208 F.R.D. at 209. By contrast, Dominguez does not claim that any of United's tickets, let alone a significant portion of tickets, are sold by the allegedly excluded parties. United and Dominguez dispute whether a monopolist has a duty to deal with its rivals. In the wake of *Aspen Skiing* and *Trinko*, however, our Circuit has made clear that a viable antitrust claim based on a monopolist's refusal to deal can only exist where the plaintiff can show "either that the defendant had previously 'engaged in a course of dealing with its rivals or [that it] would ever have done so absent statutory compulsion." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 673 (D.C. Cir. 2005) (quoting *Trinko*, 540 U.S. at 409) (alteration in original). Here, unlike in *Northwest*, Dominguez has not claimed nor put forth evidence of United ever cooperating with secondary resellers to effect passenger name changes. Thus, even assuming that secondary resellers are competitors of United, its refusal to deal is not anticompetitive.

> interest in adopting them.  And the latter is not an adequate
> basis for action under Sherman Act § 2.

3B Areeda et al. ¶ 760b1, at 50 (3d ed. 2008).

Dominguez does not claim that United's prohibition of resale excludes competitors from the market.  Instead, he points only the exclusion of *resellers*, as opposed to actual *competitors*, or even, as in *Northwest*, of distributors.  Dominguez's own expert concedes that the plaintiff cannot identify any airline that has been impeded from competing in the market, or that the resale prohibition has resulted in any reduction in output in the relevant market.  Defs.' Exs. 7, 13.  Indeed, this case is particularly confounding because of the circular way in which the plaintiff has defined the allegedly relevant market.  By arguing that United's prohibition against resale of its own tickets is unlawful, plaintiff's argument, reduced to its essence, is that United has a monopoly for *passage on its own planes*, and by wielding that "power" to control pricing and distribution of the capacity of those flights United runs afoul of the antitrust laws.  This not only defies logic, but more importantly, cannot be the basis of an actionable antitrust claim.

Accordingly, because Dominguez has not put forth sufficient evidence demonstrating any exclusionary effect of United's resale prohibition on tickets, summary judgment on his Section 2 claim must be granted for United.

### D.  Unjust Enrichment

Finally, unjust enrichment is a remedy available at common law when there is no contract.  "The fundamental characteristic of unjust enrichment is 'that the defendant has

15

been unjustly enriched by receiving something . . . that properly belongs to the plaintiff[, thereby] forcing restoration to the plaintiff.'" *Rapaport v. U.S. Dep't of Treasury*, 59 F.3d 212, 217 (D.C. Cir. 1995) (quoting Dobbs, Law of Remedies § 4.1(2)).  United rightly points out, however, that (1) plaintiff has alleged the existence of a contract between United and its passengers, and moreover, that (2) there is no federal common law, citing the well-known case *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Both of these facts therefore require granting summary judgment for United on this claim.

### CONCLUSION

For the foregoing reasons, United's Motion for Summary Judgment [#49] is GRANTED, plaintiff's Motion for Partial Summary Judgment [#69] is DENIED; and plaintiff's Motion for Class Certification [#53], United's Motion to Exclude the Testimony of Mr. Novak Niketic [#50], United's Motion to Exclude Parts of Dr. Bruce Isaacson's Rebuttal Testimony [#51], United's Motion to Strike the Damages Calculations and Related Testimony of Dr. John Pisarkiewicz [#52], and plaintiff's Motion to Exclude the Testimony of Dr. Gary Dorman [#69] are DENIED as moot.  An appropriate Order will accompany this memorandum opinion.

RICHARD J. LEON
United States District Judge

16